Matthew D. McGill
  (*pro hac vice pending*)
Jacob T. Spencer
  (*pro hac vice pending*)
Jeremy M. Christiansen (SBN 15110)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone:  (202) 955-8500
Fax:  (202) 467-0539
Email:  MMcGill@gibsondunn.com
JSpencer@gibsondunn.com
JChristiansen@gibsondunn.com

Neil C. Weare (*pro hac vice pending*)
EQUALLY AMERICAN LEGAL DEFENSE
  & EDUCATION FUND
1300 Pennsylvania Avenue, N.W.,
  #190-413
Washington, D.C.  20004
Phone:  (202) 304-1202
Email:  NWeare@equallyamerican.org

Charles V. Ala'ilima
  (*pro hac vice pending*)
THE LAW OFFICES OF
  CHARLES V. ALA'ILIMA, PLLC
P.O. Box 1118
Nu'uuli, AS  96799
Phone:  (684) 699-6732
Email:  cvalaw@msn.com

*Attorneys for Plaintiffs John Fitisemanu, Pale Tuli, Rosavita Tuli, and Southern Utah Pacific Islander Coalition*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JOHN FITISEMANU; PALE TULI; ROSAVITA TULI; and SOUTHERN UTAH PACIFIC ISLANDER COALITION; <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA; U.S. DEPARTMENT OF STATE; REX W. TILLERSON, in his official capacity as Secretary of the U.S. Department of State; and CARL C. RISCH, in his official capacity as Assistant Secretary of State for Consular Affairs; <br><br> Defendants. | Case No. 1:18-cv-00036-EJF <br><br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF <br><br><br> Magistrate Judge Evelyn J. Furse |

Plaintiffs John Fitisemanu, Pale Tuli, Rosavita Tuli, and Southern Utah Pacific Islander Coalition allege as follows:

## PRELIMINARY STATEMENT

1.     One hundred and fifty years ago, at the end of a brutal and bloody civil war, this Nation ratified the Fourteenth Amendment to the United States Constitution.  We declared unequivocally that "All persons born . . . in the United States, and subject to the jurisdiction thereof, are citizens of the United States." U.S. Const. amend. XIV, § 1, cl. 1.  The essential purpose of this text was "to put this question of citizenship and the rights of citizens . . . beyond the legislative power[s]" of government.  *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967) (citation omitted).  No longer could the government deprive any person, born in this country and subject to its jurisdiction, of the right to citizenship from birth.

2.     Plaintiffs are Americans.  They are healthcare professionals, commercial recycling and trash collectors, and retail employees.  They pay their federal, state, and local taxes, and abide by federal, state, and local law.  They are vital and engaged members of their communities, churches, and neighborhood associations.  They contribute to the well-being of the State of Utah and of the United States.  Plaintiffs were also born in American Samoa—a territory of the United States that is "in the United States, and subject to the jurisdiction thereof," as that phrase has been properly understood for over one hundred years.  Because of the Citizenship Clause, Plaintiffs are citizens of the United States.

2

3.      Defendants United States, the U.S. Department of State, U.S. Secretary of State Rex W. Tillerson, and U.S. Assistant Secretary of State for Consular Affairs Carl C. Risch refuse to recognize Plaintiffs' citizenship.  In direct violation of the Constitution, Defendants maintain and perpetuate a caste system among those who were born in this Nation and subject to its jurisdiction. Defendants brand persons born in American Samoa—unlike those born in any other U.S. State or territory—as "non-citizen nationals."  *See* 8 U.S.C. § 1408; *see also* State Department's Foreign Affairs Manual ("FAM"), at 7 FAM § 1125.1(b)-(c).

4.      For Plaintiffs, like other Americans born in American Samoa, the Fourteenth Amendment's promise of equality has not been fulfilled.  They have been subjected to a stamp of inferior status that diminishes their standing in their communities and in our Nation as a whole.  This arbitrary and discriminatory constitutional indignity inflicts irreparable and continuing harm on Plaintiffs.

5.      It inflicts numerous other ongoing and irreparable injuries on Plaintiffs as well.  For instance:

      a.      Plaintiffs may not vote in federal, state, or local elections—they are subject to taxation without representation.

      b.      The U.S. passports of Mr. Fitisemanu and Ms. Tuli bear a badge of inferiority in the form of a disclaimer known as "Endorsement Code 09."  That disclaimer announces that "THE BEARER IS A UNITED

STATES NATIONAL AND NOT A UNITED STATES CITIZEN."
Exhibits A.1 & C.1.

  c. Plaintiffs face economic discrimination as a result of
Defendants branding them as "non-citizen nationals."  Numerous
employment opportunities are available only to U.S. citizens, including jobs
as police officers, firefighters, military officers, border patrol agents, foreign
service officers, or FBI special agents.  Plaintiffs have attempted to obtain
some of these positions, but were ineligible because of their status.

  d. Plaintiffs are confronted with unique obstacles in trying to
sponsor family members who are foreign nationals for immigration to the
United States.  The IR-5 Parent Visa, which would permit some of the
Plaintiffs to bring aging parents to live with them in Utah is unavailable to
"non-citizen nationals."  *See* INA § 201(b)(2)(A)(i) (codified at 8 U.S.C.
§ 1151(b)(2)(A)(i)).

 6. To vindicate the promise made a century and a half ago by the
Fourteenth Amendment, Plaintiffs seek a declaratory judgment that persons born in
American Samoa are citizens of the United States by virtue of the Citizenship
Clause, and that both 8 U.S.C. § 1408(1) and the State Department's policy and
practice of imprinting Endorsement Code 09 in Plaintiffs' passports are
unconstitutional.  Plaintiffs also seek an order enjoining the State Department from
imprinting Endorsement Code 09 in the passports of persons born in American
Samoa and requiring that it issue new passports to Plaintiffs that do not disclaim

their United States citizenship.  Granting that relief, and any other relief the Court deems appropriate, will ensure the full equality of Plaintiffs and all others born in American Samoa, acknowledging them as full participants in the American experiment—economically, politically, and socially.

