Matthew D. McGill (*pro hac vice*)
Jacob T. Spencer (*pro hac vice*)
Jeremy M. Christiansen (SBN 15110)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone:  (202) 955-8500
Fax:  (202) 467-0539
Email:  MMcGill@gibsondunn.com
JSpencer@gibsondunn.com
JChristiansen@gibsondunn.com

Neil C. Weare (*pro hac vice*)
EQUALLY AMERICAN LEGAL DEFENSE
  & EDUCATION FUND
1300 Pennsylvania Avenue, N.W.,
  #190-413
Washington, D.C.  20004
Phone:  (202) 304-1202
Email:  NWeare@equallyamerican.org

Charles V. Ala'ilima (*pro hac vice*)
THE LAW OFFICES OF
  CHARLES V. ALA'ILIMA, PLLC
P.O. Box 1118
Nu'uuli, AS  96799
Phone:  (684) 699-6732
Email:  cvalaw@msn.com

*Attorneys for Plaintiffs John Fitisemanu, Pale Tuli, Rosavita Tuli, and Southern Utah Pacific Islander Coalition*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JOHN FITISEMANU; PALE TULI; ROSAVITA TULI; and SOUTHERN UTAH PACIFIC ISLANDER COALITION;<br><br>              Plaintiffs,<br><br>   v.<br><br>UNITED STATES OF AMERICA; U.S. DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity as Secretary of the U.S. Department of State; and CARL C. RISCH, in his official capacity as Assistant Secretary of State for Consular Affairs;<br><br>              Defendants. | Case No. 1:18-cv-00036-EJF<br><br>COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS / CROSS-MOTION FOR SUMMARY JUDGMENT<br><br>**HEARING REQUESTED**<br><br>Judge Clark Waddoups |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 3

I.    The Constitution's Text, Structure, And History Show That
      Plaintiffs Are Citizens By Birth. ............................................................ 4

      A.    The Fourteenth Amendment's Text And Constitutional
            Structure ..................................................................................... 4

      B.    Historical Evidence .................................................................... 8

II.   Supreme Court Precedent Confirms That Plaintiffs Are
      Citizens. .................................................................................................. 13

III.  This Court Should Not Rely On The *Insular Cases* To Deny
      Citizenship To Plaintiffs......................................................................... 18

      A.    *Downes v. Bidwell* Is Inapposite. ............................................ 18

      B.    Even If The *Insular Cases* Apply, Plaintiffs Are Entitled
            To Citizenship. .......................................................................... 23

IV.   The Government's Out-Of-Circuit Authorities Are Not Binding
      On This Court, Are Inapposite, And Are Erroneous............................... 27

V.    The Government's Policy Arguments Fall Short................................... 29

CONCLUSION ....................................................................................................... 32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**CASES**                                                                                     **Page(s)**

*Afroyim v. Rusk,*
    387 U.S. 253 (1967)...............................................................3, 11, 12, 13, 24, 30

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
    570 U.S. 1 (2013)............................................................................................2, 21

*Bonidy v. U.S. Postal Serv.,*
    790 F.3d 1121 (10th Cir. 2015) ........................................................................17

*Boumediene v. Bush,*
    553 U.S. 723 (2008)...........................................................................23, 25, 28

*Boyd v. Nebraska,*
    143 U.S. 135 (1892)..........................................................................................27

*Calero-Toledo v. Pearson Yacht Leasing Co.,*
    416 U.S. 663 (1974).........................................................................................23

*Calvin's Case,*
    7 Co. Rep. 1a, 77 Eng. Rep. 377 (1608)...........................................................10

*Craddick v. Territorial Registrar,*
    1 Am. Samoa 2d 11 (App. Div. 1980)...............................................................31

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)......................................................................................4, 16

*Downes v. Bidwell,*
    182 U.S. 244 (1901).........................................................7, 18, 19, 20, 21, 22

*Efron ex. rel. Efron v. United States,*
    1 F. Supp. 2d 1468 (S.D. Fla. 1998).................................................................32

*Elk v. Wilkins,*
    112 U.S. 94 (1884)...........................................................................13, 15, 17

*Examining Bd. of Eng'rs, Architects, & Surveyors v. Flores de Otero,*
    426 U.S. 572 (1976)..................................................................23, 25, 30, 31

# TABLE OF AUTHORITIES
### (*continued*)

CASES *(continued)*                                                      Page(s)

*Fedorenko v. United States*,
    449 U.S. 490 (1981) .................................................................................25

*Gonzales v. Williams*,
    192 U.S. 1 (1904) ............................................................................... 2, 22

*Inglis v. Trs. of Sailor's Snug Harbor*,
    28 U.S. (3 Pet.) 99 (1830) .......................................................................9

*Kennedy v. Mendoza- Martinez*,
    372 U.S. 144 (1963) ...................................................................24, 25, 26

*Lacap v. INS*,
    138 F.3d 518 (3d Cir. 1998) .................................................................27

*Loughborough v. Blake*,
    18 U.S. (5 Wheat.) 317 (1820) ...............................................................5

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) .................................................................3

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ...............................................................................26

*Medellin v. Texas*,
    552 U.S. 491 (2008) ...............................................................................32

*Miller v. Albright*,
    523 U.S. 420 (1998) ...............................................................................17

*Nolos v. Holder*,
    611 F.3d 279 (5th Cir. 2010) ................................................................27

*Perez v. Brownell*,
    356 U.S. 44 (1958) .................................................................................25

*Picquet v. Swan*,
    19 F. Cas. 609 (C.C.D. Mass. 1828) ......................................................9

## TABLE OF AUTHORITIES
(*continued*)

CASES *(continued)*                                                       Page(s)

*Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico,*
    478 U.S. 328 (1986) ....................................................................................23

*Puerto Rico v. Sanchez Valle,*
    136 S. Ct. 1863 (2016) ...............................................................................23

*Rabang v. Boyd,*
    353 U.S. 427 (1957) ....................................................................................27

*Rabang v. INS,*
    35 F.3d 1449 (9th Cir. 1994) ......................................................................27

*Reid v. Covert,*
    354 U.S. 1 (1957) ........................................................................................18

*Richardson v. Ramirez,*
    418 U.S. 24 (1974) ......................................................................................12

*Rogers v. Bellei,*
    401 U.S. 815 (1971) ....................................................................................17

*Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873) ........................13, 14, 15, 17

*Torres v. Puerto Rico,*
    442 U.S. 465 (1979) ....................................................................................23

*Trop v. Dulles,*
    356 U.S. 86 (1958) ......................................................................................24

*Trump v. Hawaii,*
    585 U.S. __, 2018 WL 3116337 (June 26, 2018) .............................................22

*Tuaua v. United States,*
    788 F.3d 300 (D.C. Cir. 2015) ..............................................7, 12, 24, 27, 29, 30

