MICHAEL F. WILLIAMS, P.C. (*pro hac vice* filed)
KATHLEEN A. BROGAN (*pro hac vice* filed)
BRITNEY A. LEWIS (*pro hac vice* filed)
LAUREN N. BEEBE (*pro hac vice* filed)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000
mwilliams@kirkland.com

JESS M. KRANNICH (Utah Bar #14398)
TREVOR J. LEE (Utah Bar #16703)
MANNING CURTIS BRADSHAW
 & BREDNAR PLLC
136 E. South Temple
Salt Lake City, UT 84111
(801) 363-5678
jkrannich@mc2b.com

*Counsel for the American Samoa Government and the Hon. Aumua Amata*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

|  |  |
|---|---|
| JOHN FITISEMANU, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>Defendants. | Case No. 1:18-cv-00036<br>Judge Clark Waddoups<br><br>**PROPOSED INTERVENORS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, CROSS-MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

**Page**

INTRODUCTION..................................................................................................................1

BACKGROUND ..................................................................................................................3

    A.    The United States and Its Territories ....................................................3

    B.    The American Samoan Way of Life .......................................................5

    C.    The Lawsuit .............................................................................................6

RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL
    FACTS ................................................................................................................7

ARGUMENT ....................................................................................................................10

I.    The Imposition of Birthright Citizenship by Judicial Fiat Would Violate the
Sovereignty and Cultural Traditions of American Samoa .................................10

II.    The Imposition of Birthright Citizenship Would Upset a Political Process That
Ensures Self-Determination for the People of Unincorporated Territories ......15

    A.    The People of American Samoa Are Entitled to Choose Their Own
Political  Arrangements.........................................................................15

    B.    Congress—Not the Courts—Extended Citizenship to Other Territories and
Never  Over Their Objections.............................................................18

CONCLUSION .................................................................................................................19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barber v. Gonzalez,*
   347 U.S. 637 (1954) ........................................................................................... 8

*Corp. of Presiding Bishop of Church of Jesus Christ of the Latter-Day Saints v. Hodel,*
   830 F.2d 374 (D.C. Cir. 1987) .......................................................................... 12

*Downes v. Bidwell,*
   182 U.S. 244 (1901) ........................................................................................... 8

*Hirabayashi v. United States,*
   320 U.S. 81 (1943) ........................................................................................... 12

*Kennett v. Chambers,*
   55 U.S. (14 How.) 38 (1852) ............................................................................ 15

*King v. Andrus,*
   452 F. Supp. 11 (D.D.C. 1977) ........................................................................ 18

*Lee v. Weisman,*
   505 U.S. 577 (1992) ......................................................................................... 14

*Reid v. Covert,*
   354 U.S. 1 (1957) ............................................................................................... 2

*Tuaua v. United States,*
   788 F.3d 300 (D.C. Cir. 2015) ................................................................... passim

**Statutes**

8 U.S.C. § 1101(a)(29) ........................................................................................... 18

8 U.S.C. § 1406 ...................................................................................................... 18

8 U.S.C. § 1407 ...................................................................................................... 18

8 U.S.C. § 1408(1) ............................................................................................ 4, 18

48 U.S.C. § 1421 .................................................................................................... 17

Act of March 24, 1976,
   90 Stat. 266 ...................................................................................................... 18

Am. Samoa Code Ann. § 37.0204(a) (1992) ........................................................ 12

Am. Samoa Code Ann. § 37.0204(a)–(b) ............................................................. 13

Convention between the United States and Denmark for Cession of the Danish West Indies,
   art. I, Aug. 4, 1916, 39 Stat. 1706 (ratified on Jan. 16, 1917
   and formally transferred on Apr. 1, 1917) ......................................................... 3

Jones-Shafroth Act of 1917, Pub. L. 64-368,
    39 Stat. 951 ................................................................................................. 18

S.C. Res. 21 ¶ 2 (Apr. 2, 1947) ............................................................................ 3

Treaty of Paris, art. II, Dec. 10, 1898,
    30 Stat. 1754 ................................................................................................. 3

**Other Authorities**

1 Joseph Story, *Commentaries on the Constitution of
    the United States* (Thomas M. Cooley ed., 4th ed. 1873) ....................... 15

7 F.A.M. § 1313(a) .............................................................................................. 8

Alexander M. Bickel, *The Morality of Consent* (1975) ................................... 16

Arnold H. Leibowitz, *American Samoa: Decline of a Culture*,
    10 Cal. W. Int'l L.J. 220 (1980) ............................................... 6, 11, 12

Arnold H. Liebowitz, *Defining Status: A Comprehensive
    Analysis of United States Territorial Relations* (1989) ........................... 11

Cession of Manu'a Islands, Jul. 16, 1904, U.S.-Manua Samoa .......................... 5

Cession of Tutuila and Aunu'u, Apr. 17, 1900, U.S.-Tutuila Samoa,
    *reprinted in* Am. Samoa Code Ann., Historical Documents and Constitutions (1992) ......... 4, 5

Daniel E. Hall, *Curfews, Culture, and Custom in American Samoa:
    An Analytical Map for Applying the U.S. Constitution to U.S. Territories,*
    2 Asian-Pacific L. & Policy J. 69 (2001) ............................................ 11, 14