## PARTIES

7.      Plaintiff John Fitisemanu was born in American Samoa in 1965.  He currently resides in Woods Cross, Utah.  Defendants do not recognize Mr. Fitisemanu as a citizen of the United States.  To the contrary, Defendants have issued a U.S. passport to Mr. Fitisemanu that is imprinted with Endorsement Code 09.  As a result of being labeled a "non-citizen national" by Defendants, Mr. Fitisemanu is denied the right to vote, despite being a taxpaying American. Mr. Fitisemanu thinks it is unjust that he does not enjoy the same rights as other Americans.  He is distressed when fellow Americans question his "choice" not to vote or assume that he is a foreigner.  Over the course of his career, Mr. Fitisemanu has been discouraged from applying for certain federal and state jobs that list U.S. citizenship as an eligibility requirement, diminishing his employment opportunities.

8.      Plaintiff Pale Tuli was born in American Samoa in 1993.  He currently resides in Kearns, Utah.  Defendants do not recognize Mr. Tuli as a citizen of the United States.  As a result of being deemed a "non-citizen national" by Defendants, Mr. Tuli is denied the right to vote, despite being a taxpaying American.  He has also faced discrimination with respect to employment

opportunities—he would like to become a police officer, but is ineligible as a "non-citizen national."

9.     Plaintiff Rosavita Tuli was born in American Samoa in 1985.  She currently resides in Kearns, Utah.  Defendants do not recognize Ms. Tuli as a citizen of the United States.  To the contrary, Defendants have issued a U.S. passport to Ms. Tuli that is imprinted with Endorsement Code 09.  Ms. Tuli is proud to carry a U.S. passport, but is insulted by the disclaimer labeling her a "non-citizen."  As a result of being labeled a "non-citizen national" by Defendants, Ms. Tuli is denied the right to vote, despite being a taxpaying American.

10.     Plaintiff Southern Utah Pacific Islander Coalition (the "Coalition") is a nonprofit corporation based in St. George, Utah, that advocates for greater empowerment of the Pacific Islander community in Southern Utah.  Many of its members are labeled as "non-citizen nationals" by Defendants.  Several times a year, the Coalition sponsors workshops to assist "non-citizen nationals" and other non-citizens in navigating the naturalization process.  The Coalition also works to increase voter registration and civic engagement in the Pacific Islander community. Its advocacy work focuses on issues such as access to health care, youth development, education, and cultural preservation.  Plaintiffs Fitisemanu, Pale Tuli, and Rosavita Tuli are members of the Coalition.  The Coalition derives its standing from the harms suffered by its members as described in the Complaint and is accordingly included as one of the "Plaintiffs" referred to throughout.

11.     Defendant United States exercises exclusive sovereignty over the U.S. territory of American Samoa and is a Defendant based on the actions and conduct of its agents, including the U.S. Department of State, the Secretary of State, and the Assistant Secretary of State for Consular Affairs.

12.     Defendant the U.S. Department of State is an executive department of the United States.  The State Department, through its Bureau of Consular Affairs, is responsible for the issuance of United States passports.

13.     Defendant Rex W. Tillerson is being sued in his official capacity as the Secretary of State.  By law, Secretary Tillerson or his designee is directly responsible for the execution and administration of the statutes and regulations governing the issuance of U.S. passports.  *See* 22 U.S.C. § 211A.  Secretary Tillerson "delegates this function to the Bureau of Consular Affairs."  7 FAM § 1311(e).

14.     Defendant Carl C. Risch is being sued in his official capacity as the Assistant Secretary of State for Consular Affairs.  In that capacity, Assistant Secretary Risch is responsible for the State Department's Bureau of Consular Affairs and the creation of policies and procedures relating to the issuance of passports.  *See* 1 FAM § 251.1(d).  Accordingly, he is Secretary Tillerson's designee as to the execution and administration of the statues and regulations governing the issuance of U.S. passports.

## JURISDICTION AND VENUE

15.     Because Plaintiffs' claims arise under the United States Constitution, this Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

16.     Sovereign immunity has been waived under 5 U.S.C. § 702.

17.     Venue is proper in this district under 28 U.S.C. § 1391(e).

## ALLEGATIONS

### I.     The Fourteenth Amendment's Citizenship Clause Makes All Those Born In The United States And Subject To Its Jurisdiction Citizens From Birth.

18.     The Fourteenth Amendment removes the power of government to determine which persons born in the United States are citizens and which are not; the text and history of the Citizenship Clause demonstrate that it applies in both states *and* territories of the United States.

19.     The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  U.S. Const. amend. XIV, § 1, cl. 1.

20.     Since the Founding, citizenship in the United States has been bestowed on persons by virtue of the location of their birth and their allegiance to the sovereign of that location.  This system of birthright citizenship is derived from an English common law doctrine known as *jus soli*—or "right of the soil."  The English doctrine provided that someone who was "born within a place where the

8

sovereign [wa]s at the time in full possession and exercise of his power" and at the time of birth "derive[d] protection from, and consequently owe[d] obedience or allegiance to the sovereign" was a subject of the sovereign.  *Inglis v. Trs. of Sailor's Snug Harbor*, 28 U.S. (3 Pet.) 99, 155 (1830) (opinion of Story, J.).  After the Revolutionary War, American courts recognized and adopted this doctrine, determining citizenship by a person's birthplace and "community of allegiance at the time of birth."  *Dawson's Lessee v. Godfrey*, 8 U.S. (4 Cranch) 321, 322–24 (1808); *see Kilham v. Ward*, 2 Mass. 236, 239 (1806) ("All persons . . . within the *United States* . . . became citizens of the established government.").