*United States v. Wong Kim Ark,*
    169 U.S. 649 (1898) ...........................................................................13, 16, 17

# TABLE OF AUTHORITIES
### (*continued*)

| CASES *(continued)* | Page(s) |
|---|---|

*Valmonte v. INS*,
  136 F.3d 914 (2d Cir. 1998) ...............................................................................27

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886)............................................................................................30

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
  566 U.S. 189 (2012)............................................................................................13

## CONSTITUTIONAL PROVISIONS

United States Constitution

  art. I, § 1 .............................................................................................................6

  art. I, § 2 .............................................................................................................6

  art. I, § 8, cl. 1 .........................................................................................2, 19, 20, 21

  art. I, § 8, cl. 17 .................................................................................................6

  art. IV, § 3, cl. 2 ...........................................................................................6, 10

  amend. V .............................................................................................................30

  amend. XIV, § .............................................................................................*passim*

  amend. XIV, § 2...........................................................................................5, 6, 7

  amend. XIV, § 5...................................................................................................13

## STATUTES

8 U.S.C. § 1408 .....................................................................................................3

Northwest Ordinance of 1787, § 14, art. 4 (July 13, 1787) .......................................6

Northwest Ordinance of 1789, Ch. 8, 1 Stat. 50 (1789) ...........................................6

Philippine Organic Act of 1902, ch. 1369, § 4, 32 Stat. 691 (1902) .......................28

# TABLE OF AUTHORITIES
### (*continued*)

**LEGISLATIVE HISTORY**                                                **Page(s)**

Cong. Globe, 39th Cong., 1st Sess. 2896 (1866)..............................................11, 12

**OTHER AUTHORITIES**

29 *The American and English Encyclopaedia of Law* (1904) ...................................5

Joseph E. Worcester, A Dictionary of the English Language (1878).......................5

Ltr. from J.B. Henderson to Hon. C.E. Littlefield (June 28, 1901),
   *reproduced in* Charles E. Littlefield, *The Insular Cases (II: Dred
   Scott v. Sandford)*, 15 Harv. L. Rev. 281 (1901) ...............................................11

William Rawle, *A View of the Constitution of the United States of
   America* (2d ed. 1829) ......................................................................................9

Willis Drummond, *Report of the Commissioner of the General Land
   Office* (GPO 1872)...........................................................................................11

**INTRODUCTION**

"This case presents a pure question of constitutional law."  Defs.' Mot. to Dismiss or Cross-Mot. for Summ. J. 1 ("Gov't Mot."), Dkt. 66.  "[T]here are no disputes over any material facts," and the government agrees that American Samoa is "subject to the jurisdiction" of the United States.  *Id.* at 10 & n.3.  The only question in this case is thus whether American Samoa is "in the United States" for purposes of the Fourteenth Amendment's Citizenship Clause.  Every source for determining the Clause's meaning—its text, structure, history, and Supreme Court precedent construing the Clause—leads to the same answer:  Yes.

The government makes no serious effort to show that any of the text, structure, history, or purpose of the Citizenship Clause dictates a different result. The government concedes that the Clause applies by its plain text to the District of Columbia and offers only tortured distinctions in an attempt to excise territories from the Clause's scope.  Notably, the government is unable to cite a single statement or case from the Reconstruction era supporting its narrow view that the Citizenship Clause applies only in States and the District of Columbia.  That is because, as Plaintiffs and expert *amici* have shown, all contemporaries of the Fourteenth Amendment believed that the Citizenship Clause encompassed the territories, that it incorporated the doctrine of *jus soli*, and that *jus soli* applied to *all* the physical territory of the sovereign.  And all three Supreme Court majority opinions interpreting the Citizenship Clause confirm that the territories are "in the United States" for purposes of the Fourteenth Amendment.

Against all of this, the government offers the *Insular Cases* and the *Insular Cases* alone.  But "[n]one of the *Insular Cases* resolved a claim under the Citizenship Clause, nor does their reasoning logically extend to the question this case presents."  Mem. for *Amici Curiae* Scholars of Constitutional Law and Legal History in Supp. of Neither Party 2 ("Constitutional Scholars Br."), Dkt. 56. *Downes v. Bidwell* was, as the government concedes, a splintered set of separate opinions concerning the Uniformity Clause.  *See* Gov't Mot. 14 n.6.  No Justice joined the radical position of Justice Brown (the position advocated by the government here) that no territory is a part of the United States.  Three Justices said the Uniformity Clause did not apply because Puerto Rico was not incorporated into the United States.  And Justice Gray reasoned that the levies at issue were contemplated by the treaty with Spain.

Confirming that the fractured reasoning of the Justices in the *Downes* majority lacks "precedential value" in a case involving an entirely different constitutional provision, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 16 n.8 (2013), the Supreme Court confronted the question whether the Citizenship Clause applies to the territories just three years after *Downes*, but expressly declined to reach the constitutional issue, *see Gonzales v. Williams*, 192 U.S. 1, 12 (1904).

The text, history, structure, and case law that are relevant to the question all point in a single direction:  Plaintiffs, born in American Samoa, were born "in the United States and subject to the jurisdiction thereof."  They are thus citizens of the

United States.  This aligns with the purpose of the Citizenship Clause, which was to put the "'question of citizenship and the rights of citizens . . . beyond the legislative power.'"  *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967) (citation omitted). Thus, Plaintiffs have not "directed their grievance to the wrong branch of government."  Gov't Mot. 1.  "It is emphatically the province and duty of the *judicial* department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) (emphasis added); under the law, Plaintiffs are entitled to U.S. citizenship.  Plaintiffs should not be required to ask Congress for that which is guaranteed to them by the Constitution.

Because there are no disputes as to any material fact, and because Plaintiffs are entitled to judgment as a matter of law, this Court should declare that 8 U.S.C. § 1408 and the relevant implementing polices and regulations are unconstitutional. The Court should therefore enjoin the enforcement of those policies and direct Defendants to issue Plaintiffs new passports, consistent with the relief requested in the Complaint and together with any other relief the Court sees as just and proper.

## ARGUMENT

Plaintiffs were born in the United States and subject to its jurisdiction within the meaning of the Fourteenth Amendment.  As discussed below, (I) the Citizenship Clause's text, structure, and history weigh decisively in Plaintiffs' favor, as (II) the Supreme Court's precedents construing that Clause confirm.  The Court should reject the government's invitation to apply (III) the inapposite *Insular*

*Cases*, (IV) out-of-circuit authority, or (V) unsupported policy arguments.  The Court thus should grant Plaintiffs' motion for summary judgment.