Derek Heater, *Citizenship: The Civic Ideal in World History,
    Politics and Education* (3d ed. 2004) .................................................... 16

H.R. 5026, 115th Cong. (2018) .......................................................................... 17

Jeffrey B. Teichert, *Resisting Temptation in the Garden of Paradise:
    Preserving the Role of Samoan Custom in the Law of American Samoa,*
    3 Gonz. J. Int'l L. 35 (2000) ................................................................. 5, 13

Lowell D. Holmes, *Quest for the Real Samoa: The
    Mead/Freeman Controversy & Beyond* 38 (1987) ............................... 11

Marcus Tullius Cicero, *De Re Publica*
    (George H. Sabine & Stanley B. Smith trans., Prentice Hall 1929) ......... 11

Neil Weinstock Netanel, *Cyberspace Self-Governance: A Skeptical
    View from Liberal Democratic Theory,*
    88 Calif. L. Rev. 395 (2000) ................................................................. 16

Revised Const. of Am. Samoa .................................................. 4, 6, 10, 11

Stanley K. Laughlin, Jr., *Cultural Preservation in Pacific Islands:
    Still A Good Idea—and Constitutional,* 27 U. Haw. L. Rev. 331 (2005) ........ 6

Statement of Hon. Peter Tali Coleman, *Revised Constitution of Am. Samoa: Hearing before the Subcomm. on Energy Conservation and  Supply of the Comm. on Energy and Natural Res.*,  98th Cong. 46 (1984) ......................................................................... 15

Statement of Hon. Salanoa S.P. Aumoeualogo, *Revised Constitution of Am. Samoa: Hearing before the Subcomm. on Energy Conservation and Supply of the Comm. on Energy and Natural Res.*, 98th Cong. 46 (1984) ..................................................... 18

Statement of Robert B. Shanks, *Revised Constitution of Am. Samoa: Hearing before the Subcomm. on Energy Conservation and Supply of the Comm. on Energy and Natural Res.*, 98th Cong. 46 (1984)........................................................... 13, 15

Statement of Cong. Eni F.H. Faleomavaega before the United Nations Special Committee on Decolonization (May 23, 2001) ................................................................................. 4

*The Future Political Status Study Commission of American Samoa* (Jan. 2, 2007)..................... 17

**INTRODUCTION**

This case presents the question of whether the Court should, for the first time in the nation's history, extend United States citizenship by judicial fiat to residents of an unincorporated territory of the United States.  The answer to that question, according to the precedent of the Supreme Court and every other federal court to hear the question and historical practice for more than a century, is plainly "no."  Whenever the United States has extended citizenship to the inhabitants of an unincorporated territory, it has done so through congressional legislation, not through judicial intervention.  This practice is more important than ever today, as only congressional legislation can account for the distinctive political and cultural considerations that should govern whether residents of a territory of the United States may choose to accept the privileges and responsibilities of United States citizenship.

This is an inconvenient brief for Plaintiffs.  Plaintiffs—three individual United States nationals and a non-profit organization—urge the Court to extend birthright citizenship to American Samoa.  But the leaders of American Samoa, represented here by the American Samoa Government and the Congresswoman from American Samoa, disavow the Plaintiffs' claims and consistently have opposed other similar efforts urging the courts to unilaterally impose U.S. citizenship on all American Samoans.  This is because the people of American Samoa zealously guard their rights of self-determination and are fiercely protective of *fa'a Samoa*, traditional Samoan ways that might be threatened by a fundamental change in the status of the American Samoan people.  Plaintiffs would deprive the people of American Samoa of their rights to determine their own status, even though those rights were an important condition of American Samoa's association with the United States.

At bottom, the arguments advanced by Plaintiffs amount to a plea that this Court extend United States citizenship to the American Samoan people, whether they like it or not. These

1

arguments are untenable, and the Court should dismiss the complaint for at least two additional reasons not fully addressed in the current Defendants' briefs.[1]

*First*, extending birthright citizenship to people who do not want it violates every legal principle of self-determination, sovereignty, and autonomy.  Many aspects of *fa'a Samoa*—the Samoan way of life—are truly unique within the United States, and the people of American Samoa are dedicated to preserving their traditional culture.  The people of American Samoa believe, with good justification, that a fundamental change in their status, such as the judicial extension of United States citizenship, could threaten *fa'a Samoa*.  It would be impractical and anomalous for the Court to impose such a change upon American Samoa against its will.

*Second*, whether birthright citizenship should extend to the people of American Samoa is a question for the people of American Samoa and its elected representatives, and not for this Court to decide.  In *every* other case in which people born in overseas territories were granted birthright citizenship, Congress, not the courts, has made that decision in conjunction with the elected representatives of those territories.  There is simply no legal or practical basis for upsetting more than a century of precedent establishing that the Citizenship Clause does not automatically apply in every unincorporated territory of the United States.

---

[1] Proposed Intervenors concur with the current Defendants' arguments in support of its Motion to Dismiss or, in the Alternative, Cross-Motion for Summary Judgment, ECF No. 66, and incorporate those arguments by reference.  Proposed Intervenors separately address here only those additional arguments that they are in a unique position to articulate and which bear directly on the U.S. Constitutional question at issue.  As in *Tuaua v. United States*, the question before this Court is "whether the Citizenship Clause mandates the imposition of birthright citizenship where doing so overrides the wishes of an unincorporated territory's people."  788 F.3d 300, 310 (D.C. Cir. 2015).  The answer to that question is "no," not simply because of the constitutional text and case law described by the current Defendants, but also because "the circumstances are such that recognition of the right to birthright citizenship would prove 'impracticable and anomalous,' as applied to contemporary American Samoa."  *Id.* at 309 (quoting *Reid v. Covert*, 354 U.S. 1, 74-75 (1957)).