21.    For citizenship purposes, American courts did not differentiate between persons born within states and those born within territories.  *See*, *e.g.*, *Gardner v. Ward*, 2 Mass. 244 (1805) ("[A] man, born within the jurisdiction of the common law, is a citizen of the country wherein he is born."); *cf. Inglis*, 28 U.S. (3 Pet.) at 120 (majority opinion) ("It is universally admitted, both in the English courts and in those of our own country, that all persons born within the colonies of North America, while subject to the crown of Great Britain, were natural-born British subjects.").  The term "the United States" was long understood to "designate the whole, or any particular portion of the American empire . . . which is composed of States *and territories*."  *Loughborough v. Blake*, 18 U.S. (5 Wheat.) 317, 319 (1820) (Marshall, C.J.) (emphasis added).  "The [D]istrict of Columbia, *or the territory west of the Missouri*, is not less within the United States than Maryland or Pennsylvania."  *Id.* (emphasis added).  Those born

9

in the territories were, therefore, citizens of the United States by birth.  *See*, *e.g.*, *Picquet v. Swan*, 19 F. Cas. 609, 616 (C.C.D. Mass. 1828) (Story, J.) ("A citizen of one of our territories is a citizen of the United States.").

22.    In 1857, the Supreme Court abandoned the doctrine of birthright citizenship—for the first and only time—in order to exclude African Americans from the ranks of U.S. citizens.  *See Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857).  This decision precipitated the Civil War.  In the aftermath of that conflict, Congress introduced the Fourteenth Amendment to constitutionalize birthright citizenship and supersede *Dred Scott*.  *See McDonald v. City of Chicago*, 561 U.S. 742, 807–08 (2010) (Thomas, J., concurring) (The Fourteenth Amendment "unambiguously overruled this Court's contrary holding in *Dred Scott* that the Constitution did not recognize black Americans as citizens of the United States or their own State." (citation omitted)).

23.    During the Senate debate on the Fourteenth Amendment, Senator Jacob Howard introduced the text of the Citizenship Clause and expressed his belief that the Clause "settles the great question of citizenship and removes all doubt as to what persons are or are not citizens of the United States."  Cong. Globe, 39th Cong., 1st Sess. 2890 (1866).  According to Senator Howard, he and other proponents of the Citizenship Clause "desired to put this question of citizenship and the rights of citizens . . . beyond the legislative power."  *Id.* at 2896.

24.     During this same Senate debate, Senator Lyman Trumbull, Chairman of the Senate Judiciary Committee, explained that the Fourteenth Amendment's "second section [*i.e.*, the Apportionment Clause] refers to no persons except those in the States of the union; but the first section [*i.e.*, the Citizenship Clause] refers to persons everywhere, whether in the States or *in the Territories* or in the District of Columbia."  Cong. Globe, 39th Cong., 1st Sess. at 2894 (emphasis added).

25.     When the Fourteenth Amendment was ratified in 1868, U.S. territories constituted nearly half the land area of the United States.  With the recent acquisition of the Alaska territory in 1867, the territorial limits of American expansion remained uncertain.  *See* Eric T. L. Love, Race Over Empire:  Racism and U.S. Imperialism, 1865–1900, at 31–33 (2004).

26.     Less than five years after the Fourteenth Amendment was ratified, the Supreme Court recognized that the Citizenship Clause was adopted to "pu[t] at rest" the proposition that "[t]hose . . . who had been born and resided always in the District of Columbia *or in the Territories*, though *within the United States*, were not citizens."  *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 72–73 (1873) (emphasis added).

27.     In 1898, the Supreme Court declared that "[t]he [Fourteenth] [A]mendment, in clear words and in manifest intent, includes the children born, *within the territory* of the United States, . . . of whatever race or color, domiciled within the United States."  *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898) (emphasis added).  The Court also noted that "[t]he [F]ourteenth

11

[A]mendment . . . has conferred no authority upon [C]ongress to restrict the effect of birth, declared by the [C]onstitution to constitute a sufficient and complete right to citizenship."  *Id.* at 703.

## II.   American Samoa Has Been "In" And "Subject To The Jurisdiction" Of The United States For Over A Century, During Which Its Ties To The Rest Of The United States Have Only Strengthened.

28.     American Samoa's history and current status place it squarely "in the United States, and subject to the jurisdiction thereof," making persons born there U.S. citizens by birth.

29.     American Samoa comprises the eastern islands of an archipelago located southwest of Hawaii in the South Pacific.

30.     All those born in American Samoa owe "permanent allegiance" to the United States.  *E.g.*, 8 U.S.C. § 1101(21), (22).

31.     On April 17, 1900, the traditional leaders of the islands of Tutuila and Aunu'u voluntarily signed Deeds of Cession formally ceding sovereignty of their islands to the United States, *see* 48 U.S.C. § 1661, pursuant to the Tripartite Convention of 1899 among the United States, Great Britain, and Germany, *see* 31 Stat. 1878 (ratified Feb. 16, 1900).  Similar Deeds of Cession were signed by the traditional leaders of the Manu'a islands in 1904.  *See* 48 U.S.C. § 1661.  In 1925, federal law recognized the atoll of Swains Island as part of American Samoa.  *See* § 1662.

32.     Following the Deeds of Cession, the people of American Samoa believed that they had become citizens of the United States when the American flag was raised upon their territory.  When they learned that this was not recognized as being the case, they attempted to seek birthright citizenship through the legislative process.  In 1930, community leaders in American Samoa explained to the visiting U.S. American Samoan Commission that the American Samoan people "desire[d] citizenship."  Reuel S. Moore & Joseph R. Farrington, The American Samoan Commission's Visit to Samoa, September–October 1930, at 53 (1931).

33.     Over the past 117 years, American Samoa's ties to the rest of the United States have strengthened significantly as it has been integrated into the Nation's political, economic, and cultural identity.