**I.       The Constitution's Text, Structure, And History Show That Plaintiffs Are Citizens By Birth.**

The government concedes, as it must, that "persons born in the territories are 'subject to the jurisdiction' of the United States."  Gov't Mot. 10.  It thus agrees that this case turns on a single question:  "whether U.S. territories are 'in the United States' for purposes of the [Citizenship] Clause."  *Id.* at 11.  As Plaintiffs and *amici* have shown, the Fourteenth Amendment's text, structure, and history all lead to the conclusion that the United States includes territories.  *See* Pls.' Mot. for Summ. J. & Mem. in Supp. 13-32 ("Mot."), Dkt. 30; Br. of Citizenship Scholars as *Amici Curiae* in Supp. of Pls. 2-14 ("Citizenship Scholars Br."), Dkt. 52.  The government fails to refute this showing.

**A.       The Fourteenth Amendment's Text And Constitutional Structure**

When the Fourteenth Amendment was adopted, "the United States" was understood to encompass the States, the District of Columbia, *and the territories*. *See* Mot. 14-16; *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008) (the Constitution's words mean today what "they were understood to mean when the people adopted them").  As Chief Justice Marshall had declared, the phrase "the United States" encompassed the whole of "our great republic, which was

composed of States *and territories*."  *Loughborough v. Blake*, 18 U.S. (5 Wheat.) 317, 319 (1820) (emphasis added).  Thus, "[t]he district of Columbia, or *the territory west of the Missouri*, [wa]s not less within the United States, than Maryland or Pennsylvania."  *Id.* (emphasis added).

From "a very early day" it was understood that reference to "the United States" included the territories, while narrower phrases such as the "states united" meant the States alone.  29 *The American and English Encyclopaedia of Law* 146 (1904).  That understanding was incorporated into the Fourteenth Amendment, which distinguishes between "the United States," U.S. Const. amend. XIV, § 1 (Citizenship Clause), and "the several States," *id.* § 2 (Apportionment Clause), showing that "the United States" sweeps beyond States.  The plain text of the Citizenship Clause and its neighboring Clause thus confirm that U.S. territories are "within" as opposed to "without" the United States.  Joseph E. Worcester, A Dictionary of the English Language 730 (1878).

Denying that territories are in the United States, the government advances the narrow view that the United States includes *only* the States and the District of Columbia.  Gov't Mot. 11.  This untenable reading of the Citizenship Clause finds no support in the Fourteenth Amendment's text or the Constitution's structure.

The government begins by asserting that when "the Constitution was adopted, 'the United States' consisted of the original 13 States" and a federal district to be created from land ceded by "particular States."  Gov't Mot. 11 (relying in part on the 2014 edition of Black's Law Dictionary).  To the contrary, territories have been part of the United States from the Founding.  Consider the Northwest Territory.  While the delegates were debating the Constitution in Philadelphia, the Confederation Congress declared that the this "territory" would "forever *remain* a part of th[e] confederacy of the United States of America." Northwest Ordinance of 1787, § 14, art. 4 (July 13, 1787) (emphasis added).  And after the Constitution was ratified, the First Congress reenacted the Ordinance without altering that provision.  *See* Northwest Ordinance of 1789, Ch. 8, 1 Stat. 50, 50-53 (1789).

Certainly the Constitution "distinguishes between States and territories." Gov't Mot. 11.  As the Northwest Ordinance shows, however, this does not suggest that territories are any less within "the United States."  The Constitution also expressly distinguishes between "the United States," *e.g.*, U.S. Const. art. I, §§ 1, 2, the "several States," *e.g.*, *id.* § 2, amend. XIV § 2, the District of Columbia, *id.* art. I, § 8, cl. 17, "Territory," *id*. art. IV, § 3, cl. 2, and "other Property belonging to the United States," *id.*  Yet the government admits that the States and the District

6

of Columbia are "in the United States," despite being separately described in the

Constitution.  It cannot explain why territories would not be included as well.  The

closest the government comes to an explanation is positing a "fundamental

distinction" between "'the United States' and the territories belonging to the

United States."  Gov't Mot. 11.  But no one would suppose that the Utah Capitol

grounds or Dead Horse Point are not "in" Utah merely because they "belong" to

Utah.  Similarly, U.S. territories are "in" the United States even though they

"belong" to the United States.

The government never acknowledges (let alone explains) the textual

distinction drawn by the Fourteenth Amendment itself—between "*the several*

*States*," on the one hand, and "*the United States*" on the other.  U.S. Const. amend.

XIV, §§ 1-2 (emphasis added); *see also* Mot. 17-18, 29.  Instead it argues that the

Thirteenth Amendment's disjunctive text establishes that there "'*may* be places

subject to the jurisdiction of the United States'" but not in the United States, and

that those places might include unincorporated territories.  Gov't Mot. 11-12

(quoting *Downes v. Bidwell*, 182 U.S. 244, 336-37 (1901) (White, J. concurring))

(emphasis added).  Even the D.C. Circuit found this argument, based on dicta from

a concurring opinion, unpersuasive.  *See Tuaua v. United States*, 788 F.3d 300, 303

(D.C. Cir. 2015).  Indeed, the government does not dispute Plaintiffs'

explanation—corroborated the Thirteenth Amendment's co-author—that the disjunctive phrasing reflects Congress' intent to abolish slavery in every place subject to U.S. control.  *See* Mot. 17-18; Gov't Mot. 12 n.4.

The government's arguments make clear that "there is simply no interpretive or structural basis for concluding that [the Citizenship Clause] includes the District of Columbia but not Territories, or excludes both but includes foreign possessions."  Mot. 17.  Because the constitutional text and structure confirm that American Samoa is in "the United States" for purposes of the Citizenship Clause, Plaintiffs are entitled to U.S. citizenship.

## B.    Historical Evidence

Even if there were some ambiguity in the constitutional text and structure, it would be dispelled by the consistent testimony of numerous historical sources, which the government cannot account for and thus largely ignores.

***First***, the Citizenship Clause incorporated the common-law doctrine of *jus soli* and must be read in light of that history.  *See* Mot. 18-23; Citizenship Scholars Br. 9 (Fourteenth Amendment "constitutionalized *jus soli* citizenship") (citation omitted).  Common-law courts applying the doctrine did not distinguish between persons born in territories and those born in States—all persons born on the sovereign's soil and subject to the sovereign's authority were citizens of the

8

sovereign.  *See*, *e.g.*, *Picquet v. Swan*, 19 F. Cas. 609, 616 (C.C.D. Mass. 1828)

(Story, J.) ("A citizen of one of our territories is a citizen of the United States.");

William Rawle, *A View of the Constitution of the United States of America* 86 (2d

ed. 1829) ("[E]very person born within the United States, its territories or districts,

whether the parents are citizens or aliens, is a natural born citizen in the sense of

the Constitution.").