For these reasons, this suit presents unique and serious concerns to the elected representative of the American Samoan people, Congresswoman Aumua Amata Coleman Radewagen, and the American Samoa Government. They should be permitted to intervene in a suit that seeks to upend their sovereignty, autonomy, and way of life, and the Court should dismiss the Complaint in its entirety for failure to state a claim upon which relief can be granted, and deny Plaintiffs' motion for summary judgment as moot. In the alternative, the Court should deny Plaintiffs' motion for summary judgment, and grant Defendants' and Proposed Intervenors' cross-motions for summary judgment, on all claims.

## BACKGROUND

### A.  The United States and Its Territories

Between 1857 and 1947, the United States acquired all of the geographic areas later known as the insular possessions or territories of the United States by purchase, conquest, or cession. The United States first took possession of a series of uninhabited islands in the Pacific containing deposits of guano, which was prized for its use in gunpowder and agricultural fertilizer. In 1899, Spain ceded control of Guam, the Philippines, and Puerto Rico to the United States as a result of the Spanish-American War in the Treaty of Paris. Treaty of Paris, art. II, Dec. 10, 1898, 30 Stat. 1754. In 1900, the *matai*, traditional Samoan leaders, ceded sovereignty of certain of the Samoan Islands to the United States. Compl. ¶ 31. In 1917, the United States purchased the U.S. Virgin Islands from Denmark. *See* Convention between the United States and Denmark for Cession of the Danish West Indies, art. I, Aug. 4, 1916, 39 Stat. 1706 (ratified on Jan. 16, 1917 and formally transferred on Apr. 1, 1917). Finally, in 1947, the United Nations entrusted the United States with the Trust Territory of the Pacific Islands, which included the Marshall Islands, Federated States of Micronesia, Northern Mariana Islands, and Palau. S.C. Res. 21 ¶ 2 (Apr. 2, 1947). Today, the Territory of Guam, the Territory of American Samoa, the Territory of the U.S. Virgin Islands, the

Commonwealth of Puerto Rico, and the Commonwealth of the Northern Mariana Islands (CNMI) all remain territories of the United States.

The United States has always considered each territory individually, basing its territorial policies on a combination of self-determination and particularized economic assistance. Thus, the relationship between the United States and each territory has changed over time in response to the will of each territory's inhabitants. The Philippines gained self-governance and, eventually, full independence. The Marshall Islands, Federated States of Micronesia, and Palau became independent, but freely associated with the United States after the United States' trusteeship ended. And Congress eventually conferred U.S. citizenship on the citizens of the unincorporated territories of Guam, the Northern Mariana Islands, Puerto Rico and the U.S. Virgin Islands.

American Samoa is unique among these territories. In contrast to all other U.S. territories, "American Samoa has never been taken as a prize of war, and never been annexed against the will of [its] people." *See* Statement of Cong. Eni F.H. Faleomavaega before the United Nations Special Committee on Decolonization (May 23, 2001). Instead, American Samoa's traditional leaders, the *matai*, voluntarily ceded sovereignty to the United States Government in 1900. *See* Cession of Tutuila and Aunu'u, Apr. 17, 1900, U.S.-Tutuila Samoa, *reprinted in* Am. Samoa Code Ann., Historical Documents and Constitutions (1992).

From thereon, those same traditional leaders and their successors have maintained their essential role in a predominantly self-governing territory. The American Samoa Constitution establishes a bicameral legislature, elected by the Samoan people; a judiciary appointed by the Secretary of the Interior; and a popularly-elected territorial governor. *See* Revised Const. of Am. Samoa arts. II–IV. It also includes a Bill of Rights that recognizes freedom of speech, freedom of religion, due process under law, freedom from unreasonable searches and seizures, and many other

4

protections of civil rights.  *See* Revised Const. of Am. Samoa art. I §§ 1, 2, 5.  And since 1978, American Samoa has had representation in the U.S. House of Representatives.

Today, American Samoans are born U.S. nationals, not U.S. citizens.  Compl. ¶ 45; 8 U.S.C. § 1408(1).  They owe allegiance to the United States, can freely enter the United States, and may apply for U.S. citizenship without first becoming a permanent resident.  Many American Samoans also serve with distinction in the U.S. Armed Forces.  Compl. ¶ 38.  Although American Samoans are proud of their relationship with the United States, they nonetheless have not achieved consensus as to whether they should ask Congress to grant them citizenship.  *Cf.* Compl. ¶ 32 (referring to initial legislative efforts regarding citizenship).

### B.  The American Samoan Way of Life

Even after voluntarily ceding sovereignty to the United States in 1900, American Samoa has retained its own vibrant and distinctive culture.  *See Tuaua v. United States*, 788 F.3d 300, 312 (D.C. Cir. 2015) ("American Samoans take pride in their unique political and cultural practices, and they celebrate its history free from conquest or involuntary annexation by foreign powers.").  In fact, the original deeds of cession make express provision for the preservation of Samoan culture.  *See* Cession of Tutuila and Aunu'u, Apr. 17, 1900, U.S.-Tutuila Samoa and Cession of Manu'a Islands, Jul. 16, 1904, U.S.-Manua Samoa.