34.     ***American Samoan Governance***.  The governance structure of American Samoa has become distinctly American in significant ways since it came under U.S. sovereignty.  During American Samoa's first 51 years as part of the United States, it was administered by the U.S. Navy, with limited self-governance. In 1951, authority was transferred to the Department of the Interior, which retains general administrative supervision to this day.  Beginning in 1967, the United States approved the Constitution of American Samoa, establishing a tripartite government with a popularly elected bicameral legislature, an appointed governor, and an independent judiciary appointed by the Secretary of the Interior.  A decade later, the United States provided for a popularly elected territorial governor.

13

Around the same time, the individual right to trial by jury was extended to criminal proceedings in American Samoa. *See King v. Andrus*, 452 F. Supp. 11 (D.D.C. 1977). And in 1978, Congress enacted legislation providing for a non-voting delegate to represent American Samoa in the U.S. House of Representatives.

35. ***Education***. When American Samoa first became a part of the United States, there was no formalized system of public education. Today, American Samoa has twenty-three primary schools, seven secondary schools, and an accredited community college in the public education system, with a curriculum reflecting U.S. educational standards, including instruction in English. *See, e.g.*, *Exec Order Adopts Common Core State Standards, ASDOE is Implementor*, SAMOA NEWS (Oct. 10, 2012), https://tinyurl.com/y9l3l3yt.

36. ***Connections with the Mainland***. In 1900, the only way to travel or communicate between American Samoa and the rest of the United States was by ship. Today, regular flights between American Samoa's capital of Pago Pago and Honolulu have furthered American Samoa's integration into the United States. Moreover, the internet and other technological advances allow instantaneous communication between American Samoa and the rest of the United States.

37. These connections have facilitated cultural, economic, and political exchanges in both directions. Natives of American Samoa include Congresswoman Tulsi Gabbard, playwright John Kneubuhl, actor Al Harrington, and Olympians Kaino Thomsen and Ching Wei. Also, American Samoa is appropriately nicknamed "Football Island." Any season of NFL football will

feature dozens of players from American Samoa—not to mention players of American Samoan descent, such as Marcus Mariota, Troy Polamalu, Junior Seau, and Jack "The Throwin' Samoan" Thompson. Utah's universities have produced NFL players such as Gabriel Reid, Shaun Nua, and Ifo Pili. By one estimate, a Samoan male is 56 times more likely to play in the NFL than an American who is not Samoan. *See* Leigh Steinberg, *How Can Tiny Samoa Dominate The NFL?*, FORBES (May 21, 2015), https://tinyurl.com/ybntbf8m. And hundreds of American Samoans play football at NCAA Division I universities across the country, including universities in Utah.

38.  ***Military Service***. American Samoans have served in the U.S. Armed Forces since the islands first became part of the United States. As early as July 1900, the Navy Commandant stationed in American Samoa was authorized to enlist 58 American Samoans as "Landsmen" in the U.S. Navy to form the Fita Fita Guard, which supported the U.S. Navy during the 51 years of naval administration. American Samoans have served the Nation during every war of the 20th and 21st centuries. Today, American Samoa's enlistment rate is among the highest in the Nation. Blue Chen-Fruean, *American Samoa Army Recruiting Station Again Ranked #1 Worldwide*, Pacific Islands Report (Jul. 17, 2017), https://tinyurl.com/y9p5fuw3. On a per-capita basis, American Samoa has had a casualty rate in Iraq and Afghanistan that is seven times the national average. Kirsten Scharnberg, *Where the U.S. Military is the Family Business*, Chicago Tribune (March 11, 2007), https://tinyurl.com/y9z7fq48.

39.     The U.S. Army's recruiting station in American Samoa is consistently ranked number one out of all of the Army's 885 recruiting stations.  Recruiters from other military branches also make regular recruiting visits.  Supporting these efforts, American Samoa's seven public high schools host U.S. Army Junior Reserve Officer Training Corp ("ROTC") programs, and the American Samoa Community College hosts a U.S. Army ROTC program.  The U.S. Military Academy, the U.S. Naval Academy, the U.S. Air Force Academy, and the U.S. Merchant Marine Academy each reserve space for two students from American Samoa to be appointed and enrolled.

40.     American Samoa is home to a multimillion-dollar U.S. Army Reserve Center named in honor of the late Sergeant First Class Konelio Pele, an American Samoan who was awarded a Silver Star during the Vietnam War for his heroic efforts saving the lives of fellow Americans.  American Samoa also supports a Community-Based Outpatient Clinic as part of the U.S. Department of Veterans Affairs Pacific Islands Health Care System.  The U.S. Coast Guard has a Marine Safety Detachment Unit based in American Samoa.

41.     ***Federal Government Presence on the Island***.  The federal government also has a strong civilian presence in American Samoa, with numerous federal agency offices in the territory.  Like other Americans, American Samoans participate in and benefit from many federal programs.  Congress has established the National Park of American Samoa as part of the National Park System.  Thirty locations in American Samoa are also listed on the National Register of Historic

16

Places, two of which—Government House and the World War II Blunts Point Battery—have received the official designation of National Historic Landmark. The National Marine Sanctuary of American Samoa, which includes Rose Atoll Marine National Monument, is the largest of the 13 sanctuaries in the National Marine Sanctuary System.

42.     ***Federal Government Actions Celebrating American Samoa***.  The United States has taken a number of actions celebrating American Samoa's contributions to the Nation.  For example, on April 17, 2000, the United States Postal Service issued a stamp commemorating the centennial of American Samoa becoming a part of the United States.  In 2008, the Postal Service released a stamp recognizing the flag of American Samoa as part of the "Flags of Our Nation" series honoring the flags of the 50 states, the five territories, and the District of Columbia. In July 2009, the United States Mint released the American Samoa Quarter as part of its D.C. & U.S. Territories Quarters Program, following the popular 50 State Quarters Program.  The Mint is also scheduled to release a quarter depicting the National Park of American Samoa in 2020 as part of its America the Beautiful Quarters Program.