The government has no answer to this historical evidence about the

common-law underpinnings of the Citizenship Clause.  It does not dispute that the

Fourteenth Amendment constitutionalized *jus soli*.  And it does not contest the

"historical understanding" that persons born within the territories were citizens of

the United States at common law.  Gov't Mot. 24.

Instead, the government asserts that the common-law doctrine "does not

address whether an unincorporated territory like American Samoa is 'in the United

States,' for purposes of the Fourteenth Amendment's Citizenship Clause."  Gov't

Mot. 24.  But the doctrine of *jus soli* simply asked which sovereign owned the soil

on which a person was born and whether that person owed allegiance to the

sovereign.  Fine gradations of political status were irrelevant.  That is why a person

born in any British "*colon*[*y*] of North America," no less than a person born in

England or Wales, was a "natural born British subject[]."  *Inglis v. Trs. of Sailor's*

9

*Snug Harbor*, 28 U.S. (3 Pet.) 99, 120 (1830) (emphasis added); *see also Calvin's Case*, 7 Co. Rep. 1a, 77 Eng. Rep. 377, 383 (1608) (all people born on soil under sovereign power of the King "natural liege subjects"). For purposes of *jus soli*, it makes no difference whether American Samoa is "incorporated" or "unincorporated," a distinction that finds no basis in the common law.[1]

To be sure, "birth within United States jurisdiction" is not the only requirement for citizenship under *jus soli* or the Citizenship Clause. Gov't Mot. 24-25. Just as the Fourteenth Amendment excludes those who are not "subject to the jurisdiction" of the United States, U.S. Const. amend. XIV, § 1, the common-law rule excluded those who owed allegiance to a foreign sovereign, such as the children of diplomats, *see* Citizenship Scholars Br. 5, 7. That exclusion is beside the point here because (as the government concedes) American Samoa is subject to the jurisdiction of the United States. *See* Gov't Mot. 10.

***Second***, as the government does not dispute, the Fourteenth Amendment overturned *Dred Scott*, restored the doctrine of *jus soli* as the constitutional rule,

---

[1]   Neither does the distinction between these types of territories have any textual basis in the Constitution, which gives Congress broad power to govern its "territory." U.S. Const. art. IV, § 3, cl. 2. The distinction between *categories* of territories was not announced until the *Insular Cases*, and the government unsurprisingly provides no historical or textual evidence that the concept existed at any time prior to the early 1900s, much less in 1868 when the Fourteenth Amendment was ratified.

and thereby placed the question of citizenship "'beyond the legislative power.'"
*Afroyim v. Rusk*, 387 U.S. 253, 263 (1967) (quoting Cong. Globe, 39th Cong., 1st
Sess. 2896 (1866) (Sen. Howard)); *see also* Mot. 20-21.  If the government were
correct that "the United States" for purposes of the Citizenship Clause means *only*
States and the District of Columbia, Gov't Mot. 11, then the Fourteenth
Amendment would not have fulfilled its purpose.  In the 1860s nearly *half* of the
land mass of the United States consisted of territories (the Utah Territory among
them).  *See* Willis Drummond, *Report of the Commissioner of the General Land
Office* 297 (GPO 1872).  Under the government's view, the Citizenship Clause left
Congress with complete discretion to deny citizenship to persons born in those
territories.  Not surprisingly, the government cannot cite even a shred of historical
evidence in support of that unlikely view.

  ***Third***, both proponents and detractors of the Fourteenth Amendment *agreed*
that the Citizenship Clause applied with full force in the territories.  *E.g.*, Ltr. from
J.B. Henderson to Hon. C.E. Littlefield (June 28, 1901), *reproduced in* Charles E.
Littlefield, *The Insular Cases (II: Dred Scott v. Sandford)*, 15 Harv. L. Rev. 281,
299 (1901); Cong. Globe, 39th Cong., 1st Sess. 574 (1866) (Sen. Trumbull); *id.* at
3031 (Sen. Henderson); *id.* at 2890 (Sen. Howard); *id.* at 2893 (Sen. Johnson); *id.*
at 2894 (Sen. Trumbull).  Senators debated whether Indians were "subject to the

jurisdiction" of the United States, but *all* evinced the common understanding, consistent with the doctrine of *jus soli* and the Clause's plain text, that Indians born "within the territory of the United States," whether in a State or not, met the first prong of the proposed Clause.  *See* Cong. Globe, 39th Cong., 1st Sess. at 2890 (Sen. Howard), 2893-94 (Sens. Johnson and Trumbull).

The government brushes aside this evidence as "'scattered statements'" of "legislators" and asserts that that the Fourteenth Amendment "'contains many statements from which conflicting inferences can be drawn.'"  Gov't Mot. 24 (quoting *Tuaua*, 788 F.3d at 304, in turn quoting *Afroyim*, 387 U.S. at 267).  Yet the government fails to cite a *single* statement from *any* legislator supporting its view.  In any event, the government's reliance on this statement from *Afroyim* is misplaced.

To begin with, *Afroyim* considered the constitutionality of *removal* of citizenship from someone who already had it; the comment on "conflicting inferences" was about statements of members of Congress related to that specific question, not all questions related to the Fourteenth Amendment.  *See* 387 U.S. at 267-68.  The Supreme Court has in fact relied on the views of some of these very same legislators in determining the "convincing evidence of the historical understanding" of other sections of the Fourteenth Amendment.  *Richardson v.*

*Ramirez*, 418 U.S. 24, 53 (1974) (discussing Senator Henderson's views in relation to Section 5).  This Court should likewise consider their views:  Statements by the Framers of the Reconstruction Amendments are powerful evidence of the meaning of the text they adopted.

Moreover, the Supreme Court did not suggest even in *Afroyim* that that statements by the Framers were irrelevant to the question it addressed.  Rather, the Court cautioned that its holding about removal of citizenship "*might* be unwarranted" if the decision "rested *entirely*" upon the particular "legislative history" cited.  387 U.S. at 267 (emphasis added).  Here, Plaintiffs have offered a wealth of "textual, structural, and historical evidence," *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012), about the meaning of the Citizenship Clause. And all of that evidence, along with *every* statement from the Framers of the Fourteenth Amendment, supports the same conclusion:  territories like American Samoa are "in the United States" for purposes of the Citizenship Clause.

## II.    Supreme Court Precedent Confirms That Plaintiffs Are Citizens.

The Supreme Court has construed the Citizenship Clause of the Fourteenth Amendment three times—in the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873), in *Elk v. Wilkins*, 112 U.S. 94 (1884), and in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898).  Each of these cases confirms that the Citizenship

Clause applies to American Samoa.  The government's attempts to dismiss these cases fail.