The American Samoan way of life, *fa'a Samoa*, is of critical importance to the American Samoan people.  As one author has put it, *fa'a Samoa* is "more than merely a set of laws, norms, and social conventions.  The *fa'a Samoa* is the *essence* of being Samoan, and includes a unique attitude toward fellow human beings, unique perceptions of right and wrong, the Samoan heritage, and fundamentally the aggregation of everything that the Samoans have learned during their experience as a distinct race." Jeffrey B. Teichert, *Resisting Temptation in the Garden of Paradise: Preserving the Role of Samoan Custom in the Law of American Samoa*, 3 Gonz. J. Int'l L. 35, 37

(2000).  Many aspects of *fa'a Samoa* are wholly unlike anything in either the other territories or the continental United States.  And this rich and unique cultural heritage permeates every level of Samoan society, from the individual, to the familial, to the institutional.

Samoan households, for example, are notable for their organization according to large, extended families, known as *'aiga*.  *See* Stanley K. Laughlin, Jr., *Cultural Preservation in Pacific Islands: Still A Good Idea—and Constitutional*, 27 U. Haw. L. Rev. 331, 337 (2005).  These extended families, under the authority of *matai*, or chiefs, remain a fundamental social unit in Samoan society.  *See* Arnold H. Leibowitz, *American Samoa: Decline of a Culture*, 10 Cal. W. Int'l L.J. 220, 224–25 (1980).  Deep kinship and social ties also contribute to American Samoans' strong sense of community.  For example, the *matai* traditionally organize the resources of the *'aiga* to undertake projects for the benefit of the entire community.  *Id.* at 224.  And communal ownership of land remains the fundamental aspect of Samoan identity; indeed, other important parts of Samoan culture (such as the *'aiga* and *matai*) are intimately and historically predicated upon control of the land.  *See id.* at 222–23.  As such, the American Samoa Bill of Rights specifically provides for restrictions on alienation of land to prevent "the destruction of the Samoan way of life and language, contrary to [the] best interests [of the Samoan people]."  Revised Const. of Am. Samoa art. I, § 3.  These traditions are merely representative of a culture unlike anything in the United States or its other territories—one that Congress has both recognized and preserved for over a century.

### C.  The Lawsuit

Here, three U.S. nationals born in American Samoa and the Southern Utah Pacific Islander Coalition, a private organization serving Pacific Islanders in Utah, sued the United States and related parties entrusted with executing its citizenship laws.  Compl. ¶¶ 7–14.  In their Complaint, they allege that they are entitled to U.S. citizenship as a birthright because the Citizenship Clause

of the Fourteenth Amendment extends to American Samoa and that the failure of the U.S. government to recognize this right had caused them various harms.  Compl. ¶¶ 44–45, 50–62, 73–76; *see also* Pls.' Mot. for Summ. J. at 7–8 [ECF No. 30].

In a nearly identical case, a 3-0 panel of the D.C. Circuit recognized only three years ago that "to impose citizenship by judicial fiat" would require the Court to "override the democratic prerogatives of the American Samoan people themselves."  *Tuaua*, 788 F.3d at 302; *id.* at 310 ("The imposition of citizenship on the American Samoan territory is impractical and anomalous at a more fundamental level.  We hold it anomalous to impose citizenship over the objections of the American Samoan people themselves, as expressed through their democratically elected representatives.").  This case likewise presents unique and serious concerns to the Congresswoman and the American Samoa Government as the elected representatives of the American Samoan people, and the Court should reject Plaintiffs' similar attempts to hijack the legislative process and impose United States citizenship on almost 60,000 people who may not want it and have not sought it.

**RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.     Disputed to the extent that Plaintiffs inaccurately describe, and overly simplify, the unique status of America Samoa as an unincorporated U.S. territory whose tribal leaders, the *matai*, voluntarily ceded sovereignty to the United States government, and to the extent that Plaintiffs undermine the American Samoan people's inherent right to self-determination.  While the people of American Samoa undisputedly owe allegiance to the United States, it is a predominantly self-governing territory.

2.     Undisputed.  The referenced provision of the U.S. Code speaks for itself.

3.     Undisputed.  The referenced provision of the U.S. Code speaks for itself.

4.      Undisputed that as of March 30, 2018, Rex W. Tillerson was the Secretary of State. The current Secretary of State is Michael R. Pompeo.

5.      Undisputed with respect to current Secretary of State Michael R. Pompeo.  The referenced provision of the U.S. Code speaks for itself.

6.      Undisputed with respect to current Secretary of State Michael R. Pompeo.  The referenced provision of the U.S. Code speaks for itself.

7.      Undisputed.

8.      Undisputed with respect to current Secretary of State Michael R. Pompeo.  The referenced provision of the State Department's Foreign Affairs Manual speaks for itself.