43.     ***American Samoans in Utah***.  Many generations of American Samoans now live throughout the United States, including thousands of American Samoans living in the State of Utah.  Plaintiffs are among them and have built their lives here in Utah, substantially contributing to the well-being of the State.

a.      Plaintiff John Fitisemanu works in the healthcare industry, helping to ensure the health and well-being of those in his community.  His four adult children are all proud graduates of Utah public schools.  He is also an active member of his church, serving as a leader in church activities.

b.      Plaintiffs Pale and Rosavita Tuli are active church members, participating in their church choir and assisting with other church activities. They plan to have children, and look forward to raising their family in Utah.

c.      Plaintiff Southern Utah Pacific Islander Coalition makes significant contributions to the health, education, and well-being of the growing Pacific Islander community in and around St. George, Utah.  It has received recognition for its important work hosting community health fairs, assisting students from low-income families obtain scholarships and necessary school supplies, and promoting cultural activities.  It also helps enrich the lives of people in its community through public cultural performances and other activities that contribute to Utah's diversity.

III.    **Defendants' Actions Deprive American Samoans Of Equal Dignity Under The Law And Stigmatize Them As Second-Class Americans.**

44.     Despite the text and history of the Citizenship Clause of the Fourteenth Amendment, Defendants have refused to recognize that persons born in the U.S. territory of American Samoa are guaranteed U.S. citizenship by virtue of their birth within the United States.

45.    In direct contravention of the Constitution, Congress enacted Section 204(a) of the Nationality Act of 1940, which provided that persons born in American Samoa "shall be recognized as nationals, but not citizens, of the United States at birth."  This provision was reenacted in 1952 as INA § 308(1) and subsequently codified at 8 U.S.C. § 1408(1).  American Samoa stands alone as the only U.S. territory in which its residents are not recognized as citizens at birth.

46.    Under federal law, unless persons born in American Samoa obtain citizenship through parents who are already recognized as citizens, they can be recognized as U.S. citizens only through naturalization.

47.    Persons born in American Samoa are the only individuals whom Defendants classify as "non-citizen nationals."  This designation is an anomalous category that creates confusion and misunderstanding at the federal, state, and local level as well as internationally.

48.    Further, it is the State Department's policy and practice to imprint Endorsement Code 09 in the U.S. passports of persons born in American Samoa who are classified as "non-citizen nationals."  *See* 7 FAM § 1130 App'x H ¶ (c). Endorsement Code 09 states:  "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN."  *Id.*; *see* Exhibits A.1 & C.1.

49.    Collectively, these actions inflict various harms and injustices upon Plaintiffs, including:

19

## A.   Dignitary Harms.

50.   First and foremost among all harms Defendants impose on Plaintiffs is the indignity of denying them the title of "citizen," and branding them instead with the second-class label of "non-citizen national."  Plaintiffs suffer this indignity simply because they were born in an "outlying" territory of the United States, rather than in some other territory or in a State.

51.   In all their interactions with fellow Americans who were born anywhere else in the United States, Plaintiffs know that they alone are stigmatized as "non-citizen nationals."  Several Plaintiffs have experienced comments from others as a result of this stigmatizing label that make them feel as though they are not full and equal members of American society.

## B.   Civic Harms.

52.   Despite their desire to participate in self-governance alongside their fellow Americans, Plaintiffs are prevented from voting in federal, state, or local elections, cannot run for office, and are denied the ability to serve on a jury. Despite being taxpayers, Plaintiffs are unable to meaningfully participate in the civic life of the very governments they as Americans help fund.

53.   Because of their status as "non-citizen nationals," Plaintiffs may not vote under Utah law.  The Utah constitution specifies that "[n]o person shall be deemed a qualified voter . . . unless such person be a citizen of the United States." Utah Const. art. IV, § 5; *see also* Utah Code Ann. § 20A-2-101 (restricting voter registration to U.S. citizens).

20

54. Registering to vote would require Plaintiffs to "swear (or affirm), subject to penalty of law for false statements, . . . that [they are] citizen[s] of the United States." *See* State of Utah Mail-in Voter Registration Form (May 2015), https://tinyurl.com/y8kkdfya.  Because they are classified by Defendants as "non-citizen nationals," Plaintiffs could face criminal liability if they were to attempt to register to vote by invoking their birthright citizenship under the Fourteenth Amendment.  But for Defendant's unlawful branding of Plaintiffs, Plaintiffs would register to vote and would, like everyone else, participate freely in the democratic process that governs their lives.

55. Plaintiffs are also prohibited from serving in elective office.  The status of "non-citizen national" restricts Plaintiffs from seeking elective office in the highest levels of the federal government, *e.g.*, U.S. Const. art. I, § 2, cl. 2 (restricting eligibility for Congress to U.S. citizens), and prevents Plaintiffs from running for any elective office in Utah, *see* Utah Code Ann. § 20A-9-201(1).

56. Plaintiffs are also barred from serving on juries, both at the federal and state level.  28 U.S.C. § 1865(b)(1); Utah Code Ann. § 78B-1-105(1).  This denies Plaintiffs the ability to participate in one of the most important civic duties an American can perform.  Given the relatively large and concentrated American Samoan community in Utah, it also denies them of a jury of their peers should they ever be tried by a jury.

**C.    Employment and Economic Harms.**

57.    Defendants' classification of Plaintiffs as "non-citizen nationals" instead of as "citizens" also imposes economic harms on Plaintiffs.  Because of this classification, Plaintiffs are denied recognition as U.S. citizens by federal, state, and local governments, private employers, and other entities.  Plaintiffs are required to navigate a confusing patchwork of federal and state laws that often treat them less favorably than other citizens, and sometimes even less favorably than permanent resident aliens.  Laws that limit the civil, political, and economic liberties of "non-citizen nationals" affect Plaintiffs' choices, including decisions about where to live and what careers to pursue.