***Slaughter-House Cases.***  Just five years after the Citizenship Clause was enacted, the Supreme Court ruled directly on the Clause's meaning, purpose, and geographic scope in the *Slaughter-House Cases*.  The very "first observation" the Court made was that the Clause "overturns the Dred Scott decision by making *all persons* born *within the United States* and subject to its jurisdiction citizens of the United States."  83 U.S. (16 Wall.) at 73 (second emphasis added).  Previously, some judges had said that only citizens of "one of the States" could be "citizen[s] of the United States," meaning that "[t]hose . . . who had been born and resided always in the District of Columbia *or in the Territories*, though *within the United States*, were not citizens."  *Id.* at 72-73 (emphasis added).  But the Citizenship Clause "put[]" that question "at rest" by "declar[ing] that persons may be citizens of the United States without regard to their citizenship of a particular State."  *Id.* at 73.  Those born in the territories are thus citizens of the United States because they were born within the United States.

The government writes off the *Slaughter-House Cases* by saying they dealt merely with the "constitutionality of laws enacted by the State of Louisiana to regulate local butchers."  Gov't Mot. 23.  But the Court's analysis of those laws'

constitutionality depended on its discussion of the Citizenship Clause.  The Court rejected the butchers' claims because the rights they sought to vindicate were not "privileges and immunities of citizens *of the United States*."  83 U.S. at 80 (emphasis added).  And the Fourteenth Amendment's Privileges or Immunities Clause protects only those rights, not the privileges and immunities belonging to "citizens *of the several States*."  *Id.* at 75 (emphasis added).  The Court drew its "distinction between citizenship of the United States and citizenship of a State" *from the text of the Citizenship Clause*.  *Id.* at 73.  That Clause makes clear that "a man [may] be a citizen of the United States *without being a citizen of a State*."  *Id.* at 74 (emphasis added).  Without its discussion of the Citizenship Clause—and that Clause's geographic scope—the Court's analysis falls apart.  *See id.* at 74.

  ***Elk v. Wilkins.***  Only a few years after that, the Court again directly ruled on the geographic scope of the Citizenship Clause in *Elk*, concluding that an Indian born in the Iowa Territory was indeed "born within the territorial limits of the United States," and so was "in a geographical sense born *in the United States*." 112 U.S. at 102 (emphasis added).  Nonetheless, he could not claim citizenship because, like the children of "ambassadors or other public ministers" he was not "subject to the jurisdiction" of the United States.  *Id.*  The government fails to acknowledge this point, let alone refute it.

***Wong Kim Ark.***  Finally, in 1898, the Supreme Court decided *Wong Kim Ark*, which again directly construed the Citizenship Clause, asking whether a man of Chinese decent born in California was a citizen and squarely holding that he was because he was born within the domain of the United States.  The Court unequivocally held that the Citizenship Clause "reaffirmed" the "fundamental principle of citizenship by birth *within the dominion*"—that is, *jus soli*—using "the most explicit and comprehensive terms."  *Wong Kim Ark*, 169 U.S. at 675 (emphasis added).  The Clause, "in clear words and in manifest intent, includes the children born, *within the territory* of the United States, . . . of whatever race or color, domiciled within the United States."  *Id.* at 693 (emphasis added).

The government dismisses *Wong Kim Ark* because it involved a person who was born in a state.  Gov't Mot. 22.  But that misses the pivotal point.  Because *Wong Kim Ark* authoritatively construed the Citizenship Clause as "codif[ying] a *pre-existing* right,"—the common-law *jus soli* rule—this Court should look to that right's "historical background" to discern its scope.  *Heller*, 554 U.S. at 592.  *Jus soli* encompassed *all* of the sovereign's soil and nothing in the doctrine's history indicates that some territorial outposts counted and others did not.  The government lacks any historical basis for contending that *jus soli* would not apply

16

to *all* of the soil possessed by the sovereign, whether a colony, a territory, an unincorporated territory, or something else.

Every single case in which the Supreme Court has actually construed the *Citizenship Clause*'s phrase—"in the United States"—has interpreted it as encompassing *all* of the sovereign's geographic territory. These statements are not dicta; they were necessary to the reasoning that led to the Supreme Court's holding in each case. *See* Mot. 25-26. Because the *Insular Cases* have no application here (nor do they "enfeeble" the reasoning of the cases above, Gov't Mot. 23 n.8), *see* Part III, *infra*, this Court is bound to follow the *Slaughter-House Cases*, *Elk*, and *Wong Kim Ark*, *see Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015).[2]

---

[2]   This Court should not follow the courts of appeals who have failed to heed this binding precedent. *See* Gov't Mot. 22. The Supreme Court and its members have repeatedly cited *Wong Kim Ark* approvingly and reaffirmed its statements. *See*, *e.g.*, *Miller v. Albright*, 523 U.S. 420, 453 (1998) (Scalia, J., concurring in the judgment, joined by Thomas, J.) (under *Wong Kim Ark*, it is only those "born *outside the territory* of the United States" who must be naturalized) (emphasis added); *Rogers v. Bellei*, 401 U.S. 815, 828 (1971) (observing that the "unanimous Court" has relied on *Wong Kim Ark*'s holding that "nationality" is "fixed" by "birth *within the limits* . . . of the United States") (emphasis added). Circuit court decisions that misunderstand and misapply Supreme Court precedent are no substitute for authoritative Supreme Court decisions that speak to the citizenship question presented here.

**III.   This Court Should Not Rely On The *Insular Cases* To Deny Citizenship To Plaintiffs.**

The government's view that the Citizenship Clause applies only to the States and the District of Columbia lacks any support in text, structure, history, or Supreme Court precedent construing that Clause.  Instead, the government stakes its defense of refusing to recognize Plaintiffs' U.S. citizenship on an expansive reading of the *Insular Cases*.  Ignoring warnings that "neither the [Insular C]ases nor their reasoning should be given any further expansion," *Reid v. Covert*, 354 U.S. 1, 14 (1957) (plurality opinion), the government invites this Court to apply them to a Clause that none of them addressed and a territory that has been a part of the United States for over a century.  *See*, *e.g.*, Constitutional Scholars Br. 7 ("*None* of the *Insular Cases* spoke to the meaning of the phrase 'the United States' as used in the Fourteenth Amendments' Citizenship Clause.")  This Court should reject that invitation.

**A.   *Downes v. Bidwell* Is Inapposite.**

The government ultimately grounds its entire position on just one of the *Insular Cases*, *Downes v. Bidwell*, 182 U.S. 244 (1901).  *See* Gov't Mot. 12-26. The government cannot offer a compelling argument from text and constitutional structure that "the United States" excludes territories, so it relies on *Downes*.  *See id.* at 11-12.  The government has no historical evidence that the Citizenship

Clause excludes territories, so it relies on *Downes*.  *See id.* at 23.  The government
urges this Court to ignore the Supreme Court's cases actually construing the
Citizenship Clause because they pre-date *Downes*.  *See*, *e.g.*, *id.* at 22 (Plaintiffs'
cases "pre-date[] the *Insular Cases*"); *id.* at 23 (Plaintiffs cases decided "before the
*Insular Cases*").  The government's case begins and ends with *Downes*.