9.      Undisputed.  The referenced provision of the State Department's Foreign Affairs Manual speaks for itself.  Proposed Intervenors further note that the described State Department policy is consistent with binding U.S. Supreme Court precedent holding that the Citizenship Clause of the Fourteenth Amendment does not extend birthright citizenship to United States nationals who are born in unincorporated territories.  *See, e.g.*, *Barber v. Gonzales*, 347 U.S. 637, 639 n.1 (1954); *Downes v. Bidwell*, 182 U.S. 244, 251 (1901).

10.     Disputed to the extent that Plaintiffs inaccurately identify non-citizen U.S. nationality as the "only" recognized status for the people born in American Samoa.  Individuals born in American Samoa may obtain full United States citizenship (including from their date of birth) from sources of law other than the Citizenship Clause of the Fourteenth Amendment.  The referenced provision of the State Department's Foreign Affairs Manual speaks for itself.

11.     Disputed to the extent that Plaintiffs inaccurately describe the referenced "policy."  The referenced provisions of the U.S. Code and the State Department's Foreign Affairs Manual speak for themselves.

12.     Undisputed, except to the extent that such individuals "fall within a statutory or regulatory basis for denial," 7 F.A.M. § 1313(a), unrelated to their citizenship, nationality, or identity.  The referenced provision of the State Department's Foreign Affairs Manual speaks for itself.

13.      Undisputed.  The referenced provision of the State Department's Foreign Affairs Manual speaks for itself.

14.   Undisputed, except to the extent that Plaintiffs characterize Endorsement Code 09 as a "disclaimer."  The referenced provision of the State Department's Foreign Affairs Manual speaks for itself.

15.     Undisputed.

16.     Undisputed.

17.     Undisputed.

18.     Undisputed.

19.     Undisputed.

20.     Undisputed.

21.     Undisputed.

22.     Undisputed.

23.     Undisputed.

24.     Undisputed.  The referenced provision of the U.S. Code speaks for itself.

25.     Undisputed.

26.     Disputed to the extent that Plaintiffs inaccurately describe certain State Department policies in paragraphs 10 and 11, and to the extent that Plaintiffs ignore all available avenues for Plaintiffs to pursue the various rights, benefits, privileges, and responsibilities associated with

9

United States citizenship other than through novel judicial interpretation, and imposition, of the Citizenship Clause of the Fourteenth Amendment.

27.     Disputed to the extent that Plaintiffs inaccurately describe certain State Department policies in paragraphs 10 and 11, and to the extent that Plaintiffs suggest that they are "citizens." Proposed Intervenors lack knowledge or information sufficient to form a belief about the truth of Plaintiffs' claims that they "feel discriminated against and branded as inferior," which is, in all events, not a material fact and not representative of all American Samoans.

## ARGUMENT

Whether or not to extend birthright citizenship to the people of American Samoa is a question for the American Samoan people and Congress—not the courts.  ***First***, imposition of citizenship by judicial fiat would fail to recognize American Samoa's sovereignty and the importance of the *fa'a Samoa*.  ***Second***, imposition of citizenship over American Samoan's objections violates fundamental principles of self-determination.  In *every other territory*, the grant of birthright citizenship has been made by Congress with the support of the territorial governments. This is as it should be, because questions of birthright citizenship are tied to questions of political status, and thus necessarily political questions.

## I.    The Imposition of Birthright Citizenship by Judicial Fiat Would Violate the Sovereignty and Cultural Traditions of American Samoa.

The American Samoan way of life, *fa'a Samoa*, is of fundamental importance to the American Samoan people, and Congress has done its part to help preserve this unique culture for over a century.  Plaintiffs ignore the anomalous and potentially disruptive consequences for the people and culture of American Samoa that would result from a judicial determination that American Samoans are automatically American citizens.  Such a judicial determination could threaten certain aspects of *fa'a Samoa*, including its basic social structures, its traditional practices

with respect to alienation of land, and its religious customs—all of which are constitutionally protected principles of American Samoan society. *See* Revised Const. of Am. Samoa art. 1, § 3 ("It shall be the policy of the Government of American Samoa to protect persons of Samoan ancestry against alienation of their lands and the destruction of the Samoan way of life and language.").

*Social Structure.* First, citizenship by judicial fiat could threaten the basic structure of American Samoan society. American Samoan households are organized according to large, extended families, known as '*aiga*. *See* Leibowitz, *American Samoa: Decline of a Culture*, 10 Cal. W. Int'l L.J. 220, at 224–25. *Matai*, holders of hereditary chieftain titles, regulate village life. *See* Daniel E. Hall*, Curfews, Culture, and Custom in American Samoa: An Analytical Map for Applying the U.S. Constitution to U.S. Territories,* 2 Asian-Pacific L. & Policy J. 69, 71–72 (2001) (quoting Lowell D. Holmes, *Quest for the Real Samoa: The Mead/Freeman Controversy & Beyond* 38 (1987)).