58.    State and federal laws also limit the employment opportunities of people bearing the mark of "non-citizen national."  At the federal level, citizenship is required for service as an officer in the U.S. Armed Forces and the U.S. Special Forces.  *See*, *e.g.*, 10 U.S.C. § 532(a) (restricting appointment as a commissioned officer to U.S. citizens).  Numerous federal agencies also limit certain career paths exclusively to U.S. citizens.  From Research Librarians at the Library of Congress to Park Rangers in the National Park Service, "non-citizen nationals" are disqualified or disadvantaged in the job pool because of this status.  Even the federal courts exclude "non-citizen nationals" from eligibility for many posted job opportunities, from probation officers to library technicians to Supreme Court fellows.

59.     Utah state laws similarly reserve numerous employment opportunities for U.S. citizens exclusively or give preference to U.S. citizens in hiring for them. *E.g.*, Utah Code Ann. § 17-18a-302 (district or county attorneys must be U.S. citizens); § 34-30-1 (U.S. citizens given preference for public works projects). These and other employment restrictions limit career opportunities for Plaintiffs. For example, Plaintiff Pale Tuli—who would like to pursue a career as a police officer—is statutorily disqualified from serving as one.  §§ 17-30-7(1), 53-6-203(1)(a).

60.     Further, pursuant to Utah law, applicants for state-based public benefits must certify under penalty of perjury that they are either a U.S. citizen or a qualified alien.  *See* Utah Code Ann. § 76-9-1008(1)(b).  A false statement of citizenship under this statute equates to "public assistance fraud" for the declarant, § 76-9-1008(2), and can subject the declarant to the penalties of perjury, § 76-9-1008(1)(c).  "Non-citizen nationals" are not encompassed within the statutory language, and thus persons born in American Samoa are statutorily restricted from receiving these benefits in Utah.

61.     Plaintiffs are also denied economic equality of opportunity in the private sector because of their anomalous status as "non-citizen nationals."  Many private-sector employers are reluctant to hire "non-citizen nationals."  These employers, unfamiliar with the status of "non-citizen nationals," choose U.S. citizens over otherwise qualified applicants with this status.  Plaintiffs are thus unable to compete on the same terms as their fellow Americans whose citizenship

is recognized by Defendants.  Plaintiff Rosavita Tuli, for example, has been denied

employment opportunities in the private sector on numerous occasions.  On at least

one occasion, when an employer learned of Ms. Tuli's status as a "non-citizen

national," it became obvious that she was no longer being considered as a viable

candidate for the position.  This limitation in employment opportunities has made

it more difficult for her to provide for her family.

### D.     Passport and Travel Restrictions.

62.     The anomalous and second-tier status of "non-citizen national" also

impacts Plaintiffs' fundamental right to travel, as well as their ability to care for

their family members living abroad.  Plaintiffs Fitisemanu and Rosavita Tuli

possess U.S. passports, but those passports carry the disclaimer known as

"Endorsement Code 09."  This stamp singles out the passport holder as inferior,

stating:  "THE BEARER IS A UNITED STATES NATIONAL AND NOT A

UNITED STATES CITIZEN."  Exhibits A.1 & C.1.

63.     As demonstrated by the State Department's Foreign Affairs Manual, it

is the State Department's policy that the Fourteenth Amendment's Citizenship

Clause does not apply to persons born in American Samoa.  *See* 7 FAM

§ 1125.1(b) ("[T]he citizenship provisions of the Constitution do not apply to

persons born there [*i.e.*, American Samoa].").

64.     It is also the State Department's policy to recognize only "non-citizen

U.S. nationality for the people born . . . in American Samoa."  7 FAM § 1125.1(d).

This policy relies upon INA § 308, which provides that persons born in American

Samoa "shall be nationals, but not citizens, of the United States at birth[.]"

8 U.S.C. § 1408; *see* 7 FAM § 1125.1(d)-(e).

65.     A U.S. passport is the only federal document for which a member of the general public may apply in order to obtain official federal recognition of U.S. citizenship by virtue of birth in the United States.

66.     U.S. passports may only be issued by the State Department.

67.     According to the State Department, "U.S. citizens and non-citizen U.S. nationals who have satisfactorily established their identity and U.S. citizenship/non-citizen U.S. nationality . . . are entitled to regular U.S. passports." 7 FAM § 1313(a).  "Nationals of the United States who are not citizens," however, are entitled only to "U.S. passports with appropriate endorsements."  § 1111(b)(1).

68.     "Non-citizen nationals" are unable to obtain a properly issued U.S. passport that is not imprinted with Endorsement Code 09 unless they successfully undertake the naturalization process.

69.     Persons born in American Samoa are the only individuals who are issued U.S. passports stating that they are *not* citizens of the United States.

70.     "Non-citizen nationals" who travel internationally must rely on U.S. passports that expressly state, via Endorsement Code 09, that they are not U.S. citizens.  Endorsement Code 09 creates uncertainty about how foreign officials will react when presented with an anomalous U.S. passport stating that the bearer is *not* a U.S. citizen.  Mr. Fitisemanu and Ms. Tuli, for instance, are deterred from exercising their right to travel abroad because their U.S. passport states that they

are not U.S. citizens, and they fear the confusion that Endorsement 09 might create for foreign officials.

71.    In some cases, Plaintiffs' status as "non-citizen nationals" creates special burdens.  For example, the Independent State of Samoa (an independent sovereign nation comprising the western islands of the archipelago that makes up the Samoan islands) requires that "non-citizen nationals" purchase a special visitor's permit that is not required for visiting U.S. citizens.