But *Downes* did not even *concern* the Citizenship Clause and thus does not
(and cannot) control this case.  As the government concedes, the actual "question
in *Downes*" was whether the Uniformity Clause "applies to Puerto Rico."  Gov't
Mot. 14.  Although a fractured majority of the Court concluded that it did not, the
members of the majority "agreed on little other than the case's ultimate result."
Constitutional Scholars Br. 4.  The government thus distorts *Downes* when it says
that "[t]he Court held that Puerto Rico is not part of the 'the United States' for
purposes of that provision."  Gov't Mot. 14.  And, in all events, the Supreme Court
certainly did not decide that American Samoa is not part of "the United States" for
purposes of the Citizenship Clause, despite the government's efforts to stitch
fractured dicta into majority agreement.  *See id.* at 14-15 & n.6.

The government repeatedly invokes Justice Brown's view—based on the
textual distinction between the Thirteenth and Fourteenth Amendments—that "the
United States" includes *only* States and the District of Columbia, not territories.

19

*See* Gov't Mot. 11-12, 14-15.  But Justice Brown's reasoning "found no takers."

Constitutional Scholars Br. 5.  Every other member of the Supreme Court rejected

that position.  *See id.* at 5.  Moreover, even Justice Brown ultimately limited his

radical position by saying that "Porto Rico is a territory appurtenant and belonging

to the United States, but not a part of the United States *within the revenue clauses*

*of the Constitution*."  *Downes*, 182 U.S. at 287 (emphasis added).

Justice White, joined by two other Justices, rejected Justice Brown's radical

view.  As these three Justices put it, "[i]n the case of the territories," the relevant

question is not "whether the Constitution is operative, *for that is self-evident*, but

whether the provision relied on is applicable."  *Downes*, 182 U.S. at 292 (emphasis

added).  And, in their view, the Uniformity Clause applied in territories that were

"incorporated" into the United States, but not territories "merely appurtenant [to

the United States] as . . . possessions."  *Id.* at 292, 342.

Justice Gray took a still different approach, stating that when the United

States takes territory by conquest, "civil government must take effect either by the

action of the treaty-making power, or by that of the Congress of the United States."

*Downes*, 182 U.S. at 345-46.  When the treaty with Spain was signed, it permitted

the type of levies at issue, and "these [treaty] provisions could [not] be carried out

if the Constitution required the customs regulations of the United States to apply"
immediately.  *Id.* at 346.  Thus, the levies were permissible.  *Id.* (emphasis added).

Splintered decisions such as *Downes*, where the majority agrees in the
ultimate result but not on any particular rationale, are of limited precedential value
and must be applied on the narrowest available grounds.  *See Arizona v. Inter
Tribal Council of Ariz., Inc.*, 570 U.S. 1, 16 n.8 (2013).  If this case presented the
question whether the Uniformity Clause applied to Puerto Rico during the
transitional period, *Downes* would control.  But it does not control the question
whether American Samoa is part of "the United States" for purposes of the
Citizenship Clause.

To be sure, some of the opinions in *Downes* contain dicta about citizenship.
Yet it is astonishing that the government would rely on those statements.  Justice
Brown believed that the power to acquire territory implies the power "'to prescribe
upon what terms the United States will receive its inhabitants.'"  Gov't Mot. 15
(quoting *Downes*, 182 U.S. at 279).  That was because he could not abide the
alternative:  that the inhabitants' "children thereafter born, whether savages or
civilized," would be "citizens of the United States . . . and entitled to all the rights,
privileges and immunities of citizens."  *Downes*, 182 U.S. at 279.  And Justice
White thought that the "right to acquire territory 'could not be practically exercised

21

if the result would be to endow the inhabitants with citizenship of the United States.'"  Gov't Mot 15 (quoting *Downes*, 182 U.S. at 306).  Why not?  Because it might lead to "the immediate bestowal of citizenship on those absolutely unfit to receive it."  *Downes*, 182 U.S. at 306.  In short, the government relies not just on the *Insular Cases*, but on their most egregious, indefensible passages.  *See* Constitutional Scholars Br. 19-22 (explaining that the *Insular Cases* "rest in important part on discredited notions of racial inferiority and imperial governance").  Those sentiments were "gravely wrong the day" they were uttered and have "no place in law under the Constitution."  *Trump v. Hawaii*, 585 U.S. __, 2018 WL 3116337, at *24 (June 26, 2018) (citation omitted).

Any doubt whether *Downes* controls this case would be resolved by the fact (unmentioned in the government's brief) that the Supreme Court actually took up a case presenting the question whether the Citizenship Clause applied in Puerto Rico just three years after *Downes*.  *See Gonzales v. Williams*, 192 U.S. 1 (1904); *see also* Citizenship Scholars Br. 21-24; Constitutional Scholars Br. 8.  Yet the Court expressly declined to reach the issue, ruling on statutory grounds instead.  *See Gonzales*, 192 U.S. at 12.  Because *Downes* does not control this case, this Court should not hesitate to apply the Citizenship Clause as it was written, originally understood, and consistently interpreted by every pertinent Supreme Court case.

**B.     Even If The *Insular Cases* Apply, Plaintiffs Are Entitled To Citizenship.**

The Supreme Court has recognized that "'guaranties of certain fundamental personal rights declared in the Constitution'" apply "even in unincorporated Territories." *Boumediene v. Bush*, 553 U.S. 723, 758 (2008) (citation omitted); *see also* Mot. 33.  Consistent with this framework, the Supreme Court has extended numerous constitutional rights to unincorporated territories.  *See Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1868 (2016) (Double Jeopardy Clause); *Boumediene*, 553 U.S. at 771 (Suspension Clause); *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 331 n.1 (1986) (First Amendment); *Torres v. Puerto Rico*, 442 U.S. 465, 468-71 (1979) (Fourth Amendment); *Examining Bd. of Eng'rs, Architects, & Surveyors v. Flores de Otero*, 426 U.S. 572, 600 (1976) (Equal Protection); *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 668 n.5 (1974) (Due Process).  This is because "the Constitution has independent force" in the Territories, *Boumediene*, 553 U.S. at 757; "over time" as "the ties between the United States and any of its unincorporated Territories strengthen" such strengthening has "constitutional significance," *id.* at 758; and, whatever power Congress has "to acquire, dispose of, and govern territory," Congress does "not [have] the power to decide when and where [the Constitution's] terms apply," *id.* at 765.  Citizenship is unquestionably a

23

"fundamental right," and it should thus be extended to U.S. territories like American Samoa. *Trop v. Dulles*, 356 U.S. 86, 103 (1958) (plurality opinion); *see also*, *e.g.*, *Afroyim*, 387 U.S. at 267-68; *Kennedy v. Mendoza- Martinez*, 372 U.S. 144, 159 (1963).