The United States has always recognized the *matai* system in American Samoa. *See* Arnold H. Liebowitz, *Defining Status: A Comprehensive Analysis of United States Territorial Relations*, at 440 (1989). Although the United States initially imposed a few changes to the *matai* structure by suppressing some titles and transferring governmental recognition of authority from certain high-ranking *matais* to lesser ranking *matais*, the basic *matai* structure was untouched and is preserved today. *See id.* at 441. When American Samoa was under the authority of the Navy from 1900–1951, it was customary for the naval government to meet annually with the district governors whom had been appointed by the naval governor on the basis of their rank within the *matai* system. *Id.* This annual meeting, or *fono*, eventually evolved into what is the American Samoa Legislature (*Fono*) today. *Id.*

11

The prominence of *matai* in American Samoan culture is recognized by limiting eligibility to serve in the upper house of the territorial legislature to "the registered *matai* of a Samoan family who fulfills his obligations as required by Samoan custom in the county from which he is elected." Revised Const. of Am. Samoa art. II, § 3. Were all American Samoan people granted United States citizenship, this tradition could be subjected to scrutiny under the Equal Protection Clause. Indeed, the Supreme Court has observed that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States,* 320 U.S. 81, 100 (1943). While it is far from predetermined that precedent would require abolition of the *matai* system if the Court extended United States citizenship to American Samoans, there is good reason for the people of American Samoa to urge caution in any societal changes that could imperil their revered cultural institutions.

**Land Alienation.** In addition to endangering the role of the *matai*, citizenship by judicial fiat could also compromise the ways in which land in American Samoa is owned and alienated. The ʻaiga, which can range in number from dozens to thousands, owns the land in common for the benefit of the group, and the property is managed via the *matai*. *See* Leibowitz, *American Samoa: Decline of a Culture*, 10 Cal. W. Int'l L.J. at 222–24. Each *matai's* power rests in control over the land, without which he would have no authority. The *matai*, in turn, supervise the economic activity of the common land and meet with each other in a council (*fono*) to organize larger projects. *Id.* at 224.

American Samoan social institutions revolve around the communal ownership and management of the land for the good of the community. More than ninety percent of the land in American Samoa is communally owned. *Id.* at 239. Alienation of communal land is strictly

regulated, to the extent that the Governor himself must approve the sale.  Am. Samoa Code Ann. § 37.0204(a) (1992).  Thus, it is unsurprising that the D.C. Circuit has observed that "[c]ommunal ownership of land is the cornerstone of the traditional Samoan way of life."  *Corp. of Presiding Bishop of Church of Jesus Christ of the Latter-Day Saints v. Hodel*, 830 F.2d 374, 377 (D.C. Cir. 1987).  It is this complex relationship that the Samoans sought to protect in the Instruments of Cession.  As the D.C. Circuit more recently noted, this long expressed concern that the extension of United States citizenship to the territory could potentially undermine this aspect of the Samoan way of life plays a large part in the reluctance and inability of the American Samoan people to come to a collective consensus in requesting a change in status.  *Tuaua*, 788 F.3d at 310.

Furthermore, Samoan law restricts the sale of community land to anyone with less than fifty percent racial Samoan ancestry.  Am. Samoa Code Ann. § 37.0204(a–b).  This restriction is consistent with practice going back to when the United States assumed possession of American Samoa in 1900 and Commander B.F. Tilley prohibited the alienation of land to non-Samoans.  *See* Teichert, *Resisting Temptation in the Garden of Paradise*, 3 Gonz. J. Int'l L. at 50.

Notably, the Department of Justice has recognized the role that American Samoans' status as noncitizen nationals plays in preserving traditional aspects of Samoan culture.  The Department of Justice explained during American Samoa's constitutional debates of 1984 that the maintenance of *fa'a Samoa*:

> has been based partly on treaty and partly simply on our sense of obligation of not imposing our ways arbitrarily on others. That protection . . . has been accomplished in part through a legal isolation of American Samoa, which stems *in part from the fact that American Samoans are noncitizen nationals rather than American citizens*.

Statement of Robert B. Shanks, *Revised Constitution of Am. Samoa: Hearing before the Subcomm. on Energy Conservation and Supply of the Comm. on Energy and Natural Res.*, 98th Cong. 46

(1984) ("Const. Hearing") (emphasis added).  In American Samoa, the racial land alienation rules are tied into the communal ownership of land and its relation to both the *matai* hierarchy and the '*aiga* clan system.  All of this could be endangered by judicial imposition of United States citizenship.

*Religion.*   Unlike the United States, American Samoa has an exceptionally homogenous culture of religion.  Daniel E. Hall, *Curfews, Culture, and Custom in American Samoa: An Analytical Map for Applying the U.S. Constitution to U.S. Territories*, 2 Asian-Pacific L. & Policy J. 69, 71 (2001) ("One hundred percent of Samoans report being Christian.").  Religious observance is not only a social norm, it is enforced by local leaders, the village *matai*: "[i]n most villages in American Samoa, there are both early evening 'prayer' curfews as well as nocturnal curfews."  *Id*. at *97.  American Samoans themselves characterize the early evening curfew as having "a religious purpose."  *Id.*  Curfews are enforced by young men who punish violators with a range of sanctions that could "include requiring the offender to feed the entire village or the village council, fining the offender as much as $100, reprimanding the offender, withdrawal of titles in extreme cases, banishment, and withholding village protection of the family of the offender."  *Id.* at *98.

It is not difficult to imagine the disruptive consequences that the extension of United States citizenship might create for the American Samoa tradition of prayer curfews. First, the Establishment Clause, whatever else it proscribes, has been interpreted to prohibit attempts to aid religion through government coercion. *See*, *e.g.*, *Lee v. Weisman*, 505 U.S. 577, 606 (1992). Second, "most curfews in American Samoa apply to both adults and juveniles," Hall, *Curfews, Culture, and Custom*, 2 Asian-Pacific L. & Policy J. at 97, and the imposition of blanket adult curfews to United States citizens could be unconstitutional under existing case law.