72.    Ms. Tuli, for example, faces these travel restrictions when attempting to enter Independent Samoa.  Both her parents are citizens of Independent Samoa and are advancing in age.  Because she is branded a "non-citizen national," she must obtain a travel permit and pay a special fee in order to visit her parents, which she would not be required to do if she were recognized as a U.S. citizen.  Ms. Tuli also limits her travel to other countries out of fear that she will be treated differently due to her status.

**E.    Immigration-Related Harms.**

73.    "Non-citizen nationals" are treated less favorably than citizens when it comes to "sponsoring" foreign-national relatives for immigration visas because "non-citizen nationals" are generally considered equivalent to "lawful permanent residents" for purposes of immigration preference.

74.    The U.S. Citizenship and Immigration Services ("USCIS") permits U.S. citizens to sponsor foreign national spouses, parents, and siblings to obtain an immigration visa, and there is no waiting requirement for a U.S. citizen's spouse or

parent after the immigration visa application has been approved.  In contrast, "non-citizen nationals" may only sponsor spouses, but not parents or siblings. Moreover, the spouses of "non-citizen nationals" cannot receive a visa, even after their immigration application has been approved, until they reach their immigration priority date.  According to the April 2018 Visa Bulletin, the current wait is more than two years.

75.     These restrictions have burdened Plaintiffs whose immediate family members are foreign nationals.  For example, Mr. Tuli is unable to sponsor his foreign national parents so that they may relocate to his home state of Utah.  His parents are aging and lack access to appropriate medical services and economic opportunities they would otherwise enjoy if Mr. Tuli could sponsor their relocation to Utah.  Because Mr. Tuli is deemed by statute a "non-citizen national," he cannot obtain an IR-5 Parent Visa for his parents.  Likewise, Ms. Tuli's ability to sponsor her foreign national family members is inhibited by Defendants' unconstitutional label.  She is prohibited from obtaining an IR-5 Parent Visa to sponsor her parents.

**F.     Naturalization Costs.**

76.     The lengthy, costly, and burdensome nature of the naturalization process prevents many "non-citizen nationals" from obtaining the status and corresponding rights of citizenship.  The naturalization process can take a year or more to complete, with no guarantee of success, as the ultimate citizenship determination is made on a case-by-case basis by a USCIS officer.

77.     Although persons born in American Samoa who are classified by Defendants as "non-citizen nationals" are Americans, they are treated the same as foreign nationals for most aspects of the naturalization process:

a.      "Non-citizen nationals" must first establish residency for a period of three months in a USCIS district before applying to naturalize. This is shorter than required for foreign nationals, but there are no districts in American Samoa.  So residents of American Samoa who wish to naturalize must bear the substantial costs and disruption of relocating to, and establishing residency in, another part of the United States before even being able to apply.  *See* 8 U.S.C. § 1436.

b.      "Non-citizen nationals," like foreign nationals, must take and pass the USCIS English and civics test, even though the public education curriculum in American Samoa is taught in English and reflects U.S. educational standards for English and language arts, American history, and American government.

c.      "Non-citizen nationals," like foreign nationals, must submit to fingerprinting and a determination of their good moral character, including an in-person interview.

d.      "Non-citizen nationals" must take the same Oath of Allegiance that is required of foreign nationals, which includes an affirmation that they "absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, of whom or which [they]

28

have heretofore been a subject or citizen." 8 C.F.R. § 1337.1. Yet by definition, all "non-citizen nationals" necessarily "owe[] permanent allegiance to the United States," 8 U.S.C. § 1101(a)(22), and many have already sworn an oath to defend the Constitution through military or other federal government service.

  e. "Non-citizen nationals" of the United States, like foreign nationals, must pay government fees currently totaling $725, in addition to any other expenses associated with the naturalization process.

**FIRST CLAIM FOR RELIEF**

**<u>Declaratory Judgment:</u>**
**<u>8 U.S.C. § 1408(1) Violates the Fourteenth Amendment</u>**

  78. Plaintiffs incorporate the preceding paragraphs by reference.

  79. The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born . . . in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

  80. Section 1408(1), Title 8, of the United States Code provides that "[a] person born in an outlying possession of the United States on or after the date of formal acquisition of such possession" "shall be [a] national[], but not [a] citizen[], of the United States at birth."

  81. By classifying persons born in American Samoa as nationals, but not citizens, of the United States, 8 U.S.C. § 1408(1) violates the Fourteenth Amendment, both on its face and as applied to Plaintiffs through the State

29

Department's policy and practice of imprinting Endorsement Code 09 in the passports issued to persons born in American Samoa.

82.    An actual controversy within this Court's jurisdiction exists as to the constitutionality of § 1408(1), and a declaratory judgment would settle the illegality of Defendants' actions and end that controversy.

83.    Plaintiffs therefore seek a declaration that 8 U.S.C. § 1408(1) violates the Fourteenth Amendment on its face and as applied to Plaintiffs.  *See* 28 U.S.C. §§  2201, 2202.

## SECOND CLAIM FOR RELIEF

### Injunctive Relief:
### 8 U.S.C. § 1408(1) Violates the Fourteenth Amendment

84.    Plaintiffs incorporate the preceding paragraphs by reference.

85.    By classifying persons born in American Samoa as nationals, but not citizens, of the United States, 8 U.S.C. § 1408(1) violates the Fourteenth Amendment, both on its face and as applied to Plaintiffs through the State Department's policy and practice of imprinting Endorsement Code 09 in the passports issued to persons born in American Samoa.

86.    This classification results in continued and irreparable harm to Plaintiffs for which there is no other adequate remedy at law.

87.    Plaintiffs seek an order enjoining Defendants from placing Endorsement Code 09 in the passports of persons born in American Samoa, and ordering Defendants to issue new passports to Plaintiffs that do not contain

Endorsement Code 09 and that do not otherwise disclaim that they are citizens of the United States.