The government resists this conclusion, arguing that a fundamental-rights analysis is inapplicable because the Citizenship Clause defines its own geographic scope. *See* Gov't Mot. 27. Plaintiffs *agree* that the Clause defines its own geographic scope, which is why it should be interpreted based on its own text, structure, and history—not based on scattered dicta from the *Insular Cases*. Mot. 30-31. But if this Court determines that the *Insular Cases* apply at all, it should apply their fundamental-rights framework. *See Tuaua*, 788 F.3d at 376-77 (engaging in the fundamental rights analysis after concluding the *Insular Cases* did not squarely control, but adopting them nonetheless).

Although the government is willing to concede that citizenship is fundamental, at least in some contexts, it says that "birthright citizenship in an unincorporated territory is not a 'fundamental right.'" Gov't Mot. 27-28. This appears to suggest that a right can be fundamental in some parts of the United States, but not fundamental in unincorporated territories. But that view would make a hash of the fundamental-rights framework: If a right is fundamental, it is

"guaranteed to the inhabitants" of unincorporated territories. *Flores de Otero*, 426 U.S. at 599 n.30; *accord Boumediene*, 553 U.S. at 758. Thus, asserting that a right is fundamental only if it is recognized as fundamental in unincorporated territories begs the question.

Moreover, the government offers no persuasive argument for the remarkable proposition that *citizenship* is not a fundamental right. American citizenship "is 'one of the most valuable rights in the world today.'" *Kennedy*, 372 U.S. at 160 (citation omitted); *see also*, *e.g.*, *Fedorenko v. United States*, 449 U.S. 490, 522 (1981) ("The freedoms and opportunities secured by United States citizenship long have been treasured by persons fortunate enough to be born with them, and are yearned for by countless less fortunate.") (Blackmun, J., concurring); Mot. 33-34 (collecting cases). Citizenship has been called the most "basic right for it is nothing less than the right to have rights." *Perez v. Brownell*, 356 U.S. 44, 64 (1958) (Warren, C.J., dissenting), *overruled by Afroyim*, 387 U.S. at 268.

The government dismisses these cases as involving the removal of citizenship, not "citizenship at birth." Gov't Mot. 28. But that distinction cuts the other way: *Birthright* citizenship "is expressly guaranteed by the Fourteenth Amendment to the Constitution, which speaks in the most positive terms," whereas

"[t]he Constitution is silent about the permissibility of involuntary forfeiture of citizenship rights." *Kennedy*, 372 U.S. at 159.

The government seemingly relies, at bottom, on the position advanced in *Tuaua* that rights are "fundamental" only if they are recognized by all free governments. *See* Gov't Mot. 28-29. But that crabbed understanding of fundamental rights is inconsistent with modern Supreme Court authority, which recognizes that the relevant question is whether rights are "fundamental from an *American* perspective." *McDonald v. City of Chicago*, 561 U.S. 742, 784 (2010) (controlling plurality opinion) (emphasis added). Other "free" societies take drastically narrower views of the rights secured by our Constitution—for example, by permitting established churches, banning gun ownership, or recognizing no right to appointed counsel. *See id.* at 781-83. The Supreme Court, however, has never suggested that some least-common-denominator version of the Bill of Rights applies in unincorporated territories—a proposition that could have far-reaching and troubling consequences for the nearly 4 million Americans living in U.S. territories today. Recognizing that those born in American Samoa are entitled to citizenship would not only be consistent with the *Insular Cases* framework, it would vindicate the fundamental promise of the Fourteenth Amendment. *Contra* Gov't Mot. 28.

Thus, even if the *Insular Cases* applied here, Plaintiffs would be entitled to their fundamental right to citizenship.

## IV. The Government's Out-Of-Circuit Authorities Are Not Binding On This Court, Are Inapposite, And Are Erroneous.

The government also urges this Court to follow non-binding, out-of-circuit decisions in cases addressing either the Philippines or, in just one case, American Samoa.  *See Tuaua*, 788 F.3d at 302; *Nolos v. Holder*, 611 F.3d 279, 283-84 (5th Cir. 2010) (per curiam); *Lacap v. INS*, 138 F.3d 518, 519 (3d Cir. 1998) (per curiam); *Valmonte v. INS*, 136 F.3d 914, 918 (2d Cir. 1998); *Rabang v. INS*, 35 F.3d 1449, 1450-52 (9th Cir. 1994).  This Court should not do so.

First and foremost, decisions involving the Philippines, a *former* territory, do not apply to *current* territories like American Samoa.  The government hints that faithfully construing the Citizenship Clause might retroactively confer citizenship on anyone born in the Philippines while it was a U.S. territory.  Gov't Mot. 20.  If the government actually believes that, its fear is unfounded.  With the Philippines' independence, the Supreme Court has held, came a transfer of nationality, *see Rabang v. Boyd*, 353 U.S. 427, 430-31 (1957)—a principle irrelevant to territories (like American Samoa) that remain.  Thus, whether or not persons born in the Philippines during the territorial period were ever U.S. citizens, they presumably became citizens of the Philippines alone upon independence.  *Cf. Boyd v.*

27

*Nebraska*, 143 U.S. 135, 162 (1892).  The courts should have resolved the

Philippines cases by applying this principle, not by extending the *Insular Cases*.

Moreover, it was "'always . . . the purpose of the people of the United States

to withdraw their sovereignty over the Philippine Islands and to recognize their

independence as soon as a stable government c[ould] be established therein.'"

*Boumediene*, 553 U.S. at 757.  Whether "in the United States" includes areas only

*temporarily* under U.S. control—a way-station to independence—sheds no light on

territories that *were once* independent but voluntarily ceded sovereignty to the

United States with the full expectation of U.S. citizenship.  *See* Mot. 4-5.

Similarly, as the government admits, "[t]he legal documents by which the United

States acquired American Samoa *did not set out specific rules for governance of*

*the territory*" or say anything about incorporation one way or the other.  Gov't

Mot. 3 (emphasis added).  That stands in stark contrast to the government's own

authorities regarding the Philippines, the transitionary legal proclamations of

which expressly dealt with the subject.  Gov't Mot. 17; *see also* Philippine Organic

Act of 1902, ch. 1369, § 4, 32 Stat. 691, 692 (1902) (providing that certain

inhabitants of the Philippines and "their children born subsequent thereto" would

be "citizens of the Philippine Islands").  American Samoa stood on and stands on

entirely different footing than the Philippines.