14

For more than a century, the people of American Samoa have worked with Congress to protect *fa'a Samoa* and to develop a unique relationship between the unincorporated territory and the United States.  For example, when Congress voted to amend the American Samoa Constitution in 1984, it made clear that "[i]t has been the constant policy of the United States, partly as a matter of honor, partly as a result of treaty obligations, not to impose our way of life on Samoa." Statement of Robert B. Shanks, *Const. Hearing* at 53.  Indeed, as Governor Peter Tali Coleman, the first person of Samoan descent to serve as governor of American Samoa and also the first popularly elected governor of American Samoa, explained to Congress during the same hearing, "[t]he United States in turn has guaranteed protection to American Samoa not only of our islands themselves but also of our land, customs and traditions."  Statement of Hon. Peter Tali Coleman, *Const. Hearing* at 10.  Governor Coleman noted, moreover, that "Congress has played, and we pray, that it will continue to play a meaningful role in our development, and particularly, the role of being the protector of the Samoan way of life."  *Id.* at 16.  Extending United States citizenship by judicial fiat would upend this longstanding relationship and could threaten *fa'a Samoa*.

## II.  The Imposition of Birthright Citizenship Would Upset a Political Process That Ensures Self-Determination for the People of Unincorporated Territories.

### A.  The People of American Samoa Are Entitled to Choose Their Own Political Arrangements.

The American Samoan people have never reached a consensus regarding the imposition of birthright citizenship.  Thus, "[t]he imposition of citizenship on the American Samoan territory is impractical and anomalous at a . . . fundamental level."  *Tuaua*, 788 F.3d at 310.  Consent of the governed is the foundational premise of a democratic republic.  *Id.* at 310 (*citing Kennett v. Chambers,* 55 U.S. (14 How.) 38, 41 (1852)).  As Justice Story explained:

> [C]ivil society has its foundation in a voluntary consent or submission; and, therefore, it is often said to depend upon a social compact of the people composing the nation.  And this, indeed, does not, in substance, differ from the definition of it

by Cicero, *Multitudo, juris consensu et utilitatis communione sociata*; that is . . . a multitude of people united together by a common interest, and by common laws, to which they submit with one accord.

1 Joseph Story, *Commentaries on the Constitution of the United States* 225–26 (Thomas M. Cooley ed., 4th ed. 1873) (footnotes omitted).  Accordingly, the state "arises from, and its legitimacy depends upon, the express or tacit consent of individuals.  The state, in turn, may rightfully exercise its authority only in accordance with the terms of that 'social contract.'"  Neil Weinstock Netanel, *Cyberspace Self-Governance: A Skeptical View from Liberal Democratic Theory*, 88 Calif. L. Rev. 395, 409 (2000); *see also* Marcus Tullius Cicero, *De Re Publica* bk. I, ch. 25, 26–35 (George H. Sabine & Stanley B. Smith trans., Prentice Hall 1929) ("A republic of people "is not every group of men, associated in any manner, [it] is the coming together of . . . men who are united by common agreement . . . .").

Citizenship, as an effect of the social compact, defines the relationship between the individual and the state.  *See* Alexander M. Bickel, *The Morality of Consent* 33 (1975).  However, the significance of citizenship is not limited to the sum of its benefits nor a certain set of rights. "Citizenship contain[s] a cluster of meanings related to a defined legal or social status, a means of political identity, a focus of loyalty, a requirement of duties, an expectation of rights and a yardstick of good social behavior."  Derek Heater, *Citizenship: The Civic Ideal in World History, Politics and Education* 166 (3d ed. 2004).  The imposition of a compact of citizenship, directly conflicting with the will of the American Samoan people, therefore serves as an "irregular intrusion into the autonomy of Samoan democratic decision-making; an exercise of paternalism—if not overt cultural imperialism—offensive to the shared democratic traditions of the United States and modern American Samoa."  *Tuaua*, 788 F.3d at 312.

16

The D.C. Circuit paid proper attention to modern standards of majoritarian self-determination in deciding that an extension of birthright citizenship without the will of the governed is in essence a form of "autocratic subjugation" of the American Samoan people. *Id.* at 310. An extension of constitutional citizenship to American Samoans through judicial means would short-circuit and undercut the democratic process of self-determination, undeniably putting American Samoa on a path to greater union with the United States.

With sincere regard for the interests of its electorate, the elected officials of American Samoa continue to evaluate the best steps for maintaining or changing the Samoan relationship with the United States through an effective democratic method. *See The Future Political Status Study Commission of American Samoa* 41 (Jan. 2, 2007) (incorporating the opinions of the Samoan people through a number of public hearings, including special hearings organized for the traditional leaders, the local government, and *faifeaus* (Samoan religious leaders) under the auspices of the Office of Samoan Affairs). In fact, on February 14, 2018 (over a month before this lawsuit was filed), Congresswoman Amata introduced a bill relating to American Samoan citizenship, which remains pending. H.R. 5026, 115th Cong. (2018). As described above, the imposition of birthright citizenship would usurp the political process of self-determination.