## THIRD CLAIM FOR RELIEF

### Declaratory Judgment: The State Department's Policy and Practice of Refusing to Recognize the Birthright Citizenship of Persons Born in American Samoa Violates the Fourteenth Amendment

88.     Plaintiffs incorporate the preceding paragraphs by reference.

89.     By classifying persons born in American Samoa as nationals, but not citizens, of the United States, the State Department's policy that "the citizenship provisions of the Constitution do not apply to persons born [in American Samoa]," as reflected in 7 FAM § 1125.1(b) and (d), violates the Fourteenth Amendment, both on its face and as applied through the Department's policy and practice of imprinting Endorsement Code 09 in passports issued to persons born in American Samoa.

90.     An actual controversy within this Court's jurisdiction exists as to the constitutionality of the Department's policy, and a declaratory judgment would settle the illegality of Defendants' actions and end that controversy.

91.     Plaintiffs therefore seek entry of a judgment declaring that the State Department's policy, as reflected in 7 FAM § 1125.1(b) and (d), violates the Fourteenth Amendment on its face and as applied to Plaintiffs.  *See* 28 U.S.C. §§ 2201, 2202.

## FOURTH CLAIM FOR RELIEF

### Injunctive Relief: The State Department's Policy and Practice of Refusing to Recognize the Birthright Citizenship of Persons Born in American Samoa Violates the Fourteenth Amendment

92.     Plaintiffs incorporate the preceding paragraphs by reference.

93.     By classifying persons born in American Samoa as nationals, but not citizens, of the United States, the State Department's policy that "the citizenship provisions of the Constitution do not apply to persons born [in American Samoa]," as reflected in 7 FAM § 1125.1(b) and (d), violates the Fourteenth Amendment, both on its face and as applied through the Department's policy and practice of imprinting Endorsement Code 09 in passports issued to persons born in American Samoa.

94.     This classification results in continued and irreparable harm to Plaintiffs for which there is no other adequate remedy at law.

95.     Plaintiffs seek an order enjoining Defendants from placing Endorsement Code 09 in the passports of persons born in American Samoa, and ordering Defendants to issue new passports to Plaintiffs that do not contain Endorsement Code 09 and that do not otherwise disclaim that they are citizens of the United States.

## FIFTH CLAIM FOR RELIEF

### Administrative Procedure Act: The State Department's Practice of Placing Endorsement Code 09 in the Passports of Persons Born in American Samoa Violates the APA

96.     Plaintiffs incorporate the preceding paragraphs by reference.

97.     The State Department's policy and practice of imprinting Endorsement Code 09 in the passports of persons born in American Samoa, including Plaintiffs, is "contrary to constitutional right" and is "not in accordance with law."  5 U.S.C. § 706(2)(A), (B).

98.     Plaintiffs seek an order holding unlawful and setting aside Defendants' practice of imprinting Endorsement Code 09 in the passports of persons born in American Samoa as in violation of the Administrative Procedure Act, enjoining Defendants from placing Endorsement Code 09 in the passports of persons born in American Samoa, and ordering Defendants to issue new passports to Plaintiffs that do not contain Endorsement Code 09 and that do not otherwise disclaim that they are citizens of the United States.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare that persons born in American Samoa are born "in the United States and subject to the jurisdiction thereof" for purposes of the Fourteenth Amendment's Citizenship Clause and are therefore U.S. citizens by birth;

B.      Declare that 8 U.S.C. § 1408(1) violates the Fourteenth Amendment on its face and as applied to classify persons born in American Samoa as nationals, but not citizens, of the United States;

C.      Declare that the State Department's policy as reflected in 7 FAM § 1125.1(b) and (d) violates the Fourteenth Amendment on its face and as applied to classify persons born in American Samoa as nationals, but not citizens, of the United States;

D.      Declare that the State Department's policy and practice of imprinting Endorsement Code 09 in the passports of persons born in American Samoa violates the Administrative Procedure Act;

E.      Enter a permanent injunction preventing Defendants from taking any action to enforce 8 U.S.C. § 1408(1) or the State Department's policy as reflected in 7 FAM § 1125.1(b) and (d), including through Defendants' practice of imprinting Endorsement Code 09 in passports issued to persons born in American Samoa;

F.      Order Defendants to issue new passports to Plaintiffs that do not contain Endorsement Code 09 and that do not otherwise disclaim that they are citizens of the United States;

G.      Award such costs and reasonable attorneys' fees to which Plaintiffs might be entitled by law; and

H.      Award such other relief as this Court may deem just and appropriate.

Dated: March 27, 2018                          Respectfully submitted.


                                               s/ *Jeremy M. Christiansen*

Neil C. Weare (*pro hac vice pending*)         Matthew D. McGill
EQUALLY AMERICAN LEGAL DEFENSE &                 (*pro hac vice pending*)
  EDUCATION FUND                               Jacob T. Spencer
1300 Pennsylvania Avenue, N.W.,                  (*pro hac vice pending*)
  #190-413                                     Jeremy M. Christiansen (SBN 15110)
Washington, D.C.  20004                        GIBSON, DUNN & CRUTCHER LLP
Phone:  (202) 304-1202                         1050 Connecticut Avenue, N.W.
Email:  NWeare@equallyamerican.org             Washington, D.C.  20036
                                               Phone:  (202) 955-8500
Charles V. Ala'ilima                           Fax:  (202) 467-0539
  (*pro hac vice pending*)                     Email:  MMcGill@gibsondunn.com
THE LAW OFFICES OF                             JSpencer@gibsondunn.com
  CHARLES V. ALA'ILIMA, PLLC                   JChristiansen@gibsondunn.com
P.O. Box 1118
Nu'uuli, AS  96799
Phone:  (684) 699-6732
Email:  cvalaw@msn.com