In all events, this Court should eschew these cases because they erred in concluding that the Citizenship Clause does not apply in U.S. territories.  None takes seriously the task of examining the text, structure, history, and purpose of the Citizenship Clause, and each erroneously draws implications from *Downes* that are unjustifiable.  *See* Parts I, III, *supra*.  Most relevant here, *Tuaua* offers no reason why the text of the Citizenship Clause would on its own exclude the territories; it fails to grapple with the original meaning of that text or the long history of *jus soli* citizenship; it discounts unequivocal evidence of the Framers of the Fourteenth Amendment without pointing to any contrary evidence; and it uncritically extends the *Insular Cases*.  *See* 788 F.3d at 303-06.  Rather than adopting the faulty reasoning of those courts, this Court should faithfully construe the Citizenship Clause and grant summary judgment to Plaintiffs.

## V.    The Government's Policy Arguments Fall Short.

Throughout its brief, the government suggests that the Court should decline to rule in Plaintiffs' favor because local elected officials in American Samoa oppose citizenship.  *See*, *e.g.*, Gov't Mot. 25-26.  But the government admits that "the wishes of the people of American Samoa" are not "controlling with respect to the application of the Citizenship Clause."  *Id.* at 25.  That is because the very "purpose" of the Citizenship Clause was to put the "'question of citizenship and

the rights of citizens . . . under the civil rights bill beyond the legislative power.'"
*Afroyim*, 387 U.S. at 263 (omission in original) (citation omitted).  If the
Constitution extends birthright citizenship to territories, neither Congress nor
territorial governments have any prerogative to deprive Plaintiffs this constitutional
right.

Moreover, any fear that faithfully interpreting the Citizenship Clause might
threaten the Samoan way of life—*fa'a Samoa*—would be unfounded.  The
government notes that "many in American Samoa" worry that citizenship "would
upset 'the traditional Samoan way of life,'" such as "the territory's longstanding
'system of communal land ownership.'"  Gov't Mot. 25 (quoting *Tuaua*, 788 F.3d
at 309).  In *Tuaua*, American Samoa's government and the territory's delegate
posited that "the extension of citizenship could result in greater scrutiny under the
Equal Protection Clause."  788 F.3d at 310.  This concern has never made any
sense.  The Equal Protection Clause (like the Fifth Amendment) "is not confined to
the protection of *citizens*"; it protects "all *persons* . . . without regard to any
differences of race, of color, *or of nationality*."  *Yick Wo v. Hopkins*, 118 U.S. 356,
369 (1886) (emphasis added); *see also*, *e.g.*, *Flores de Otero*, 426 U.S. at 599-601.
The constitutional guarantee of equal protection (whether it stems from the
Fourteenth or the Fifth Amendment) already applies in unincorporated territories.

*E.g.*, *Flores de Otero*, 426 U.S. at 600-01.  And the core features of *fa'a Samoa* that have prompted the local elected officials' concerns—land-alienation restrictions—have already survived strict scrutiny.  *See Craddick v. Territorial Registrar*, 1 Am. Samoa 2d 11 (App. Div. 1980) (Schwartz, J., Chief Judge of the U.S. District Court for the Southern District of California, sitting by designation). Recognizing the citizenship of three Utahns will thus have no effect whatsoever on the application of equal protection principles in American Samoa or on *fa'a Samoa*.

Finally, the government contends that recognizing Plaintiffs' citizenship would contradict longstanding practice under which territorial citizenship has been treated as a statutory matter, not a constitutional right.  *E.g.*, Gov't Mot. 18.  But there is much less to the government's argument than meets the eye.  To begin with, the government has presented *no* evidence that birthright citizenship in the territories was treated as a statutory matter from the time the Fourteenth Amendment was ratified until the Spanish-American War.  *See id.* at 17-18. Supreme Court precedent from that period confirms that territories were "in the United States" for purposes of the Citizenship Clause.  *See* Part II, *supra*. Moreover, Congress long ago recognized the citizenship of those born in every current U.S. territory *except* American Samoa; litigation over the constitutional

question cannot arise in those territories.[3]  And, in all events, "[p]ast practice does

not, by itself, create power."  *Medellin v. Texas*, 552 U.S. 491, 532 (2008)

(alteration in original) (citation omitted).  Whatever its practice might have been,

Congress has no power to deny to Plaintiffs the citizenship promised to them by

the Fourteenth Amendment.

## CONCLUSION

This case present one legal question, both sides agree.  The text, structure,

history, purpose, and relevant case law interpreting the Citizenship Clause

uniformly point in one direction—American Samoa is "in the United States and

subject to the jurisdiction thereof."  Plaintiffs were born in American Samoa and

are therefore citizens of the United States.  The Court should grant Plaintiffs'

motion and deny the government's motion to dismiss and cross-motion for

summary judgment.

---

[3]  *See Efron ex. rel. Efron v. United States*, 1 F. Supp. 2d 1468 (S.D. Fla. 1998)
(holding that suit was not justiciable where plaintiff, born in Puerto Rico, claimed
that she was entitled to "constitutional" as opposed to "statutory" citizenship).

Dated: July 9, 2018                          Respectfully submitted.


                                             s/ *Matthew D. McGill*
                                             _____

Neil C. Weare (*pro hac vice*)               Matthew D. McGill (*pro hac vice*)
EQUALLY AMERICAN LEGAL DEFENSE &             Jacob T. Spencer (*pro hac vice*)
  EDUCATION FUND                             Jeremy M. Christiansen (SBN 15110)
1300 Pennsylvania Avenue, N.W.,              GIBSON, DUNN & CRUTCHER LLP
  #190-413                                   1050 Connecticut Avenue, N.W.
Washington, D.C.  20004                      Washington, D.C.  20036
Phone:  (202) 304-1202                       Phone:  (202) 955-8500
Email:  NWeare@equallyamerican.org           Fax:  (202) 467-0539
                                             Email:  MMcGill@gibsondunn.com
Charles V. Ala'ilima (*pro hac vice*)        JSpencer@gibsondunn.com
THE LAW OFFICES OF                           JChristiansen@gibsondunn.com
  CHARLES V. ALA'ILIMA, PLLC
P.O. Box 1118
Nu'uuli, AS  96799
Phone:  (684) 699-6732
Email:  cvalaw@msn.com

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing complies with the word-count limitations of DUCivR 56-1(g), and that this document contains 7,323 words, excluding portions of the memorandum exempted by DUCivR 56-1(g).

I further certify that the foregoing complies with DUCivR 10-1(b) and is written in Times New Roman, 14 point font, using Microsoft Word 2016.

Date: July 9, 2018

*s/ Matthew D. McGill*
Matthew D. McGill

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court for the United States District Court for the District of Utah by using the

Court's CM/ECF system on July 9, 2018.

I certify that all participants in the case are registered CM/ECF users, and

that service will be accomplished by the CM/ECF system.

Dated:  July 9, 2018

*s/ Matthew D. McGill*

Matthew D. McGill