Should the American Samoan people decide to change their status with the United States, they have options to do so, including a closer relationship to the United States (like Puerto Rico or the CNMI), free association (like the Marshall Islands or the Federated States of Micronesia), or even independence (like the Philippines). Moreover, even if the American Samoan people petition Congress for statutory citizenship within the current political framework, a change in territorial form as a commonwealth or organized, unincorporated territory has integral self-governance implications as well, which are best left to the will of the people of American Samoa. By contrast,

17

"impos[ing] citizenship by judicial fiat . . . requires [the Court] to override the democratic prerogatives of the American Samoan people themselves." *Tuaua*, 788 F.3d at 302.

> **B.** **Congress—Not the Courts—Extended Citizenship to Other Territories and Never Over Their Objections.**

Whether or not to extend United States citizenship to the people of American Samoa is a question for Congress and not the courts. Plaintiffs argue that they are "entitled" to U.S. citizenship as a constitutional right. *See* Pls.' Mot. for Summ. J. at 12–13. That position is unsupported by territorial history. In *every other territory*, the grant of citizenship has been made by Congress, not the courts. *See* 48 U.S.C. § 1421 and 8 U.S.C. § 1407 (Guam); Jones-Shafroth Act of 1917, Pub. L. 64-368, 39 Stat. 951 (Puerto Rico); Act of March 24, 1976, 90 Stat. 266 (CNMI); 8 U.S.C. § 1406 (U.S. Virgin Islands). Neither the American Samoan people nor Congress has chosen to alter the status of American Samoa. Congress has designated American Samoa as an "outlying possession" of the United States, 8 U.S.C. § 1101(a)(29), and declared that persons born to non-U.S. citizen parents in an outlying possession of the United States on or after its date of acquisition are nationals, but not U.S. Citizens, at birth. 8 U.S.C. § 1408(1). When Congress had opportunity to amend the American Samoa Constitution in 1984, it made clear that it was a policy of the United States not to impose her way of life on American Samoa.

These grants of citizenship in other territories have also been made without any significant controversy from the people's elected representatives. And rightly so, as questions of birthright citizenship are tied to questions of political status, and thus are necessarily political questions best left to the democratic process. Respect for the shared democratic traditions of the United States and modern American Samoa dictates that the majoritarian will of the Samoan people determine their status at such time and in such manner as they themselves decide. *See King v. Andrus*, 452 F. Supp. 11, 15 (D.D.C. 1977) ("The institutions of the present government of American Samoa

reflect . . . the democratic tradition."). As a unanimous panel for the D.C. Circuit found just a few years ago, at this time, there is an "absence of evidence that a majority of the territory's inhabitants endorse such a tie," and, in fact, "the territory's democratically elected representatives actively oppose such a compact." *Tuaua*, 788 F.3d at 311. American Samoa has worked closely with Congress to maintain a deliberate distance between the territory and the law of the United States. It has done so because this distance is necessary to respect the cultural autonomy of American Samoa and its way of life. *See* Statement of Hon. Salanoa S.P. Aumoeualogo, *Const. Hearing* at 15, 16. If this Court chooses to bridge that distance by imposing citizenship on Samoans, it would effectively decide the political status of American Samoa without any democratic input. This would be both unjustified and anomalous when compared to the experience of other territories.

***

A judicial decision extending United States citizenship to the people of American Samoa would contravene these democratic processes and resolve for American Samoa important questions that should be left to the people of American Samoa. Ironically, under the guise of "equality," the judiciary would achieve what the U.S. Navy could not: a conquest of American Samoa over the will of its people.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint in its entirety for failure to state a claim upon which relief can be granted, and deny Plaintiffs' motion for summary judgment as moot. In the alternative, the Court should deny Plaintiffs' motion for summary judgment, and grant Defendants' and Proposed Intervenors' cross-motions for summary judgment, on all claims.

19

Dated:  September 10, 2018                                  Respectfully submitted,

                                                  By:  */s/ Jess M. Krannich*
                                                  _____

MICHAEL F. WILLIAMS, P.C. (*pro hac vice* filed)          JESS M. KRANNICH (Utah Bar #14398)
KATHLEEN A. BROGAN (*pro hac vice* filed)                 TREVOR J. LEE (Utah Bar #16703)
BRITNEY A. LEWIS (*pro hac vice* filed)                   MANNING CURTIS BRADSHAW
LAUREN N. BEEBE (*pro hac vice* filed)                      & BREDNAR PLLC
KIRKLAND & ELLIS LLP                                      136 E. South Temple
655 Fifteenth Street, N.W.                                Salt Lake City, UT 84111
Washington, D.C. 20005                                    (801) 363-5678
(202) 879-5000                                            jkrannich@mc2b.com
mwilliams@kirkland.com

*Counsel for the American Samoa Government and the Hon. Aumua Amata*

20

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7-1(a)(3)(C) of the Local Rules of Civil Practice, I hereby certify that the textual portion of the foregoing motion (exclusive of the signature blocks, certificates of service and compliance, but including footnotes) contains 5,955 words as determined by the word counting feature of Microsoft Word 2016.

I also hereby certify that electronic files of this reply have been scanned for viruses and are virus-free.

*/s/ Jess M. Krannich*
Jess M. Krannich

## CERTIFICATE OF SERVICE

I certify that on September 10, 2018, I electronically filed the foregoing with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

*/s/ Jess M. Krannich*
Jess M. Krannich