IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JOHN FITISEMANU, *et al*,<br><br>　　　　　Plaintiffs,<br>　　v.<br><br>UNITED STATES OF AMERICA, *et. al.*,<br><br>　　　　　Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANTS' MOTION TO DISMISS; AND DENYING INTERVENORS' MOTION TO DISMISS**<br><br>Case No. 1:18-cv-36<br><br>Judge Clark Waddoups |

Before the court are three motions—Plaintiffs' Motion for Summary Judgment, (ECF No. 30), Defendant United States of America's (the Government) Motion to Dismiss, (ECF No. 66), and Intervenors American Samoa Government and the Honorable Aumua Amata's (the Intervenors) Motion to Dismiss, (ECF No. 89). As explained below, the court GRANTS Plaintiff's Motion for Summary Judgment and DENIES the Government's and the Intervenors' Motions.

## Introduction

Plaintiffs are three individuals born in American Samoa and a nonprofit corporation based in St. George, Utah. The three individual plaintiffs are John Fitisemanu, Pale Tuli, and Rosavita Tuli. The nonprofit corporation is the Southern Utah Pacific Island Coalition.

Unlike those born in the United States' other current territorial possessions, who are statutorily deemed American citizens at birth, 8 U.S.C. § 1408(1) designates the individual plaintiffs as non-citizen nationals. Plaintiffs argue that their designation as nationals, and not

1

citizens, violates the Fourteenth Amendment. Their position is that because American Samoa is "in the United States," and "subject to the jurisdiction thereof," they are entitled to birthright citizenship under Section 1 of the Fourteenth Amendment.

As explained below, resolution of this case requires the court to choose between two Supreme Court cases and their respective lines of precedent—*Wong Kim Ark* and *Downes v. Bidwell*.

The first Supreme Court case is *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). In *Wong Kim Ark*, the Supreme Court held that a man of Chinese descent, who was born in the state of California to parents who were never employed in any diplomatic capacity by the Chinese government, and who had never renounced his allegiance to the United States, became a citizen at the time of his birth in the United States—by virtue of the Citizenship Clause of the Fourteenth Amendment. In reaching this conclusion, the Supreme Court discussed at length the importance of the English common law rule of citizenship by birth in determining the meaning of the Citizenship Clause. The Court traced the United States' reliance on the common law rule from its origins in *Calvin's Case*.

*Calvin's Case*, decided in 1608, established a two part rule for acquisition of subject status at birth—(1) birth within the King's dominion and (2) allegiance to the King. The Supreme Court in *Wong Kim Ark* ultimately concluded that "[t]he fourteenth amendment affirms [this] ancient and fundamental rule of citizenship . . . ." *Wong Kim Ark*, 169 U.S. at 693. Plaintiffs argue that *Wong Kim Ark* requires this court to hold that because American Samoa is within the territory of the United States, it is "in the United States" under Section 1 of the Fourteenth Amendment.

The second Supreme Court case, and its line of precedent, which may also provide this court with an answer to the question presented, is *Downes v. Bidwell*, 182 U.S. 244 (1901). The line of cases following *Downes* are known as the *Insular Cases*.

*Downes* did not concern the Fourteenth Amendment. The question in *Downes* was whether—for purposes of the Tax Uniformity Clause of Article I, Section 8 of the Constitution— Puerto Rico is part of the United States. A splintered majority of the Court ultimately held that Puerto Rico is not part of the United States within the meaning of that provision of the Constitution.

Apart from its holding, *Downes* is relevant here because it represents the origin of the doctrine of "territorial incorporation," "under which the Constitution applies in full in incorporated Territories surely destined for statehood but only in part in unincorporated Territories." *See Boumediene v. Bush*, 553 U.S. 723, 757 (2008) (citation omitted). The Government argues that "the Citizenship Clause confers citizenship on those born 'in the United States,'" and argues that the Supreme Court's "decision in *Downes* confirms that the language 'in the United States' excludes unincorporated territories"—like American Samoa. (*See* ECF No. 66 at 22.)

As explained below, this court holds that *Downes*, and the *Insular Cases* more generally, do not control the outcome of this case. *Wong Kim Ark* is binding on this court, however.

The Supreme Court in *Wong Kim Ark* held that the Fourteenth Amendment follows the "established" and "ancient rule of citizenship"—birth within the dominion and allegiance of the sovereign. Because the Supreme Court adopted this rule, and because it has never abrogated it, vertical stare decisis requires this court to apply the rule in this case. As explained below,

application of this rule requires the court to hold that American Samoa is "in the United States" for purposes of the Fourteenth Amendment.

## **Procedural Background and Relief Sought**

Plaintiffs filed their Motion for Summary Judgment on March 30, 2018. (ECF No. 30.) They seek summary judgment on all five claims for relief asserted in their Complaint. (ECF No. 30 at 17.)

First, they seek "[a] declaratory judgment that persons born in American Samoa are citizens of the United States by virtue of the Citizenship Clause of the Fourteenth Amendment, and that 8 U.S.C. § 1408(1) is unconstitutional both on its face and as applied to Plaintiffs." (ECF No. 30 at 17.)

Second, they seek "[a]n order enjoining Defendants from enforcing 8 U.S.C. § 1408(1), including enjoining Defendants from imprinting Endorsement Code 09[1] in Plaintiffs' passports and requiring that Defendants issue new passports to Plaintiffs that do not disclaim their U.S. citizenship." (ECF No. 30 at 17–18.)

Third, they seek a "declaratory judgment that the State Department's policy that 'the citizenship provisions of the Constitution do not apply to persons born [in American Samoa],' as reflected in 7 F.A.M. § 1125.1(b) and (d) violates the Fourteenth Amendment . . . ." (ECF No. 30 at 18.)

Fourth, they seek "[a]n order enjoining Defendants from enforcing 7 F.A.M. § 1125.1(b) and (d)." (ECF No. 30 at 18.)

---

[1] Endorsement Code 09 is a disclaimer that announces that "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN."

Fifth, they seek "[a]n order declaring that Defendants' practice and policy of enforcing 8 U.S.C. § 1408(1) and 7 F.A.M. § 1125.1(b) and (d) through imprinting Endorsement Code 09 in the passports of persons born in American Samoa is contrary to constitutional right and is not in accordance with law . . . ." (ECF No. 30 at 18.)

On June 8, 2018, the Government filed its Motion to Dismiss, arguing that "this action should be dismissed in its entirety for failure to state a claim upon which relief can be granted." (ECF No. 66.)

On that same day, Intervenors filed their Motion to Intervene. (ECF No. 61.) On September 6, 2018, the court held oral argument on the Motion to Intervene. (ECF No. 86). On September 13, 2018, the court entered an order denying intervention of right, but granting permissive intervention. (ECF No. 92.)

In their Motion to Dismiss, Intervenors concurred with the Government's Motion to Dismiss. (ECF No. 89 at 2 n. 1.) They also argued that the court should dismiss the Plaintiff's complaint for two additional reasons. (ECF No. 89 at 7.) First, they argued that it would be impractical and anomalous for the court to impose citizenship "upon American Samoa against its will." (ECF No. 89 at 7.) They also argued that "whether birthright citizenship should extend to the people of American Samoa is a question for the people of America Samoa and its elected representatives, and not for this Court to decide." (ECF No. 89 at 7.)

The court heard argument on the parties' motions on November 14, 2018. (ECF No. 100.)

## Undisputed Facts

1.  The United States exercises exclusive sovereignty over the U.S. territory of American Samoa.[2]

---

[2] Intervenors argue that American Samoa's tribal leaders, the *matai*, "voluntarily ceded sovereignty to the United States government . . . ." (ECF No. 89 at 12.) They further argue that "[w]hile the people of American Samoa

2. The U.S. Department of State is an executive department of the United States.

3. The State Department, through its Bureau of Consular Affairs, is responsible for the issuance of United States passports.

4. Mike Pompeo is the current Secretary of State.

5. The Secretary of State or his designee is directly responsible for the execution and administration of the statutes and regulations governing the issuance of U.S. passports.

6. Carl C. Risch is the Assistant Secretary of State for Consular Affairs.

7. Assistant Secretary Risch is responsible for the State Department's Bureau of Consular Affairs and the creation of policies and procedures relating to the issuance of passports. In that capacity, he is Secretary Pompeo's designee as to the execution and administration of the statutes and regulations governing the issuance of U.S. passports.

8. It is the State Department's policy that the Fourteenth Amendment's Citizenship Clause does not apply to persons born in American Samoa. Most individuals born in American Samoa are designated as non-citizen nationals.

9. Generally, U.S. non-citizen nationals are entitled to U.S. passports.

10. Nationals of the United States who are not citizens are entitled only to U.S. passports with appropriate endorsements.

11. Passports issued by the State Department to those born in American Samoa of non-citizen parents contain Endorsement Code 09.

12. The endorsement states "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN."

---

undisputedly owe allegiance to the United States, it is a predominantly self-governing territory." (ECF No. 89 at 12.) The court finds that there is no genuine dispute that American Samoa's tribal leaders ceded the sovereignty of their islands to the United States, and that the United States exercises exclusive sovereignty over the U.S. territory of American Samoa.

13. A U.S. passport is the only federal document for which a member of the general public may apply in order to obtain official federal recognition of U.S. citizenship by virtue of birth in the United States.

14. Plaintiff John Fitisemanu was born in American Samoa in 1965. The Government does not recognize Mr. Fitisemanu as a citizen of the United States. The Government has issued a U.S. passport to Mr. Fitisemanu that is imprinted with Endorsement Code 09.

15. Plaintiff Pale Tuli was born in American Samoa in 1993. The Government does not recognize Mr. Tuli as a citizen of the United States.

16. Plaintiff Rosavita Tuli was born in American Samoa in 1985. The Government does not recognize Ms. Tuli as a citizen of the United States. The Government has issued a U.S. passport to Ms. Tuli that is imprinted with Endorsement Code 09.

17. The individual plaintiffs are members of Plaintiff Southern Utah Pacific Island Coalition.

18. Plaintiffs owe permanent allegiance to the United States.

19. Plaintiffs are residents of Utah.

20. Plaintiffs, as non-citizen nationals, are currently denied the right to vote, the right to run for elective federal of state office, and the right to serve on federal and state juries.

## Standard of Review

Summary judgment is proper when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court must "view the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party." *Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1298 (10th Cir. 2001).

## Historical Background

Before addressing the arguments presented in this case, it is necessary to examine the historical evidence about the common-law underpinnings of the Citizenship Clause of the Fourteenth Amendment.[3] The fundamental principle of the common law with regard to English nationality was birth within the allegiance. *United States v. Wong Kim Ark*, 169 U.S. 649, 655 (1898). This fundamental principle was clearly stated in the leading case known as *Calvin's Case*, decided in 1608. *Id.* at 655–56.

### *Calvin's Case*—1608

"With the end of the Tudor dynasty following the death of Elizabeth in 1603, James VI of Scotland inherited the throne of England as James I, thereby uniting the two kingdoms . . . ." Polly J. Price, *Natural Law and Birthright Citizenship in Calvin's Case (1608)*, 9 Yale J.L. & Human. 73, 80 (1997). "The most pressing question of political debate soon became the legal status of James's Scottish subjects in England. According to English law, were Scots aliens or were they subjects, capable of possessing and asserting at least some of the rights of English subjects, including holding land and suing in English courts?" *Id.* at 81.

That question was answered "[i]n June 1608" when "fourteen justices," *id.* at 82, "four lawyers," "and the lord chancellor participated in *Calvin's Case*." James H. Kettner, *The Development of American Citizenship, 1608-1870*, at 17 (1978). "Formally, the litigation involved a dispute over land titles." *Id.* at 16. "Two suits were introduced in the name of Robert

---

[3] In determining the relevant historical background, the court relies extensively on James Kettner's *The Development of American Citizenship, 1608-1870* (1978). Kettner "remains the leading authority on the history of [American] citizenship before the Civil War . . . ." Daniel A. Farber, *A Fatal Loss of Balance: Dred Scott Revisited*, 39 Pepp. L. Rev. 13, 22 (2011). Because the historical background is established from recognized historical sources and not in dispute, the court quotes extensively from those sources. To preserve accuracy the court largely quotes rather than paraphrases the source material.

Calvin, an infant born in Scotland in 1606 after the accession [of King James], (a *postnatus*)." *Id.* Persons born in Scotland after the accession of King James were referred to as the "postnati." *See* Price, 9 Yale J.L. & Human. at 82. The question presented was whether Calvin—as a *postnatus* born in Scotland—was a subject of England or an alien. "All but two of the justices determined that" the postnati "were to be regarded not as aliens in England but as natural-born subjects, qualified to inherit English land." *Id.*

Although fourteen justices participated in the case, the "opinion of Lord Coke, chief justice of Common Pleas, emerged as the definitive statement of the law." Kettner at 17. "Coke's attention focused on the status of the natural-born subject—the individual who was born into the community of Englishmen." *Id.* "Broadly defined, this allegiance was the 'true and faithful obedience of the subject due to his sovereign. This ligeance and obedience is an incident inseparable to every subject: for as soon as he is born, he oweth by birth-right ligeance and obedience to his sovereign.'" *Id.* at 17–18 (quoting Calvin's Case, 4b.) Ultimately, "*Calvin's Case* established a territorial rule for acquisition of subject status at birth:"

> Every one born within the dominions of the King of England, whether here or in his colonies or dependencies, being under the protection of—therefore, according to our common law, owes allegiance to—the King and is subject to all the duties and entitled to enjoy all the rights and liberties of an Englishman.

Price, 9 Yale J.L. & Human. at 83 (quoting Herbert Broom, *Constitutional Law Viewed in Relation to Common Law* 31 (London, W. Maxwell & Son, 2d ed. 1885)).

*Calvin's Case* "would exert a strong influence over the development of attitudes and doctrines concerning the constitutional character of the new imperial community in the eighteenth century." Kettner at 28. "Americans in particular would seize upon elements of *Calvin's Case* to explain and legitimize their special relationship with [England]." *Id. Calvin's Case's* "maxims and definitions would survive as guiding imperatives, serving as the source and

inspiration for the ideas of future generations." *Id*.

Pre-Revolution Colonial Period

"Englishmen who left their native country to settle on the far shores of the Atlantic remained subjects of the king." Kettner at 65. "The same common law principles that made subjects of the Scottish *postnati* applied equally well to persons in America." *Id*. "English emigrants lost neither their allegiance nor their status when they left their mother country, and all children born under the king's protection were nautral-born subjects in all the dominions." *Id*; *see also Inglis v. Trustees of Sailor's Snug Harbor*, 28 U.S. 99, 120–21, 7 L. Ed. 617 (1830) ("It is universally admitted, both in the English courts and in those of our own country, that all persons born within the colonies of North America, whilst subject to the crown of Great Britain, were natural born British subjects, and it must necessarily follow, that that character was changed by the separation of the colonies from the parent state, and the acknowledgement of their independence."). Indeed, that "same rule was in force in all the English colonies upon this continent down to the time of the Declaration of Independence, and in the United States afterwards, and continued to prevail under the constitution as originally established." *Wong Kim Ark*, 169 U.S. at 658.

The Declaration of Independence

"Americans repudiated the authority of Great Britain not as individuals, but as organized societies." Kettner at 175. "They withdrew their allegiance from George III and severed the connection with England in formal, public, and communal acts passed by representative bodies purporting to speak for a united people." *Id*.

On July 4, 1776, the Continental Congress voted to adopt the Declaration of Independence. The Declaration stated, in part, that "the Representatives of the United States of

America . . . in the Name, and by the Authority of the good People of these Colonies," declared those colonies "Absolved from all Allegiance to the British Crown . . . ." The Declaration of Independence para. 32 (U.S. 1776). It also famously provided that "all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness." *Id*. para. 2.

After the American Revolution, a "perplexing" "question" remained. *See* Kettner at 209. Did the Revolution create "one community of allegiance or many?" *Id*. During the Revolution "[i]t was enough to decide that one was a subject or a citizen." *Id*. "To consider whether ['citizen'] meant membership in a state or in a nation of states seemed unnecessary" at the time. *See id*. "The question would become a critical one in the years after the Revolution." *Id*. "It would appear in many different contexts and in many different guises," including "the status of inhabitants of the American territories, in conflicts between nationalists and advocates of states' rights, and ultimately in the soul-searing crisis of slavery." *Id*.

Confederation Period

America's first constitution, the Articles of Confederation, was ratified in 1781. At that time, the nation was a loose confederation of states, each operating like independent countries. On September 3, 1783, Great Britain formally recognized the independence of the United States in the Treaty of Paris. Soon after America won its independence, it became increasingly evident that the young republic needed a stronger central government to remain stable. In 1786, Alexander Hamilton called for a constitutional convention to discuss the matter. The Confederation Congress, which in February 1787 endorsed the idea, invited all 13 states to send delegates to a meeting in Philadelphia. The Constitutional Convention took place from May 25 to September 17, 1787.

"The framers of the Constitution failed to grapple with the relationship of state and national citizenship, but they did concern themselves with problems involving citizenship status that had become apparent since independence." Kettner at 224. The framers had "debates over the citizenship qualifications for office . . . ." *See id*. at 224–30. "The delegates assumed that citizenship was a prerequisite for high political office and closely contested the length of time that one had to be a citizen, but at no time did they discuss the relationship between state and national citizenship." *Id*. at 230.

The United States Constitution (1789)

The United States Constitution was signed on September 17, 1787, by delegates to the Constitutional Convention. On June 21, 1788, New Hampshire became the ninth and last necessary state to ratify the Constitution. It came into effect on March 4, 1789, by agreement of the Confederation Congress.

The term "citizen" is used in the Constitution. For example, Article IV of the Constitution provided that "[t]he Citizens of each State stall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. Article III gave the federal judiciary jurisdiction in disputes "between a State and Citizens of another State;–between Citizens of different States; –between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." U.S. Const. art. III, § 2, cl. 1. Article I of the Constitution imposed a citizenship requirement for House of Representative Members. U.S. Const. art. I, § 2, cl. 2 ("No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States . . . ."). And it imposed a citizenship requirement for all senators. U.S. Const. art. I, § 3, cl. 3 ("No Person shall be a Senator who shall not have attained

to the Age of thirty Years, and been nine Years a Citizen of the United States . . . .”). Article II of the Constitution imposed a citizenship requirement for the presidency. U.S. Const. art. II, § 1, cl. 4 (“No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President . . . .”).

But the Constitution did not define “citizen.” *See* William Rawle, *A View of the Constitution of the United States of America* 85 (2d ed. 1829) (“It cannot escape notice, that no definition of the nature and rights of citizens appears in the Constitution.”). Indeed, “the Constitution in its final form left critical questions relating to citizenship unanswered.” Kettner at 231. “There was an implicit assumption that birth within the United States conferred citizenship—the president was to be a ‘natural born citizen’ resident in the United States—but did this encompass all persons born within the states and territories of the new nation, or could the states or federal governments distinguish among natives, accepting some as birthright citizens while rejecting others?” *Id*. Questions regarding “the exact relations among the states and between the states and the nation as a whole would remain problematical until the ultimate question of the nature of individual citizenship was confronted directly.” *Id*. at 232. “The framers dealt with the question tangentially, and, in consequence, the constitutional provisions involving citizenship contained profound ambiguities that would become apparent only long after the new government went into operation.” *Id*.

Early 19th Century

“Judicial rulings on the meaning of the privileges and immunities and of the diversity jurisdiction clauses helped clarify the peculiarly dualistic character of American citizenship.” Kettner at 264. “However, they by no means fully determined the political questions that might arise from the definition of that status.” *Id*. “Considerable ambiguity thus remained at the heart

of [the] notion of dual citizenship." *Id.* "Perhaps the most crucial unresolved question was whether the individual citizen owed his primary loyalty to his state or to the United States as a whole, and this determination involved the issue of whether the state citizenship flowed from national citizenship or vice versa." *Id* at 264–65.

Dred Scott (1857)

The Supreme Court issued its notorious *Dred Scott* decision on March 6, 1857. "The opinion of the Court by Chief Justice Taney took the occasion to rule that free blacks could never become citizens of the United States, that Congress lacked the power to limit slavery in the territories, and that federal legislation limiting slavery anywhere would violate the Due Process Clause." Daniel A. Farber, *A Fatal Loss of Balance: Dred Scott Revisited*, 39 Pepp. L. Rev. 13, 14 (2011); *see also* Kettner at 326 ("Taney's majority opinion denied that Scott or any other black man could be a citizen of the United States within the meaning of the Constitution.").

"A key issue in Dred Scott—or at least an issue that Taney chose to confront—is the relationship between state and federal citizenship." Farber, 39 Pepp. L. Rev. at 22. "The predominant Southern theory—although not the theory that Southerners found convenient in the context of Dred Scott—was that citizenship stemmed from the states." *Id*. at 23. This result would have been "unpalatable" for Southerners because "the status of blacks as citizens in Northern states" meant that they "would have been entitled to recognition [as citizens] in Southern states." *Id*. at 24. Justice Taney sought to avoid this conclusion.

According to Taney, "'every person and every class and description of persons who were at the time of the Constitution recognized as citizens in the several states,' became national citizens with the creation of the Union; but those locally admitted after 1789 enjoyed no national status." Kettner at 326 (quoting *Dred Scott v. Sandford*, 60 U.S. 393, 406, 15 L. Ed. 691 (1857)).

In other words, according to Taney, those who were citizens of a state prior to the constitution coming into effect in 1789 became national citizens after that date. But for Taney, free blacks were not state citizens before the ratification of the Constitution, so, according to him, they were not entitled to any national status as citizens thereafter.[4] *See* Kettner at 326–27; *see also Dred Scott*, 60 U.S. at 423 ("these rights are of a character and would lead to consequences which make it absolutely certain that the African race were not included under the name of citizens of a State, and were not in the contemplation of the framers of the Constitution when these privileges and immunities were provided for the protection of the citizen in other States."). According to Taney, "[a]s purely local citizens, blacks might have rights at the discretion of the individual state; but once they removed beyond that state's jurisdiction their condition depended absolutely on their new place of residence." Kettner at 327.

In short, *Dred Scott* "held that there was a racial exception to the normal rule of birthright U.S. citizenship," Farber, 39 Pepp. L. Rev. at 24, an exception that was entirely inconsistent with the rule reported by Coke in *Calvin's Case*.

Civil War (1861–1865)

The American Civil War was fought from 1861–1865. "The outbreak of war removed

---

[4] "Taney's conclusion that blacks could not enjoy the privileges and immunities of citizenship under the Constitution rested upon two premises." *Id*. at 327–28. "First, one had to accept the separation of state and national citizenship not only in theory but in fact." *Id*. at 328; *see also Dred Scott*, 60 U.S. at 405 ("we must not confound the rights of citizenship which a State may confer within its own limits, and the rights of citizenship as a member of the Union. It does not by any means follow, because he has all the rights and privileges of a citizen of a State, that he must be a citizen of the United States.").) "For Taney, the guarantees made to the 'citizens of each State' in Article IV, section 2, protected only those members of the national community, and the clause must therefore be interpreted to read 'the United citizens of each State.'" *Id*. Second "this national citizenship could not be held to derive automatically from birth 'within the dominion and jurisdiction' of the national government." *Id*. "Rather, those citizens who created the Union in 1789 formed a closed community in which membership was restricted to the descendants of the founders and to aliens co-opted by the process of naturalization." *Id*. As noted below, Taney's conclusion was thoroughly rejected with the adoption of the Fourteenth Amendment.

obstacles that had long prevented Americans from achieving a consistent concept of citizenship." Kettner at 334. In many ways, "the Civil War was a struggle over the nature of the community created in 1789—a bloody contest over allegiance." *Id*. at 340. "The lines were . . . drawn between those who stressed the primacy of the state communities of allegiance and those who insisted that the Union had created one nation and one people." *Id*. "Years of evasion and compromise in Congress and the courts had delayed the confrontation between these two points of view." *Id*. "But now the time of decision was at hand, and open conflict would determine which side would prevail." *Id*.

"In the moment of triumph," "the North sought to impose its own ideas of citizenship and community upon the nation." *Id*. As discussed below, a "succession of laws and constitutional amendments was passed over the objections of the recalcitrant President Johnson and forced upon the southern states as a condition of their readmission to the privileges forfeited by their disloyalty." *Id*. at 340–41.

The Civil Rights Act, the Thirteenth Amendment, and the Fourteenth Amendment

"On December 18, 1865, the Secretary of State certified that the Thirteenth Amendment had been ratified and become part of the Constitution." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 713–14, (1989) (plurality opinion). The Thirteenth Amendment abolished slavery and involuntary servitude. Section 1 of the Thirteenth Amendment provided: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1.

"Less than three weeks" after the Thirteenth Amendment was ratified, "Senator Lyman Trumbull," of Illinois, "Chairman of the Senate Judiciary Committee, introduced S. 61, which

was to become the Civil Rights Act of 1866." *Jett*, 491 U.S. at 713–14 (citing Cong. Globe, 39th Cong., 1st Sess., 129 (1866)). "In March 1866 Congress passed and sent to . . . [P]resident [Johnson] the Civil Rights Act, based explicitly upon the principle that citizenship derived from birth within the allegiance and entitled persons enjoying the status to basic rights throughout the nation." Kettner at 341. "Johnson vetoed the act." *Id.* at 342. "He . . . pointed out that the proposed rights to be guaranteed by the national government had traditionally fallen within the jurisdiction of the states—a claim that many supporters of the bill would have denied . . . ." *Id.* "But Congress was in no mood for arguments tinged with the stain of antebellum states' rights doctrine." *Id.* "The Senate and the House overrode the president's veto, and on April 9, 1866, the Civil Rights Act became law." *Id.*

"The 1866 Act represented Congress' first attempt to ensure equal rights for the freedmen following the formal abolition of slavery effected by the Thirteenth Amendment." *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 389 (1982). "As such, it constituted an initial blueprint of the Fourteenth Amendment . . . ." *Id.* The Act "declared," in part, that "all persons born in the United States and not subject to any foreign power . . . are hereby declared to be citizens of the United States; and such citizens, of every race and color," "shall have the same right, in every State and Territory in the United States, . . . to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens . . . ." Ch. 31, § 1, (1866).

But "[w]hat one Congress enacted another could repeal, and the surest guarantee that the view of citizenship embodied in the Civil Rights Act would survive lay not in statutes but in constitutional amendment." Kettner at 342. So, "on April 30, [1866,] the draft of the Fourteenth Amendment was introduced in the House and Senate." *Id.* "[O]ne of the primary purposes of

many members of Congress in supporting the adoption of the Fourteenth Amendment was to incorporate the guaranties of the Civil Rights Act of 1866 in the organic law of the land." *Hurd v. Hodge*, 334 U.S. 24, 32 (1948).

The Senate held debates regarding the Fourteenth Amendment in May, 1866. *See United States v. Wong Kim Ark*, 169 U.S. 649, 698 (1898) ("When it came before the senate in May, 1866 . . . ."). "The fourteenth amendment of the constitution, as originally framed by the house of representatives, lacked the opening sentence." *Wong Kim Ark*, 169 U.S. at 698. Senator "Howard, of Michigan, moved to amend by prefixing the sentence in its present form (less the words 'or naturalized'), and reading: 'All persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside.'" *Wong Kim Ark*, 169 U.S. at 698. After introducing the proposed language, Senator Howard continued:

> I do not propose to say anything on that subject except that the question of citizenship has been so fully discussed in this body as not to need any further elucidation, in my opinion. This amendment which I have offered is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States.

Cong. Globe, 1st Sess. 39th Cong. 2890.

Senator Doolittle, of Wisconsin, then moved "to amend [Howard's] amendment," "by inserting after the word 'thereof' the words 'excluding Indians not taxed.'" Cong. Globe, 1st Sess. 39th Cong. 2890. A debate thereafter ensued regarding whether to add the words "excluding Indians not taxed" to Section 1 of the Fourteenth Amendment.

Senator Trumbull, of Illinois, was the "chairman of the Committee on the Judiciary . . . who . . . investigated the civil rights bill." Cong. Globe, 1st Sess. 39th Cong. 2893 (Sen. Fessenden). Senator Trumbull opposed Senator Doolittle's proposed amendment, believing that Native Americans were not subject to the complete jurisdiction of the United States because they

did not owe allegiance to the United States. *See* Cong. Globe, 1st Sess. 39th Cong. 2893 (Sen. Trumbull) ("What do we mean by 'subject to the jurisdiction of the United States?' Not owing allegiance to anybody else. That is what it means."); *see also* Cong. Globe, 1st Sess. 39th Cong. 2894 (Sen. Trumbull) ("I have already replied to the suggestion as to the Indians being subject to our jurisdiction. They are not subject to our jurisdiction in the sense of owing allegiance solely to the United States . . . .").

Senator Johnson, of Maryland, then joined in the debate. *See* Cong. Globe, 1st Sess. 39th Cong. 2893. He was in favor of adding the language "excluding Indians not taxed" to Section 1 of the Fourteenth Amendment. *See* Cong. Globe, 1st Sess. 39th Cong. 2893 (Sen. Jonson) ("The amendment proposed by my friend from Wisconsin . . . should be adopted."). Before addressing that proposed amendment, however, he stated the following:

> [T]here is no definition in the Constitution as it now stands as to citizenship. Who is a citizen of the United States is an open question. The decision of the courts and the doctrine of the commentators is, that every man who is a citizen of a State becomes *ipso facto* a citizen of the United States; but there is no definition as to how citizenship can exist in the United States except through the medium of a citizenship in a State.
>
> Now, all that this amendment provides is, that all persons born in the United States and not subject to some foreign Power—for that, no doubt, is the meaning of the committee who have brought this matter before us—shall be considered as citizens of the United States. That would seem to be not only a wise but a necessary provision. If there are to be citizens of the United States there should be some definition of what citizenship is, what has created the character of citizen as between himself and the United States, and the amendment says that citizenship may depend upon birth, and *I know of no better way to give rise to citizenship than the fact of birth within the territory of the United States*, born of parents who at the time were subject to the authority of the United States. I am, however, by no means prepared to say, as I think I have intimated before, that being born within the United States, independent of any new constitutional provision on the subject, creates the relation of citizen to the United States.

Cong. Globe, 1st Sess. 39th Cong. 2893 (Sen. Jonson) (emphasis added).

Senator Johnson then expressed disagreement with Senator Trumbull regarding whether

Native Americans are subject to the jurisdiction of the United States. Cong. Globe, 1st Sess. 39th Cong. 2893 (Sen. Johnson) ("and he supposes and states very positively that the Indians are not subject to the jurisdiction of the United States. With due deference to my friend from Illinois, I think he is in error."). Senator Johnson then pointed out that Senator Trumbull did not oppose the "excluding Indians not taxed" language in Section II of the (proposed) Fourteenth Amendment. Cong. Globe, 1st Sess. 39th Cong. 2894 (Sen. Johnson) ("I suppose that my friend from Illinois agreed to the second section of this constitutional amendment, and these terms are used in that section."). The following exchange between Senator Trumbull and Senator Johnson then occurred:

> Mr. TRUMBULL: The Senator from Maryland certainly perceives a distinction between the use of the words "excluding Indians not taxed" in the second section and in the first. The second section is confined to the States; it does not embrace the Indians of the plains at all. That is a provision in regard to the apportionment of representation among the several States.

> Mr. JOHNSON: The honorable member did not understand me. I did not say it meant the same thing.

> Mr. TRUMBULL: I understood the Senator, I think. I know he did not say that the clause in the second section was extended all over the country, but he did say that the words "excluding Indians not taxed" were in the second section, and in as much as I had said that those words were of uncertain meaning, therefore, having gone for the words in the second section I was guilty of a great inconsistency. Now, I merely wish to show the Senator from Maryland that the words in the second section may have a very clear and definite meaning, when in the first section they would have a very uncertain meaning, because they are applied under very different circumstances. *The second section refers to no persons except those in the States of the Union; but the first section refers to persons everywhere, whether in the States or **in the territories** or in the District of Columbia.*

Cong. Globe, 1st Sess. 39th Cong. 2894 (emphases added).

"By March 1867 twelve states had refused to ratify the amendment, but Congress made clear its determination to write the principle of national citizenship into the fundamental law." Kettner at 343. "In the Reconstruction Act of March 2, 1867, Congress formally provided that no

state could be restored until it had ratified and until the amendment had become part of the

Constitution." *Id*. at 343.[5] "Legislatures in the South now had no choice." *Id*. at 343. The

Fourteenth Amendment was adopted on July 9, 1868. Section 1 provides:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV § 1. Section 2 provides:

> Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

U.S. Const. amend. XIV § 2.

<u>Supreme Court Cases Interpreting the Fourteenth Amendment</u>

The Supreme Court has interpreted the Citizenship Clause of the Fourteenth Amendment

three times—in (1) the *Slaughter-House Cases*, 83 U.S. 36 (1872); (2) *Elk v. Wilkins*, 112 U.S.

94 (1884); and (3) *United States v. Wong Kim Ark*, 169 U.S. 649 (1898).

---

[5] *See also* Reconstruction Act of 1867, Section 5 ("Whereas no legal State governments or adequate protection for life or property now exists in the rebel States . . . and whereas it is necessary that peace and good order should be enforced in said States until loyal and republican State governments can be legally established: Therefore . . . be it further enacted [that] when said State, by a vote of its legislature elected under said constitution, *shall have adopted the amendment to the Constitution of the United States, proposed by the Thirty-ninth Congress, and known as article fourteen*, and when such article shall have become a part of the Constitution of the United States, said State shall be declared entitled to representation in Congress, and senators and representatives shall be admitted therefrom on their taking the oath prescribed by law . . . ." (emphasis added).

Slaughter House Cases (1872)

"Four years after the adoption of the Fourteenth Amendment," the Supreme Court "was asked to interpret the Amendment's reference to 'the privileges or immunities of citizens of the United States.'" *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 754 (2010). The *Slaughter–House Cases* "involved challenges to a Louisiana law permitting the creation of a state-sanctioned monopoly on the butchering of animals within the city of New Orleans." *Id.* "Justice Samuel Miller's opinion for the Court concluded that the Privileges or Immunities Clause protects only those rights 'which owe their existence to the Federal government, its National character, its Constitution, or its laws.'" *Id.* (quoting *Slaughter-House Cases*, 83 U.S. 36, 79 (1872)). "The Court held that other fundamental rights—rights that predated the creation of the Federal Government and that 'the State governments were created to establish and secure'— were not protected by the Clause." *Id.* (quoting *Slaughter-House Cases*, 83 U.S. at 76.) "Today, many legal scholars dispute the correctness of the narrow *Slaughter–House* interpretation." *Id.* at 756. Nevertheless, it provides helpful context to the current dispute.

Justice Miller noted that "[t]he first section of the fourteenth article . . . opens with a definition of citizenship—not only citizenship of the United States, but citizenship of the States." *Slaughter-House Cases*, 83 U.S. 36, 72 (1872). He then noted that prior to the Fourteenth Amendment, the Constitution did not define citizenship. *See id.* ("No such definition was previously found in the Constitution, nor had any attempt been made to define it by act of Congress."). He noted that historically, one view of citizenship was that one had to be a citizen of a state in order to be a citizen of the nation. *See id.* ("It had been said by eminent judges that no man was a citizen of the United States, except as he was a citizen of one of the States composing the Union."). Justice Miller then commented that, under this view of citizenship,

those born in the District of Columbia or in the Territories were not citizens. *See id.* ("Those, therefore, who had been born and resided always in the District of Columbia or in the Territories, though within the United States, were not citizens."). He continued, "[w]hether this proposition was sound or not had never been judicially decided." *Id.* at 72–73. He then commented that the "first clause of the first section" of the Fourteenth Amendment "was framed" in response to the Dred Scott decision to "establish a clear and comprehensive definition of citizenship." *Id.* at 73.

Justice Miller concluded with two observations about the first clause of the first section of the Fourteenth Amendment. *See id.* First, the clause "puts at rest . . . questions which [the Court] ha[d] stated to have been the subject of differences of opinion." *Id.* Relevant here, he stated that "[i]t declares that persons may be citizens of the United States without regard to their citizenship of a particular State . . . ." *Id.* Second, he noted that "the distinction between citizenship of the United States and citizenship of a State is clearly recognized and established." *Id.* That is because "a man" "may" "be a citizen of the United States without being a citizen of a State"—"it is only necessary that he should be born or naturalized in the United States to be a citizen of the Union." *Id.* at 74. He then noted that it is "quite clear" "that there is a citizenship of the United States, and a citizenship of a State," and noted this distinction's "explicit recognition in" the Fourteenth Amendment. *See id.*

## *Elk v. Wilkins* (1884)

In *Elk v. Wilkins*, the Supreme Court dealt "with the question [of] whether a native-born American Indian was made a citizen of the United States by the Fourteenth Amendment of the Constitution." *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99 (1960); *see also Elk v. Wilkins*, 112 U.S. 94 (1884) ("The question then is, whether an Indian, born a member of one of the Indian tribes within the United States, is, merely by reason of his birth within the United

States . . . a citizen of the United States, within the meaning of the first section of the fourteenth amendment of the constitution."). The Supreme Court ultimately held that the Plaintiff was not "a citizen of the United States under the fourteenth amendment of the constitution" *id*. at 109, because, like "children born within the United States" "of ambassadors," he was not subject to the jurisdiction of the United States because he owed allegiance to a tribe—not to the United States. *See id.* at 102.[6]

<u>*Wong Kim Ark* (March 28, 1898)</u>

In *Wong Kim Ark,* the question before the Supreme Court was "whether a child born in the United States, of parents of Chinese descent, who at the time of his birth are subjects of the emperor of China, but have a permanent domicile and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States, by virtue of the first clause of the fourteenth amendment of the constitution." *United States v. Wong Kim Ark*, 169 U.S. 649, 653 (1898). The Court separated its opinion into seven sections. This court discusses *Wong Kim Ark* extensively in its analysis.

<u>Spanish American War (December 10, 1898)</u>

The Spanish-American War was an 1898 conflict between the United States and Spain that ended Spanish colonial rule in the Americas and resulted in U.S. acquisition of territories in the western Pacific and Latin America. On December 10, 1898, the Treaty of Paris was signed.

---

[6] *Elk*, 112 U.S. at 102 ("Indians born within the territorial limits of the United States, members of, and owing immediate allegiance to, one of the Indiana tribes, (an alien though dependent power,) although in a geographical sense born in the United States, are no more 'born in the United States and subject to the jurisdiction thereof,' within the meaning of the first section of the fourteenth amendment, than the children of subjects of any foreign government born within the domain of that government, or the children born within the United States, of ambassadors or other public ministers of foreign nations.").

As a result, Spain renounced all claims to Cuba, ceded Guam and Puerto Rico to the United States, and transferred sovereignty over the Philippines to the United States.

Tutuila and Aunu'u Are Ceded to the United States (1900)

On February 16, 1900, "[i]n a treaty ratified by the United States," "Germany and Great Britain renounced any claims over the eastern Samoan islands, including Tutuila, in favor of the United States." (ECF No. 55 at 11–12; *see also* Cession of Tutuila and Aunu'u, ECF No. 55-2 at 16.[7]). "On April 17, 1900, the Samoan chiefs of the islands of Tutuila and Aunu'u signed a treaty granting the United States government 'full powers and authority to govern the islands.'" (ECF No. 55 at 12; *see also* Cession of Tutuila and Aunu'u, ECF No. 55-2 at 16–17.[8]). This treaty provided that "[t]he Government of the United States of America shall respect and protect the individual rights of all people dwelling [on those islands] to their lands and other property . . . ." (Cession of Tutuila and Aunu'u, ECF No. 55-2 at 17.) The treaty also provided that the Samoan leaders who signed the treaty, and their "heirs and representatives by Samoan Custom," would "obey and owe allegiance to the Government of the United States of America." (Cession of Tutuila and Aunu'u, ECF No. 55-2 at 18.)

Islands of Manu'a Ceded to the United States (July 14, 1904)

"On July 14, 1904, the Tui Manua' (King of Manu'a) and the chiefs of the eastern Samoan island group of Manu'a . . . granted sovereignty to the United States, 'placing the Island's of Manu'a . . . under the complete sovereignty of the United States of America to enable

---

[7] "AND WHEREAS [the Governments of Germany, Great Britain, and of the United States of America] have on the sixteenth day of February 1900 by mutual agreement determined to partition said State: AND WHEREAS the Islands hereinafter described being part of the said State have by said arrangement amongst the said Governments been severed from the parent State and the Governments of Great Britain and of Germany have withdrawn all rights hitherto . . . in favor of the Government of the United States of America . . . ."

[8] "the Chiefs, rulers, and people . . . thereof are desirous of granting unto the said Government of the United States full power and authority to enact proper legislation for and to control" the "ISLANDS OF TUTUILA and AUNUU . . . ."

said Islands, with Tutuila and Aunuu, to become a part of the territory of said United States.'"[9] (ECF No. 55 at 13 (quoting Cession of Manu'a Islands 2, ECF No. 55-2 at 27.)

American Samoan Mau Movement Begins (1920)

According to the Samoan Federation of America, "[i]n the 1920's, U.S. Naval officers informed the American Samoan people for the first time that they were not recognized as U.S. citizens by the federal government." (ECF No. 55 at 15 (citations omitted).)  According to the Samoan Federation of America, "[i]n response, prominent American Samoans organized a new political movement known as the Mau to press for recognition of U.S. citizenship and greater rights to self-government." (ECF No. 55 at 15-16; *see also* David A. Chappell, *The Forgotten Mau*, 69 Pac. His. Rev. 217 (2000), ECF No. 55-2 at 117 ("Gray," a naval historian, "dates the start of the *Mau,* to February 1920 . . . .").) According to the Samoan Federation of America, "[t]he American Samoan Mau movement was separate and distinct from the more well-known Mau movement that formed around the same time in Western Samoa, which laid the foundation for Western Samoa's eventual independence." (ECF No. 55 at 16 n. 4.)

Congress Formally Accepts Deeds of Cession (February 20, 1929)

According to the Samoan Federation of America, "[t]he Mau pushed for recognition of U.S. citizenship, organized public demonstrations, petitioned President Coolidge, and drew significant attention from Congress." (ECF No. 55 at 16; *see also The Forgotten Mau*, ECF No. 55-2 at 136 ("Repeated Samoan protests and petitions to the governor and U.S. President . . . .").) As a result of these efforts, "a U.S. senator from Connecticut," "Hiram Bingham," "introduced a bill in Congress that resulted in Public Resolution No. 89 in February 1929, which ratified at

---

[9] These islands are now generally known and referred to as American Samoa as distinguished from the independent state of Samoa, sometimes still referred to as Western Samoa.

long last the Deeds of Cession of American Samoa.")

48 U.S.C. § 1661(a), passed on February 20, 1929, provides: "[t]he cessions by certain chiefs of the islands of Tutuila and Manua and certain other islands of the Samoan group . . . herein referred to as the islands of eastern Samoa, are accepted, ratified, and confirmed, as of April 10, 1900, and July 16, 1904, respectively."

American Samoa Commission (1930)

"The American Samoan Commission [was] created by act of Congress, Public Resolution No. 89," and approved by the President on February 20, 1929 . . . ." (*American Samoa*: *Hearings Before the Comm'n Appointed by the President of the United States* (1931), ECF No. 55-2 at 62.) "President Herbert Hoover" (*The Forgotten Mau*, ECF No. 55-2 at 136) "appointed [the] commission," which consisted of "three Samoan chiefs" and "four Members of Congress," including Bingham, to hold hearings in Honolulu and Samoa "to investigate conditions in Samoa and to make recommendations for legislation to be passed by the Congress of the United States." (*See American Samoa*: *Hearings Before the Comm'n Appointed by the President of the United States* (1931), ECF No. 55-2 at 63.) These hearings resulted in a "document" that "is nearly 400 pages long," and includes "more than seventy testimonies," including "Samoan opinions on the Mau . . . ."). (*The Forgotten Mau*, ECF No. 55-2 at 136.)

According to the Samoan Federation of America, "[t]hroughout the hearings, American Samoans repeatedly and uniformly stated their desire to be recognized as U.S. citizens." (ECF No. 55 at 17.) In support, the Samoan Federation of America cites to numerous quotes from the hearing that support their position. (*See* ECF No. 55-2 at 68–79.)

On October 7, 1930, "the Governor of Samoa," "the high chiefs, the talking chiefs, and the chiefs of Tutuila-Manua," assembled "on the shore" of the bay "of Pago Pago" to hear "the

preliminary report of the American Samoan commission." (*See American Samoa*: *Hearings*

*Before the Comm'n Appointed by the President of the United States* (1931), ECF No. 55-2 at 87.)

"The seven commissioners . . . unanimously agreed" to "make a report to the Congress of the

United States" which would contain, among other things, a recommendation that "full American

citizenship be granted to the inhabitants of Tutuila-Manua as of February 20, 1929, and to their

children; and also to those inhabitants of Tuituila-Manua who were residing on the mainland of

the United States or in the Territory of Hawaii." (ECF No. 55-2 at 87.)

On January 6, 1931, Senator Bingham sent President Hoover, "for transmission to the

Congress of the United States, the official report of the American Samoan Commission . . . ." (S.

Doc. No. 71-249 (1931), ECF No. 55-2 at 154.) On January 9, 1931, the President sent the

official report to Congress. (S. Doc. No. 71-249 (1931), ECF No. 55-2 at 153.)

The official report recommended American citizenship for American Samoans. The

report stated that the commission had heard "the opinions of all elements making up the

community of American Samoa, the chiefs in particular . . . . No one who expressed a desire to

address the commission was denied." (S. Doc. No. 71-249 (1931), ECF No. 55-2 at 159.) The

official report further provided:

> Great satisfaction was expressed over the fact of annexation to the United States
> by the recent act of Congress; sincere, and expressed with deep emotion, were the
> pleas that the inhabitants of American Samoa be given full recognition as citizens
> of the United States; these two matters were uppermost, none disagreeing
> therewith.

(ECF No. 55-2 at 160.) The official report concluded that "the Samoans are capable of accepting

and should receive full American citizenship." (ECF No. 55-2 at 160.)  This conclusion was

based, at least in part, on the following:

> The people of American Samoa freely and without reserve offered the sovereignty
> of their islands to the United States. This offer Congress has accepted. These

people owed no allegiance to any foreign government. They were autonomous. For generations they had successfully governed themselves. . . . Their loyalty to the United States and their intense longings to have made certain national status demand recognition.

(ECF No. 55-2 at 162.)

<u>House of Representatives Refuses to Grant Citizenship to American Samoans</u>

According to the Samoan Federation of America, Inc, "[i]n 1931, the U.S. Senate unanimously passed a bill to recognize American Samoans as citizens. (ECF No. 55 at 21 (citing ECF No. 55-2 at 180[10]).) According to the Federation, "the bill was not reported out of the House Committee on Insular Affairs." (ECF No. 55 at 21 (citation omitted).) According to the Federation, "[t]he Senate passed identical legislation in the next session," but "the legislation again failed in the House." (ECF No. 55 at 21 (citations omitted).)

The Samoan Federation of America argues that "House Opposition to recognizing American Samoans as U.S. citizens was fueled by archaic claims of racial inferiority." (ECF No. 55 at 22.) In support, the Federation cites to the statements of Representative Jenkins, who, on the House floor, opposed granting citizenship to American Samoans when he stated: "What I am opposed to is taking American citizenship and flinging it halfway around the world, flinging it out to a group of people who are absolutely unqualified to receive it, who cannot espouse it fully, who do not need it as a prerequisite to their happiness, and who cannot maintain it honestly. This will bring trouble to them and bring trouble to us." (ECF No. 55-3 at 9.) He continued later:

Let us not load upon them the responsibility of American citizenship. They cannot take it. They do not know anything about trial by jury, and that is very

---

[10] The Samoan Federation of America, Inc's cited authority is from a Hearing on H.R. 9698, "A Bill to provide a government for American Samoa" before the House Committee on Insular Affairs, 72nd Cong. 26, 32 (1932), and provides, in relevant part:

Mr. Lozier: "What is the status of the Senate bill, has it passed the Senate at this session?"

Senator Bingham: "It has passed. It is the second time that it has passed."

fundamental and the cornerstone of American civilization and American citizenship. They are not able to espouse trial by jury and they cannot do this in Puerto Rico or in the Virgin Islands, and some believe we made a mistake in giving them full American citizenship. I say to you that this is a right we ought to circumscribe with safeguards and is something that should never be given except as a privilege, and let us not give it to these people until they are able to appreciate the privilege.

(ECF No. 55-3 at 14.)

According to the Samoan Federation of America, "[t]he legislation was again defeated in the House." (ECF No. 55 at 22 (citation omitted). According to the Federation, "[i]n 1934 the Senate again unanimously passed legislation to recognize American Samoans as U.S. citizens," but the "legislation again failed to clear House, and similar bills also failed in 1936 and 1937." (ECF No. 55 at 22–23.)

<u>Statutory Recognition of American Samoans as Non-Citizen Nationals (1940)</u>

According to the American Samoan Federation of America, the "Statutory recognition of American Samoans as 'nationals but not citizens, of the United States' did not occur until 1940." (ECF No. 55 at 15 n. 3 (citing Nationality Act, Pub. L. No. 76–853, 54 Stat. 1137, 1139 (1940)[11] (current version at 8 U.S.C. § 1408(1) (2018)). As nationals, American Samoans owe permanent

---

[11] That act provides:

Unless otherwise provided in section 201, the following shall be nationals, but not citizens, of the United States at birth:

(a) A person born in an outlying possession of the United States of parents one of whom is a national, but not a citizen, of the United States ;

(b) A person born outside the United States and its outlying possessions of parents both of whom are nationals, but not citizens, of the United States, and have resided in the United States or one of its outlying possessions prior to the birth of such person ;

(c) A child of unknown parentage found in an outlying possession of the United States, until shown not to have been born in such outlying possession.

allegiance to the United States.[12]

<u>Insular Cases</u>

The *Insular Cases* were a "series of opinions" wherein the Supreme Court "addressed whether the Constitution, by its own force, applies in any territory that is not a State." *Boumediene v. Bush*, 553 U.S. 723, 756 (2008). The court discusses those opinions that are most relevant to the question presented.

<u>*Downes v. Bidwell*</u> (1901)

In *Downes v. Bidwell,* 182 U.S. 244 (1901) the Court was called on to interpret the Uniformity Clause of Article I, Section 8 of the Constitution. "The Downes case arose out of a dispute over duties charged on a shipment of oranges from Puerto Rico to New York under the Foraker Act, an organic act passed by Congress in 1900 to establish a civil government on the island." Christina Duffy Burnett, *United States: American Expansion and Territorial Deannexation*, 72 U. Chi. L. Rev. 797, 807 (2005). "The plaintiffs argued that the duty, which applied specifically to goods from Puerto Rico, violated the Uniformity Clause of the Constitution, which provides that all 'Duties, Imposts and Excises shall be uniform *throughout the United States.*'" *Id.* (emphasis added) (quoting US Const Art I, § 8, cl 1)). A fractured majority agreed that that provision did not apply to Puerto Rico.

Justice Brown delivered the judgment of the court in an opinion in which no other Justice joined. Justice White authored a concurring opinion and was joined by Justices Shiras and McKenna. Justice Gray also authored a concurring opinion. These Justices agreed that Puerto Rico is not part of the United States for purposes of the Tax Uniformity Clause.

---

[12] *See* 8 U.S.C. § 1101(22) ("The term "national of the United States" means (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, *owes permanent allegiance to the United States*.") (emphasis added). .

<u>Justice Brown's Opinion</u>

Justice Brown described the question of the case as "whether the revenue clauses of the Constitution extend of their own force to [the United States'] newly acquired territories." 182 U.S. at 249 (opinion of Brown, J.). Justice Brown ultimately provided that Puerto Rico is "not a part of the United States within the revenue clauses of the Constitution . . . ." 182 U.S. at 287 (opinion of Brown, J.).

In reaching this conclusion, Justice Brown made many statements about citizenship that are relevant to the question presented in this case. Relevant here, Justice Brown wrote that "it can nowhere be inferred that the territories were considered a part of the United States." 182 U.S. at 250–51 (opinion of Brown, J.). He continued: "The 13th Amendment to the Constitution, prohibiting slavery and involuntary servitude 'within the United States, or in any place subject to their jurisdiction,' is also significant as showing that there may be places within the jurisdiction of the United States that are no part of the Union." 182 U.S. at 251 (opinion of Brown, J.). He also weighed in on the Fourteenth Amendment, opining that it places a "limitation to persons born or naturalized in the United States, which is not extended to persons born in any place 'subject to their jurisdiction.'" 182 U.S. at 251 (opinion of Brown, J.).

In Justice Brown's view "the Constitution is applicable to territories acquired by purchase or conquest, only when and so far as Congress shall so direct." 182 U.S. at 279 (opinion of Brown, J.). Justice Brown was of the opinion that "the power to acquire territory by treaty implies, not only the power to govern such territory, but to prescribe upon what terms the United States will receive its inhabitants, and what their status shall be in . . . the 'American empire.'" 182 U.S. at 279 (opinion of Brown, J.). He continued:

> There seems to be no middle ground between this position and the doctrine that if
> their inhabitants do not become, immediately upon annexation, citizens of the

> United States, their children thereafter born, whether savages or civilized, are such, and entitled to all the rights, privileges and immunities of citizens. If such be their status, the consequences will be extremely serious. Indeed, it is doubtful if Congress would ever assent to the annexation of territory upon the condition that its inhabitants, however foreign they may be to our habits, traditions, and modes of life, shall become at once citizens of the United States.

182 U.S. at 279–80 (opinion of Brown, J.). Perhaps most relevant here was Justice Brown's view that "there is an implied denial of the right of the inhabitants [of territories] to American citizenship until Congress by further action shall signify its assent thereto." 182 U.S. at 280 (opinion of Brown, J.).

Justice White's Opinion

Justice White's concurring opinion in *Downes* was the origin of the doctrine of territorial incorporation. *See* Christina Duffy Burnett, *United States: American Expansion and Territorial Deannexation*, 72 U. Chi. L. Rev. 797, 806–07 (2005) ("In the most important of these cases, *Downes*, a concurring opinion by Justice Edward Douglass White set forth the doctrine of territorial incorporation.").

At the outset of Justice White's concurring opinion, he wrote: "Mr. Justice Brown, in announcing the judgment of affirmance, has in his opinion stated his reasons for his concurrence in such judgment. In the result I likewise concur." 182 U.S. at 287 (White, J., concurring). He continued: "As, however, the reasons which cause me to do so *are different from*, *if not in conflict with*, those expressed in that opinion, if its meaning is by me not misconceived, it becomes my duty to state the convictions which control me." 182 U.S. at 287 (White, J., concurring) (emphasis added). Thus, at the outset of his concurring opinion, Justice White made clear that his reasoning for reaching the Court's ultimate result was "different from, if not in conflict with" those of Justice Brown.

Like Justice Brown, Justice White ultimately concluded that the Uniformity Clause did not apply to duties charged to shipments from Puerto Rico. 182 U.S. at 342 (White, J., concurring) ("the impost in question assessed on coming from Porto Rico into the United States after the cession was within the power of Congress, and that body was not, moreover, as to such impost, controlled by the clause requiring that imposts should be uniform throughout the United States; in other words, the provision of the Constitution just referred to was not applicable to Congress in legislating for Porto Rico."). In Justice White's opinion, the Uniformity Clause did not apply to Puerto Rico because Puerto Rico "had not been incorporated into the United States, but was merely appurtenant thereto as a possession." 182 U.S. at 342 (White, J., concurring).

In his concurring opinion, Justice White also expressed his view on the right of the government of the United States to acquire territory, and to enjoy the "beneficial existence" of its acquisitions—for "commercial and strategic reasons"—without the risk of "incorporat[ing] an alien and hostile people into the United States." *See* 182 U.S. at 305–08 (White, J., concurring). In Justice White's view, the government of the United States' "right" "to acquire" "territory" "could not be practically exercised if the result would be to endow the [territory's] inhabitants with citizenship of the United States . . . ." 182 U.S. at 306 (White, J., concurring).

Justice Gray's Opinion

Justice Gray "concurr[ed] in the judgment of affirmance in" the case, and "in substance agree[d] with the opinion of Mr. Justice White . . . ." 182 U.S. at 345 (Gray, J., concurring).

*Balzac v. Porto Rico*, 258 U.S. 298 (1922)

In *Balzac* a unanimous Supreme Court provided that "the opinion of Mr. Justice White of the majority, in Downes v. Bidwell, has become the settled law of the court." *Balzac*, 258 U.S. at 305.

**Analysis**

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. CONST. amend. XIV, § 1, cl. 1. The Government concedes that "persons born in the territories are 'subject to the jurisdiction' of the United States. (ECF No. 66 at 18.) The question is therefore whether American Samoa is "in the United States" for purposes of the Fourteenth Amendment.

Plaintiffs argue that "the phrase 'in the United States' includes both States *and* Territories." (ECF No. 30 at 26 (emphasis in original).) The Government argues that "[t]he best reading of the Citizenship Clause is that U.S. territories are not 'in the United States' within the meaning of the Clause because 'in the United States' means in the 50 States and the District of Columbia." (ECF No. 66 at 19.)  Both Plaintiffs and the Government argue—(I) that the Fourteenth Amendment's text, structure, and related historical evidence and (II) Supreme Court precedent—require this court to adopt their interpretation of the Citizenship Clause.

I.       Constitution's Text, Structure, and History

Whether American Samoa is "in the United States" under the Fourteenth Amendment requires this court to conduct a "careful examination of the textual, structural, and historical evidence" related to the Amendment. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012).

A.  The Fourteenth Amendment's Text

Plaintiffs argue that "[i]n the 1860s, as now, the word 'in' connoted 'presence in place, time, or state' and was synonymous with 'within' as opposed to 'without.'" (ECF No. 30 at 29.) They further argue that "[t]here is no conceivable reading of the Fourteenth Amendment's text

that would suggest someone born in a U.S. territory was born 'without' the United States." (ECF No. 30 at 29.) For this reason, they argue that "[f]rom the moment the United States exercised sovereignty over American Samoa, American Samoa was 'in the United States' as those words were understood at the time the Fourteenth Amendment was ratified." (ECF No. 30 at 30.)

The Fourteenth Amendment text's alone is insufficient to determine the Citizenship Clause's geographic scope.

B. <u>Constitutional Structure</u>

Plaintiffs contrast the language of Section 1 of the Fourteenth Amendment with Section 2 to support their argument that territories are "in the United States" for purposes of the Citizenship Clause. (*See* ECF No. 30 at 31–32.) They note that "[w]hile Section 1 of the Fourteenth Amendment . . . uses the term 'in the United States,' Section 2 . . . uses the narrower phrase 'among *the several States*' to provide that Representatives are to be apportioned only among States." (ECF No. 30 (emphasis in original) (citations omitted).) Plaintiffs argue that "the Framers' choice of different language in these adjacent, simultaneously adopted constitutional provisions is strong evidence that the provisions' geographic scopes are not coextensive" and argue that " '[i]n the United States' must therefore mean something more extensive than 'among the several states.' " (ECF No. 30 at 31.)

Plaintiffs also argue that the Thirteenth Amendment supports their reading. The Thirteenth Amendment abolished slavery "within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1, cl. 1. Plaintiffs argue that those areas that are not "within the United States," yet subject to U.S. jurisdiction, do not include Territories. (*See* ECF No. 30 at 32.) They argue that those words—"subject to their jurisdiction"—refer to "locations beyond the Nation's sovereign limits but nevertheless under U.S. control," like "vessels outside

U.S. territorial waters, embassies abroad, and military installations on foreign soil . . . ." (ECF No. 30 at 32.)

The Government argues that the Constitution's structure supports its position that American Samoa is not within the United States for purposes of the Citizenship Clause. It makes two primary arguments in support of its position.

First, the Government argues that "the general distinction drawn throughout the Constitution between 'the United States' . . . and lands '*belonging to* the United States' . . . supports the inference that territories are not 'in the United States' for purposes of the Citizenship Clause." (ECF No. 79 at 8 (emphasis in original).) It compares the language of the Tenth Amendment[13] with the language of Article IV Section 3, Clause 2[14] to argue that "[t]he Constitution itself . . . sets out a fundamental distinction between 'the United States' and the territories belonging to the United States." (ECF No. 66 at 19.)

Second, the Government contrasts the "more sweeping, disjunctive language" of the Thirteenth Amendment with the language contained in Section 1 of the Fourteenth Amendment to argue that "[t]he Thirteenth Amendment's broader language demonstrates that 'there may be places subject to the jurisdiction of the United States, but which are not incorporated into it, and hence are not within the United States in the completest sense of those words.'" (ECF No. 66 at 20 (quoting *Downes v. Bidwell*, 182 U.S. 244, 336–37 (1901) (White, J., concurring)).)

Both parties make persuasive arguments for their positions. But like the D.C. Circuit, this

---

[13] "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

[14] "The Congress shall have Power to dispose of and make all needful Rules and Regulations *respecting the Territory* or other Property *belonging to the United States*; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State." U.S. Const. art. IV, § 3, cl. 2 (emphases added).

court finds that neither argument "is fully persuasive," and finds that neither argument "squarely resolve[s] the meaning of the ambiguous phrase 'in the United States.'" *Tuaua v. United States*, 788 F.3d 300, 303 (D.C. Cir. 2015). The Constitution's structure alone is "insufficient to divine the Citizenship Clause's geographic scope." *See id*.

C. Historical Evidence

Plaintiffs make four primary arguments in support of their position that "[n]umerous historical sources similarly align and show that the common-sense reading of the Citizenship Clause—that it extends to the Territories—is correct." (ECF No. 30 at 32.) The court discusses Plaintiffs' arguments, and the Government's responses to those arguments, in turn.

First, Plaintiffs argue that "the reason the phrase 'the United States' was understood to encompass U.S. Territories was a result of the common law doctrine of *jus soli*." (ECF No. 30 at 32.) *Jus soli* is "the rule under which nationality is acquired by the mere fact of birth within the territory of a state." Polly J. Price, *Natural Law and Birthright Citizenship in Calvin's Case (1608)*, 9 Yale J.L. & Human. 73, 77 (1997). Relying on *Wong Kim Ark*, Plaintiffs argue that "[b]ecause the Citizenship Clause was drafted and ratified under the common-law understanding of the term 'citizen,' the Clause '*must* be interpreted in the light of the common law.'" (ECF No. 30 (emphasis in original) (quoting *Wong Kim Ark*, 169 U.S. at 654)). Plaintiffs, again relying on *Wong Kim Ark*, argue that "[t]he common-law rule regarding birthright citizenship was straightforward: 'the party must be born within a place where the sovereign is at the time in full possession and exercise of his power, and the party must also at his birth . . . owe obedience or allegiance to . . . the sovereign.'" (ECF No. 30 at 33 (quoting *Wong Kim Ark*, 169 U.S. at 659).)

In response to Plaintiffs' argument that the Citizenship Clause ratified the common law doctrine of *jus soli*, the Government argues that *Wong Kim Ark's* statements about common law

*jus soli* principles were dicta. (*See* ECF No. 79 at 21.) It further argues that Plaintiffs fail "to point to any *jus soli* precedent . . . that speaks to birthright citizenship in unincorporated territories." (ECF No. 79 at 21.)

Second, Plaintiffs argue that "the Fourteenth Amendment's repudiation of the Supreme Court's notorious *Dred Scott* decision provides compelling evidence that *jus soli* governs citizenship by birth." (ECF No. 30 at 34.) As noted above, one of *Dred Scott's* holdings was that Congress lacked the power to limit slavery in the territories. Plaintiffs argue that "[i]t is inconceivable that Congress would have left the question of citizenship in U.S. territories to congressional whim, *especially* when Congress's power over the Territories had been a central issue in *Dred Scott*." (ECF No. 30 at 35 (emphasis in original).)

In response to Plaintiffs' argument about *Dred Scott*, the Government states that it has "no quarrel with the proposition that the Citizenship Clause" overturns the *Dred Scott* decision, but argues that the repudiation of that decision says nothing about "whether unincorporated territories are within 'the United States' in the relevant sense." (*See* ECF No. 79 at 20.)

Third, Plaintiffs argue that "contemporaneous statements from the Fourteenth Amendment's Framers provide further evidence of the common understanding that the Citizenship Clause applies to Territories." (ECF No. 30 at 35 (citation omitted).) Plaintiffs point to the statements of three senators who took part in the May 1866 debate regarding the Fourteenth Amendment—Senators Trumbull, Howard, and Johnson—to support their argument. (*See* ECF No. 30 at 35–36.) Plaintiffs argue that "Senator Trumbull, for example, explained that '[t]he second section' of the Fourteenth Amendment—the Apportionment Clause—'refers to no persons except those in the States of the Union; but the first section'—the Citizenship Clause— 'refers to persons everywhere, whether in the States *or in the Territories* or in the District of

Columbia.'" (ECF No. No. 30 at 35–36 (emphasis in original) (quoting Cong. Globe, 39th Cong., 1st Sess. 2894).) Plaintiffs argue that two statements made by Senator Howard and Senator Johnson also support their position. (*See* ECF No. 30 at 36.)

The Government makes two arguments in response. First, it argues that "whatever the import of those statements with respect to territories that were destined for statehood, they do not address the application of the Constitution to unincorporated territories, because the United States had no such territories at the time." (ECF No. 66 at 32.) Second, relying on the D.C. Circuit, it argues that the "background to the Fourteenth Amendment 'contains many statements from which conflicting inferences can be drawn,' . . . and 'scattered statements' from three legislators 'are not impressive legislative history' and cannot determine the meaning of the [Citizenship] Clause . . . ." (ECF No. 66 at 31–32 (citation omitted).)

Fourth, Plaintiffs argue that "the 'initial blueprint' for the Amendment—Section 1 of the Civil Rights Act of 1866," further confirms that the original understanding of 'in the United States' included States *and* Territories." (ECF No. 30 at 36 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 721 (1989).) Plaintiffs argue that because that statute indicates that persons born in both states and territories would be deemed citizens at birth, and because "[m]any of the Members of the 39th Congress viewed §1 of the Fourteenth Amendment as 'constitutionalizing' and expanding the protections of the 1866 [Civil Rights Act],' . . . Section 1 of the Fourteenth Amendment cannot be understood to take a geographic reach narrower than 'every State and Territory.'" (ECF No. 30 at 36).

The court addresses the parties' arguments in turn.

<u>Wong Kim Ark</u>

The court agrees with Plaintiffs that the historical evidence supports their position. Their

strongest argument—that the Citizenship Clause must be interpreted in light of English common law—relies heavily on *Wong Kim Ark*. As discussed in Section II below, the court agrees with Plaintiffs that the historical evidence—as established by the Supreme Court—demonstrates that the Fourteenth Amendment must be interpreted in light of the doctrine of *jus soli*.

Repudiation of *Dred Scott* and Relation to Civil War

The court also agrees with Plaintiffs that the Fourteenth Amendment's repudiation of the Supreme Court's *Dred Scott* decision provides evidence that *jus soli* governs citizenship by birth. As discussed above, Justice Taney's opinion that blacks could never be national citizens created a racial exception to birthright citizenship. This exception was inconsistent with the rule of birthright citizenship as explained by Coke in *Calvin's Case*—which required only birth within the allegiance and dominion of the sovereign. The passage of the Fourteenth Amendment, when compared to the holding in *Dred Scott*, represents a change that brings the rule for citizenship in the United States closer to the English common law rule for birthright citizenship.

In examining the historical significance of the passage of the Fourteenth Amendment, this court cannot not overlook the amendment's relation to the American Civil War—and the differing views that the North and the South had regarding citizenship and the location of sovereign power in the United States. The predominant Southern theory was that "sovereignty, community, and citizenship should be defined with reference to the individual states . . . ." Kettner at 335–36; *see also id* at 338 ("The South's position" was that "citizenship was properly defined with reference to the states . . . .").) In contrast, "Unionists in the North" believed that "the Constitution was the creation of the sovereign people in their aggregate capacity and their national character." *Id*. at 339.

The North's victory of the Civil War "establish[ed] the Union's primacy over the

individual states." Kettner at 334. Through that victory, the North was able to "impose its own ideas of citizenship . . . upon the nation." *Id*. at 340. The theory that this nation is composed of a communal association of individuals bound in their allegiance to the national sovereign is obviously very different from the theory of reciprocal obligations discussed in *Calvin's Case*—where a king owed protection to his subject from the moment she was born, and she owed him corresponding allegiance. But the North's view—of both allegiance and citizenship rooted in a *single* national sovereign—is more similar to the theory of allegiance discussed in *Calvin's Case* than is the Southern theory.[15] Thus, the passage of Fourteenth Amendment, and its repudiation of the Southern view of allegiance and citizenship, provides additional evidence that *jus soli* governs citizenship by birth.

Contemporaneous Statements of Fourteenth Amendment's Framers

The court next turns to Plaintiffs' arguments regarding the "contemporaneous statements from the Fourteenth Amendment's Framers . . . ." (ECF No. 30 at 35.) The Supreme Court has already clarified that, when interpreting the meaning of the Fourteenth Amendment, courts must look first to the text of the Amendment to determine its meaning. *See Wong Kim Ark*, 169 U.S. at 699 ("the intention of the congress which framed, and of the states which adopted, this amendment of the constitution, must be sought in the words of the amendment . . . ."). The Supreme Court has also made clear that "the debates in congress are not admissible as evidence to control the meaning of" the words of the Fourteenth Amendment. *See id*. "But the statements"

---

[15] Lord Coke's resolution of *Calvin's Case* was based in large part on the fact that because "both Scottish and English subjects owed allegiance to *the same sovereign*, Scots who were born into the allegiance of James at the time he was also King of England were natural subjects in England." Polly J. Price, *Natural Law and Birthright Citizenship in Calvin's Case (1608)*, 9 Yale J.L. & Human. 73, 114 (1997) (emphasis added). The North's victory and the subsequent passage of the Fourteenth Amendment confirm that this nation is composed of a communal association of individuals, whose allegiance is bound in the *same* national sovereign. This is more similar to the theory of allegiance described in *Calvin's Case* than is the Southern view that "stressed the primacy of the state communities of allegiance . . . ." *See* Kettner at 340.

made in the debates in congress "are valuable as contemporaneous opinions of jurists and statesmen upon the legal meaning of the words themselves . . . ." *See id* at 699.

The court agrees with Plaintiffs that the Framers' contemporaneous statements that they point to support their position that the Citizenship Clause applies with full force in the territories. Senator Trumbull's statement, that "the first section" of the Fourteenth Amendment "refers to persons everywhere, whether in the States *or in the Territories* or in the District of Columbia" directly supports Plaintiffs' interpretation. The court also finds it significant that, as the Plaintiffs argue, "the government fails to cite a *single* statement from *any* legislator supporting its view." (ECF No. 75 at 19 (emphasis in original).)

While the specific statements from the debates are persuasive evidence in favor of Plaintiffs' position, the court nevertheless holds, based on the Supreme Court's guidance in *Wong Kim Ark*, that those statements do not control the meaning of the Fourteenth Amendment.

Significance of Civil Rights Act of 1866

As noted above, Plaintiffs argue that because the Civil Rights Act indicates that persons born in both states and territories would be deemed citizens at birth, and because "[m]any of the Members of the 39th Congress viewed §1 of the Fourteenth Amendment as 'constitutionalizing' and expanding the protections of the 1866 [Civil Rights Act],' . . . Section 1 of the Fourteenth Amendment cannot be understood to take a geographic reach narrower than 'every State and Territory.'" (ECF No. 30 at 36). The court is not persuaded by this argument. The decision of the 39th Congress to not include, in the Fourteenth Amendment, language related to territories— language that was present in the Civil Rights Act—may by itself constitute evidence that they did not intend for territories to be included within the Citizenship Clause's geographic scope. *C.f. In re Town & Country Home Nursing Servs., Inc.*, 963 F.2d 1146, 1151 (9th Cir. 1991) ("As a

general canon of statutory construction, where the final version of a statute deletes language contained in an earlier draft, a court may presume that the earlier draft is inconsistent with ultimate congressional intentions.").

Summary as to Text, Structure, and Historical Evidence

On balance, the parties' arguments related to the text, structure, and historical evidence of the Citizenship Clause of the Fourteenth Amendment favor the Plaintiffs' position. But the resolution of this case is ultimately governed by the Supreme Court's controlling precedent in *Wong Kim Ark*.

II.     Controlling Supreme Court Precedent

The court proceeds in four steps: the court (A) explains why it is bound by *Wong Kim Ark*, (B) explains why *Downes v. Bidwell* does not control, (C) explains how these cases can be read harmoniously, and (D) addresses the Intervenors' arguments.

A. *Wong Kim Ark's* Holding Requires this Court to Rule for Plaintiffs

"Precedents contained in judicial opinions have traditionally been considered 'unwritten law' because long ago judges simply read or announced their decisions from the bench, without writing them down." Bryan A. Garner et al., *The Law of Judicial Precedent* 1 (2016). "It used to be widely thought—until about the end of the 19th century—that judicial precedents were merely *evidence* of the law, as opposed to the *source* of it." *Id*. at 2 (emphasis in original). "No serious legal thinker now believes this." *Id*. "Today, precedents are understood to make up part of the law . . . ." *Id*. "*Black's Law Dictionary* defines" precedent "as a 'decided case that furnishes a basis for determining later cases involving similar facts or issues.'" *Id* at 22 (quoting *Black's Law Dictionary* 1366 (Bryan A. Garner ed., 10th ed. 2014)).

"Of course, not all precedent is created equal: there is a hierarchy." Garner (2016) at 23.

"Chief among the differences between precedents is that some bind future courts, while others merely persuade." *Id.* "Binding precedent is 'very powerful medicine.'" *Id.* (citation omitted). "If it's on point, it '*is* the law' and 'cannot be considered and cast aside,' even if a later court disagrees with it—unless and until it is overruled." *Id.* "All other precedent is merely persuasive or conditional." *Id.* "Lacking the coercive authority of binding precedent, it draws its power mainly from its coherence and logical force." *Id.*

"Judicial precedents come in two flavors: vertical and horizontal." Garner at 27. "Federal . . . courts are absolutely bound by vertical precedents—those delivered by higher courts within the same jurisdiction." *Id.* "This binding tie is often said to be a matter of 'owing obedience.'" *Id.* (citation omitted). "The rule is that courts must adhere not just to the result but also to any reasoning necessary to that result." *Id.*[16]

"The Supreme Court has emphasized that 'unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be.'" Garner at 28 (quoting *Hutto v. Davis*, 454 U.S. 370, 375 (1982). "[I]f a Supreme Court decision 'is to be modified, overruled, or disregarded, that will have to be done by the Supreme Court.'" *Id.* (citation omitted). Indeed, "[l]ower courts are bound even by old and crumbling precedent—until the high court itself changes direction." *Id.* at 29.

But, "[n]ot all text within a judicial decision serves as precedent." Garner at 44. "That's a

---

[16] *See also Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.");

*see also United States v. Duvall*, 740 F.3d 604, 609 (D.C. Cir. 2013) (Kavanaugh, J., concurring in the denial of rehearing en banc) ("Vertical stare decisis applies to Supreme Court precedent in two ways." *Id.* "First, the *result* in a given Supreme Court case binds all lower courts. Second, the *reasoning* of a Supreme Court case also binds lower courts. So once a rule, test, standard, or interpretation has been adopted by the Supreme Court, that same rule, test, standard, or interpretation must be used by lower courts in later cases.") (emphasis in original).

role generally reserved only for the holding: the parts of a decision that focus on the legal question actually presented to and decided by the court." *Id*. "A holding consists of the 'court's determination of a matter of law pivotal to its decision.'" *Id* (citation omitted). "Everything else amounts to **dicta**—what Francis Bacon in 1617 called the 'vapours and fumes of law.'" *Id*. (bold added). "A witty opening paragraph, the background information on how the law developed, the digressions speculating on how similar hypothetical cases might be resolved—none of those things bind future courts." *Id*. "So the line between holding and dictum . . . matters." *Id*.

"Generally, a *dictum* is a statement in a judicial opinion that is unnecessary to the case's resolution." Garner at 46. "It's a statement that 'does not explain why the court's judgment goes in favor of the winner.'" *Id*. (citation omitted). "In the words of Posner J., it is 'a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding.'" *Id*. at 46–47 (citation omitted). "The distinction between a holding and a dictum doesn't depend on whether the point was argued by counsel and deliberately considered by the court . . . but instead on whether the solution of the particular point was more or less necessary to determining the issues involved in the case." *Id*. at 51

The Government argues that "*Wong Kim Ark* . . . contains **dicta** about common-law *jus soli* principles," and argues that Plaintiffs have failed "to point to any *jus soli* precedent . . . that speaks to birthright citizenship in unincorporated territories." (ECF No. 79 at 21 (bold added).) The Government insists that *Wong Kim Ark* does not control the outcome of this case.

Plaintiffs, in contrast, argue that the Supreme "Court unequivocally **held** that the Citizenship Clause 'reaffirmed' the 'fundamental principle of citizenship by birth *within the dominion*'—that is, *jus soli*—using 'the most explicit and comprehensive of terms.'" (ECF No. 75 at 23 (bold added) (quoting *Wong Kim Ark*, 169 U.S. at 675)). Plaintiffs argue that "[b]ecause

*Wong Kim Ark* authoritatively construed the Citizenship Clause as 'codifying a *pre-existing right*,'—the common law *jus soli* rule—this Court should look to that right's 'historical background' to discern its scope." (ECF No. 75 at 23 (quoting *Heller*, 554 U.S. at 592).) Plaintiffs argue that the Supreme Court's statements in *Wong Kim Ark*—that construed the *Citizenship's Clause's* phrase, "in the United States," as "encompassing *all* of the sovereign's geographic territory" "are not dicta; they were necessary to the reasoning that led to the Supreme Court's holding in each case." (*See* ECF No. 75 at 24 (emphasis in original).) Plaintiffs further argue that "[t]his Court should not follow the court of appeals who have failed to heed this binding precedent.[17]" (*See* ECF No. 75 at 24 n. 2) They argue that "[c]ircuit court decisions that misunderstand and misapply Supreme Court precedent are no substitute for authoritative Supreme Court decisions that speak to the citizenship question presented here." (ECF No. 75 at 24 n. 2.)

As explained below, the court agrees with Plaintiffs that the Supreme Court's discussion in *Wong Kim Ark* that related to the English common-law rule for birthright citizenship was not simply dicta—the Court's discussion of the English common-law rule was a determination of a matter of law that was pivotal to its decision, and is therefore binding on this court.

In *Wong Kim Ark*, Justice Gray—joined by Justices Brewer, Brown, Shiras, White, and Peckham—delivered the opinion of the court. In the beginning of its opinion the Court discussed the facts that bore on the outcome of the case. *See Wong Kim Ark*, 169 U.S. at 652–53. The Court

---

[17] The Government argues that "every court of appeals to consider the question has agreed that unincorporated territories are not 'in the United States' for purposes of the Citizenship Clause." (ECF No. 79 at 16.) The Government recognizes, however, that "every court of appeals to consider the question has relied on the *Insular Cases* (and in particular on *Downes v. Bidwell*) to reject the claim that Plaintiffs now bring in this Court . . . ." (ECF No. 79 at 10.) Those appellate court decisions are not binding on this court. Because, as the Government recognizes, those cases relied on *Downes v. Bidwell*, this court analyzes *Downes*. As explained below, this court concludes that *Downes* does not control the outcome of this case.

noted that Wong Kim Ark was born in the United States of America.[18] *See id*. at 652. The Court

also noted that while his parents, "were persons of Chinese descent and subjects of the emperor

of China," they "were never employed in any diplomatic or official capacity under the emperor

of China." *Id*. The Court also noted that "neither he, nor his parents acting for him, ever

renounced his allegiance to the United States . . . ." *Id*. The Court articulated the question

presented:

> [t]he question presented . . . is whether a child born in the United States, of
> parents of Chinese descent, who at the time of his birth are subjects of the
> emperor of China, but have a permanent domicile and residence in the United
> States, and are there carrying on business, and are not employed in any diplomatic
> or official capacity under the emperor of China, becomes at the time of his birth a
> citizen of the United States, by virtue of the first clause of the fourteenth
> amendment of the constitution . . . .

*Wong Kim Ark*, 169 U.S. at 653. The Court then separated its opinion into seven sections—

concluding, in the seventh section, that Wong Kim Ark was a citizen by virtue of his birth within

the United States.

*Wong Kim Ark* Section I

In Section I, the Court emphasized that the Fourteenth Amendment *must* be interpreted in

light of the history of this country—a history that is traced directly to the English common law.

*See Wong Kim Ark*, 169 U.S. at 653–54 ("In construing . . . a constitution established by the

people as the supreme law of the land, regard is to be had . . . to the condition and to the **history**

of the law as previously existing, and in the light of which the new act **must** be read and

interpreted.") (bold added); *see also id*. at 654 (The Fourteenth Amendment "**must** be interpreted

---

[18] The court recognizes that Wong Kim Ark was born in California which had been admitted as a state at the time of
his birth. As explained below, that fact does not distinguish the present facts of this case to allow the court to
disregard the Supreme Court's holding and direction.

in the light of the **common law**, the principles of **history** of which were familiarly known to the framers of the constitution.") (bold added).

<u>*Wong Kim Ark* Section II</u>

In Section II, the Court articulated the English common law rule of *jus soli* subjectship. *See Wong Kim Ark*, 169 U.S. at 655 ("The fundamental principle of the common law with regard to English nationality was birth within the allegiance . . . ."). The Court noted that this rule applied not only to "natural-born subjects" but also to children born to "aliens in amity, so long as they were within the kingdom." *Id.* The Court then noted two exceptions to the common law rule—children of ambassadors and children of alien enemies. *See id.* ("But the children, born within the realm, of foreign ambassadors, or the children of alien enemies, born during and within their hostile occupation of part of the king's dominions, were not natural-born subjects . . . .").

The Court then noted that "[t]his fundamental principle . . . was clearly . . . stated in the leading case known as 'Calvin's Case' . . . ." *Id.* at 655–56. Then, after reviewing other "English authorities" *id.* at 656, the Court confirmed that the rule established in *Calvin's Case* was the rule in England for at least three centuries prior to 1898 (the date *Wong Kim Ark* was decided). *See id.* at 658.[19]

<u>*Wong Kim Ark* Section III</u>

The Court then noted that "[t]he same rule was in force in all the English colonies upon this continent down to the time of the Declaration of Independence, and in the United States

---

[19] *Wong Kim Ark*, 169 U.S. at 658 ("It thus clearly appears that by the law of England for the last three centuries, beginning before the settlement of this country, and continuing to the present day, aliens, while residing in the dominions possessed by the crown of England, were within the allegiance, the obedience, the faith or loyalty, the protection, the power, and the jurisdiction of the English sovereign; and therefore every child born in England of alien parents was a natural-born subject, unless the child of an ambassador or other diplomatic agent of a foreign state, or of an alien enemy in hostile occupation of the place where the child was born.").

afterwards, and continued to prevail under the constitution as originally established." *Wong Kim Ark*, 169 U.S. at 658. The Court then discussed case law that supported the position that the English common law rule of citizenship was the law in United States—both before and after the Constitution was signed.[20] The Court also cited favorably to an opinion of the supreme court of North Carolina that provided, in relevant part, that "[t]he term 'citizen' as understood in our law, is precisely analogous to the term 'subject' in the common law, and the change of phrase has entirely resulted from the change of government." *Id*. at 664 (citation omitted). The Court then discussed opinions of "the executive departments" that "repeatedly affirmed" the "same doctrine" of English common law birthright citizenship. *See id*. at 664–66.

### *Wong Kim Ark* Section IV

In Section IV, the Court addressed an argument raised by the Government that "the rule of the Roman law, by which the citizenship of the child followed that of the parent . . . had superseded the rule of the common law, depending on birth within the realm . . . ." *Wong Kim Ark*, 169 U.S. at 666. After reviewing the citizenship laws of some European countries, the Court concluded that "[t]here is . . . little ground for the theory that at the time of the adoption of the fourteenth amendment of the constitution of the United States there was any settled and definite rule of law generally recognized by civilized nations, inconsistent with the ancient rule of citizenship by birth within the dominion." *Id*. at 667.

---

[20] *See Wong Kim Ark*, 169 U.S. at 659 (Citing *In Inglis v. Sailors' Snug Harbor (1830) 3 Pet. 99* for the proposition that "the justices of this court . . . all agreed that the law of England as to citizenship by birth was the law of the English colonies in America."); *see id*. at 662 (Citing *Levy v. McCartee* (1832) 6 Pet. 102 for the proposition that the Court "held that the case must rest for its decision exclusively upon the principles of the common law, and treated it as unquestionable that by that law a child born in England of alien parents was a natural-born subject, quoting the statement of Lord Coke . . . ."); *see id*. at 662–63 (quoting a Kentucky Circuit Court opinion that provided, in relevant part "'All persons born in the allegiance of the king are natural born subjects, and all persons born in the allegiance of the United States are natural born citizens. Birth and allegiance go together. Such is the rule of the common law, and it is the common law of this country, as well as of England.'"); *see also id*. at 663 ("The supreme judicial court of Massachusetts . . . early held that the determination of the question whether a man was a citizen or alien was 'to be governed altogether by the principles of the common law' . . . .").

The Court then discussed whether statutes conferring citizenship to children born abroad to American citizens affected the ancient rule of citizenship by birth within the dominion. *See id*. at 668. The Court concluded that "there is no authority . . . in England or America which maintains or intimates that the statutes . . . conferring citizenship on foreign-born children of citizens have superseded or restricted, in any respect, the established rule of citizenship by birth within the dominion." *Id*. at 674.

The court then provided that "it is beyond doubt that, before the enactment of the civil rights act of 1866 or the adoption of the constitutional amendment, all white persons, at least, born within the sovereignty of the United States, whether children of citizens or of foreigners, excepting only children of ambassadors or public ministers of a foreign government, were native-born citizens of the United States." *Wong Kim Ark*, 169 U.S. at 674–75.

### *Wong Kim Ark* Section V

The Court then provided that "[i]n the forefront . . . of the fourteenth amendment of the constitution . . . the fundamental principle of citizenship by birth within the dominion was reaffirmed in the most explicit and comprehensive terms." *Wong Kim Ark*, 169 U.S. at 675.

In addressing the first section of the Fourteenth Amendment, the Court provided, in relevant part, that: "[a]s appears upon the face of the amendment, as well as from the history of the times, this was not intended to impose any new restrictions upon citizenship, or to prevent any persons from becoming citizens by the fact of birth within the United States, who would thereby have become citizens according to the law existing before its adoption." *Id*. at 676.

The Court then discussed the *Slaughter House Cases* and *Elk v. Wilkins*. *Id*. at 676–82. The Court noted that the Fourteenth Amendment contained the same two exceptions to *jus soli* citizenship that existed at common law—that children of diplomats and children of alien enemies

are not entitled to citizenship. *See id*. at 682.[21] The Court then discussed two of its previous

cases—*United States v. Rice*, 17 U.S. 246 (1819) and *The Schooner Exch. v. McFaddon*, 11 U.S.

116 (1812)—that confirmed the validity of these two exceptions to birthright citizenship. *See id*.

at 683–86 ("The principles upon which each of those exceptions rests were long ago distinctly

stated by this court."). After discussing those cases, the Court provided that "[t]hese

considerations confirm the view, already expressed in this opinion, that the opening sentence of

the fourteenth amendment is throughout affirmative and declaratory, intended to allay doubts and

to settle controversies which had arisen, and not to impose any new restrictions upon

citizenship." *Wong Kim Ark*, 169 U.S. at 687–88. The Court then discussed "opinions of the

executive departments" that confirmed "the fundamental rule of citizenship by birth within the

dominion of the United States . . . ." *See id*. at 688–692.

> The Court then provided a conclusion to Section V:
>
> The foregoing considerations and authorities irresistibly lead us to these **conclusions**: *The fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth* within the territory, in the allegiance and under the protection of the country, including all children here born of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes.
>
> The amendment, in clear words and in manifest intent, includes the children born within the territory of the United States of all other persons, of whatever race or color, domiciled within the United States. Every citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and

---

[21] *Wong Kim Ark*, 169 U.S. at 682 ("The real object of the fourteenth amendment of the constitution, in qualifying the words 'all persons born in the United States' by the addition 'and subject to the jurisdiction thereof,' would appear to have been to exclude, by the fewest and fittest words (besides children of members of the Indian tribes, standing in a peculiar relation to the national government, unknown to the common law), the two classes of cases,— *children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign state,*— both of which, as has already been shown, by the law of England and by our own law, from the time of the first settlement of the English colonies in America, *had been recognized exceptions to the fundamental rule of citizenship by birth within the country*.") (emphasis added).

consequently subject to the jurisdiction, of the United States. His allegiance to the United States is direct and immediate, and, although but local and temporary, continuing only so long as he remains within our territory, is yet, in the words of Lord Coke in Calvin's Case, 7 Coke, 6a, 'strong enough to make a natural subject, for, if he hath issue here, that issue is a natural-born subject';

and his child, as said by Mr. Binney in his essay before quoted, 'If born in the country, is as much a citizen as the natural-born child of a citizen, and by operation of the same principle.' It can hardly be denied that an alien is completely subject to the political jurisdiction of the country in which he resides, seeing that, as said by Mr. Webster, when secretary of state, in his report to the president on Thrasher's case in 1851, and since repeated by this court: 'Independently of a residence with intention to continue such residence; independently of any domiciliation; independently of the taking of any oath of allegiance, or of renouncing any former allegiance,—it is well known that by the public law an alien, or a stranger born, for so long a time as he continues within the dominions of a foreign government, owes obedience to the laws of that government, and may be punished for treason or other crimes as a native-born subject might be, unless his case is varied by some treaty stipulations.'

To hold that the fourteenth amendment of the constitution excludes from citizenship the children born in the United States of citizens or subjects of other countries, would be to deny citizenship to thousands of persons of English, Scotch, Irish, German, or other European parentage, who have always been considered and treated as citizens of the United States.

*Wong Kim Ark*, 169 U.S. at 693–94. (emphases added).

### *Wong Kim Ark* Section VI

In Section VI the Court stated that the Fourteenth Amendment "contemplates two sources of citizenship, and two only,–birth and naturalization," and held that while the Constitution grants Congress the power to regulate requirements for naturalization, it has no power to restrict birthright citizenship. *See Wong Kim Ark*, 169 U.S. at 703 ("The fourteenth amendment, while it leaves the power, where it was before, in congress, to regulate naturalization, has conferred no authority upon congress to restrict the effect of birth, declared by the constitution to constitute a sufficient and complete right to citizenship.").

More specific to the facts before it, the Supreme Court held that "[t]he fact . . . that acts of congress or treaties ha[d] not [at that time] permitted Chinese persons born out of this country

to become citizens by naturalization, [could not] exclude Chinese persons born in this country from the operation of the broad and clear words" of the Fourteenth Amendment. *See Wong Kim Ark*, 169 U.S. at 703; *see id*. at 699 ("The acts of congress, known as the 'Chinese Exclusion Acts,' the earliest of which was passed some 14 years after the adoption of the constitutional amendment, cannot control its meaning, or impair its effect, but must be construed and executed in subordination to its provisions.").

In short, Section VI of the opinion established the supremacy of the constitutional right of birthright citizenship over the ability of Congress to restrict that right—and confirmed the authority of the judiciary to give effect to that right. *See Wong Kim Ark*, 169 U.S. at 694.[22]

*Wong Kim Ark* Section VII

In Section VII the Court held that Wong Kim Ark was a citizen of the United States. *See Wong Kim Ark*, 169 U.S. at 704–05. In reaching this holding, the Court discussed the specific facts of the case necessary to reach that conclusion. For example, the Court noted that Wong Kim Ark had been born within the United States. *See id*. at 704 ("Upon the facts agreed in this case, the American citizenship which Wong Kim Ark acquired **by birth within the United States** has not been lost or taken away by anything happening since his birth." (bold added).) The court also noted that "Wong Kim Ark ha[d] not, either by himself or his parents acting for him, ever renounced his allegiance to the United States." *Id*.

The Court then affirmed the question presented at the outset of the opinion:

---

[22] *Wong Kim Ark*, 169 U.S. at 694 ("Whatever considerations, in the absence of a controlling provision of the constitution, might influence the legislative or the executive branch of the government to decline to admit persons of the Chinese race to the status of citizens of the United States, there are none that can constrain or permit the judiciary to refuse to give full effect to the peremptory and explicit language of the fourteenth amendment, which declares and ordains that 'all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States.'").

The evident intention, and the necessary effect, of the submission of this case to the decision of the court upon the facts agreed by the parties, were to present for determination the single question, stated at the beginning of this opinion, namely, **whether a child born in the United States**, of parents of Chinese descent, who, at the time of his birth, are subjects of the emperor of China, but have a permanent domicile and residence in the United States, and are there carrying on business, and **are not employed in any diplomatic or official capacity under the emperor of China**, becomes at the time of his birth a citizen of the United States. For the reasons above stated, this court is of opinion that the question must be answered in the affirmative.

*Wong Kim Ark*, 169 U.S. at 704–05 (bold added).

In short, in Section VII the Court held that Wong Kim Ark was a citizen of the United States because (1) he was born within the United States; (2) he had never renounced his allegiance to the United States; and (3) one of the historical exceptions to birthright citizenship—a child's birth to foreign minister parents—did not apply because his parents were not Chinese diplomats.

<u>*Wong Kim Ark's* Conclusion That the Fourteenth Amendment Affirms the English Common-Law Rule of Citizenship is Binding on This Court</u>

The question for this court is whether the Supreme Court's "conclusion" that "[t]he fourteenth amendment affirms" the English common-law rule for birthright citizenship is dicta, as the Government argues, or a holding, as Plaintiffs argue. The Tenth Circuit has "defined dicta as 'statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand.'" *United States v. Barela*, 797 F.3d 1186, 1190 (10th Cir. 2015) (citation omitted). If the Supreme Court's discussion of the English common law rule for citizenship was reasoning that was essential to the question presented, it is not dicta, it is a holding.

The relevance of the English common-law to the Supreme Court's outcome in *Wong Kim Ark* cannot be overstated. In the introduction of its opinion, the Court provided the relevant facts

necessary for Wong Kim Ark to satisfy his status as a citizen under the English rule: (1) he was born in the United States; (2) he had never renounced his allegiance to the United States; and (3) his parents were not diplomats. In Section I, the Court stated, in no uncertain terms, that the Fourteenth Amendment "**must** be interpreted in the light of the common law . . . ." *Wong Kim Ark*, 169 U.S. at 654 (bold added). The Court then proceeded to discuss the relevance of English Common Law to the question presented in Section II[23], Section III[24], Section IV,[25] and Section V.[26] In Section VII, the Court then again reiterated that Wong Kim Ark was born in the United States and had not renounced his allegiance to the United States. *See Wong Kim Ark*, 169 U.S. at 704–05. Then, in restating the question presented, the Court again mentioned that Wong Kim Ark's parents were not diplomats of China. *See id*. at 705.

The Supreme Court's statement that our nation's Constitution "**must** be interpreted in light of the common law," and its "conclusion" that "the fourteenth amendment affirms the ancient and fundamental rule of citizenship by **birth** within the territory, **in the allegiance**" *Wong Kim Ark*, 169 U.S. at 654; 693 (bold added), was not simply dicta. The text of the Citizenship Clause of the Fourteenth Amendment does not include the word "allegiance." Nor

---

[23] *Wong Kim Ark*, 169 U.S. at 655 ("The fundamental principle of the common law with regard to English nationality was birth within the allegiance . . . .").

[24] *See Wong Kim Ark*, 169 U.S. at 659 ("In Inglis v. Sailors' Snug Harbor (1830) . . . the justices of this court . . . all agreed that the law of England as to citizenship by birth was the law of the English colonies in America.").

[25] *See Wong Kim Ark*, 169 U.S. at 674 ("So far as we are informed, there is no authority, legislative, executive, or judicial, in England or America, which maintains or intimates that the statutes . . . have superseded or restricted, in any respect, the established rule of citizenship by birth within the dominion.").

[26] *See Wong Kim Ark*, 169 U.S. at 675 ("the fundamental principle of citizenship by birth within the dominion was reaffirmed in the most explicit and comprehensive terms."); *see id*. at 693 ("Every citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States. His allegiance to the United States is direct and immediate, and, although but local and temporary, continuing only so long as he remains within our territory, is yet, **in the words of Lord Coke in Calvin's Case**, . . . 'strong enough to make a natural subject, for, if he hath issue here, that issue is a natural-born subject' . . . .") (bold added);

does the text of the Citizenship Clause mention foreign ministers or foreign diplomats. Yet the Supreme Court emphasized—in both the introduction and the conclusion—that Wong Kim Ark had not renounced his allegiance and that his parents were not foreign diplomats. These facts are only relevant to the ultimate resolution of the case—that he was a citizen by virtue of his birth in the United States—if the Fourteenth Amendment adopted the English rule for citizenship. The Supreme Court's discussion of the relevant facts reveals that its discussion of the English common-law was essential to the determination of the question presented.

This court cannot ignore the fact that the Supreme Court discussed the relevance of the English common-law rule to the meaning of the Fourteenth Amendment at length—in five of the opinion's seven sections. The Supreme Court's discussion was not simply "[a] witty opening paragraph." Garner at 44. The Court's discussion was not simply "background information on how the law developed." *Id*. It was not a "digression[] speculating on how similar hypothetical cases might be resolved" in the future. *Id*.

It was a dictate to future courts. A mandate that this court is duty-bound to follow. The Fourteenth Amendment constitutionalized the English common-law rule for birthright citizenship, and it *must* be interpreted in light of that rule. The holding of *Wong Kim Ark* was that the Fourteenth Amendment adopted the English common-law rule for citizenship.

"[O]nce a rule, test, standard, or interpretation has been adopted by the Supreme Court, that same rule, test, standard, or interpretation **must** be used by lower courts in later cases." *United States v. Duvall*, 740 F.3d 604, 609 (D.C. Cir. 2013) (bold added) (Kavanaugh, J., concurring in the denial of rehearing en banc).

The question is whether, under the Citizenship Clause—interpreting it in light of the English common rule for birthright citizenship as this court must—American Samoa is "in the

United States." As discussed at length above, the English rule required birth within the dominion and allegiance of the sovereign. Thus, if American Samoa is within the "dominion" of the United States under the English rule, it is "within the United States" under the Fourteenth Amendment.

Relying on *Calvin's Case*, Amici Curiae Citizenship Scholars argue that "[u]nder the English common law rule that the Fourteenth Amendment codified, the doctrine extended beyond the boundaries of England to encompass any territory under the sovereignty of the King of England: 'whosoever was born within the fee of the King of England, though it be another kingdom, was a natural-born subject.'"" (ECF No. 52 at 18 (quoting *Calvin's Case*, 77 Eng. Rep. at 403).) Plaintiffs similarly argue that "*jus soli* encompassed *all* of the sovereign's soil and nothing in the doctrine's history indicates that some territorial outposts counted and others did not." (ECF No. 75 at 23 (emphasis in original).) Plaintiffs argue that the Citizenship Clause's phrase "in the United States" encompasses all of the sovereign's geographic territory. (*See* ECF No. 75 at 24.) The Government does not make any argument to dispute that, at common law, the geographic scope of England's dominion extended to any territory under the sovereignty of the king.

Interpreting the Fourteenth Amendment in light of the English common-law, this court holds that American Samoa is within the dominion of the United States because it is a territory under the full sovereignty of the United States—that is, American Samoa is within the "full possession and exercise of [the United States'] power." *Wong Kim Ark*, 169 U.S. at 659. American Samoa is therefore "in the United States" for purposes of the Fourteenth Amendment.

B. *Downes v. Bidwell* Does Not Control the Outcome of this Case

As discussed above, *Downes v. Bidwell* represents the origin of the doctrine of territorial incorporation, "under which the Constitution applies in full in incorporated Territories surely

destined for statehood but only in part in unincorporated Territories." *See Boumediene v. Bush*, 553 U.S. 723, 757 (2008) (citation omitted). The Government argues that "the Citizenship Clause confers citizenship on those born 'in the United States,'" and argues that the Supreme Court's "decision in *Downes* confirms that the language 'in the United States' excludes unincorporated territories"—like American Samoa. (*See* ECF No. 66 at 22.)

The Government acknowledges that the Court in *Downes* was not interpreting the Citizenship Clause of the Fourteenth Amendment—it was interpreting the Uniformity Clause. (*See* ECF No. 79 at 11 ("To be sure, this case is not about the Tax Uniformity Clause."); *see also* ECF No. 66 at 22 ("The Court held that Puerto Rico is not part 'of the United States' for purposes of" the Uniformity Clause.).) But the Government argues that "the Supreme Court recognized in *Downes* that the Constitution should not be read to automatically confer citizenship on inhabitants of U.S. territories" because "the Justices in the majority" "recognized that when the United States acquires various territories, the decision to afford citizenship is to be made by Congress." (ECF No. 66 at 23 (citations omitted).)

Plaintiffs[27] and the Government[28] both acknowledge that no opinion in *Downes v. Bidwell* commanded a majority of the Court. As discussed above, Justice Brown delivered the judgment of the court in an opinion in which no other Justice joined. Justice White authored a concurring opinion—joined by Justices Shiras and McKenna. Justice Gray authored a concurring opinion as well.

Because the Government relies so heavily on *Downes*—and because this court owes

---

[27] *See* ECF No. 75 at 26 ("the members of the majority [in *Downes*] 'agreed on little other than the case's ultimate result.'") (citation omitted).)

[28] *See* ECF No. 66 at 22 n. 6 ("Although Justice Brown's opinion was designated an 'opinion of the Court' . . . a reporter's note indicates that no opinion commanded a majority of the Court . . . .") (citations omitted).)

absolute obedience to Supreme Court holdings—this court must determine which opinion in *Downes* controls. "A plurality opinion is one that doesn't garner enough appellate judges' votes to constitute a majority, 'but has received the greatest number of votes of any opinion filed,' among those opinions supporting the mandate." Garner at 195. The opinion of Justice White is the plurality opinion in *Downes* because, of those supporting the result, it accumulated the most votes. Justice White's plurality opinion "isn't necessarily the opinion entitled to precedential effect, however." Garner at 196.

"Ordinarily, where 'a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgements on the narrowest grounds.'" *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006) (quoting *Marks v. United States,* 430 U.S. 188, 193 (1977)); *see also* Garner at 199 ("The prevailing approach for determining the rule that emerges from a plurality decision was established in the 1977 case of *Marks v. United States*."). This rule, known as the *Marks* rule, is important for lower courts because "vertical precedent is absolute, making it important that lower courts properly understand and apply this essential rule." Garner at 202.

But "[w]hen the plurality and concurring opinions take distinct approaches, and there is no 'narrowest opinion' representing the 'common denominator of the Court's reasoning,' then *Marks* becomes 'problematic.'" *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006) (citations omitted). As discussed above, at the outset of his opinion, Justice White noted that his reasons for concurring with Justice Brown were "different from, if not in conflict with those expressed in" Justice Brown's opinion. *Downes*, 182 U.S. at 287 (White, J., concurring). Determining *Downes*' narrowest opinion would be difficult in this case. But as

explained below, the court need not determine which of *Downes*' opinions is the narrowest because the Supreme Court has, since *Downes*, provided authoritative guidance regarding which opinion controls.

The *Marks* rule is less important for the Supreme Court than it is for lower courts. *See* Garner at 202 ("The *Marks* rule is somewhat less important for the Supreme Court itself that it is for lower courts."). "The Supreme Court—applying horizontal precedent—has flexibility to interpret, clarify, or refashion its precedents . . . ." *Id.* Approximately twenty-one years after *Downes* was decided, a unanimous Supreme Court clarified that "the opinion of Mr. Justice White of the majority, in Downes v. Bidwell, has become the settled law of the court." *Balzac v. Porto Rico*, 258 U.S. 298, 305 (1922).

Based on the Supreme Court's guidance in *Balzac*, this court accepts that Justice White's opinion has been elevated to the controlling opinion of the splintered *Downes* decision. *See* Garner at 233 ("Approval by a higher court can enhance the authority of an opinion that probably wouldn't otherwise be followed, such as . . . an opinion that simply appears weak in its reasoning."); *see id.* ("To justify reliance on a case, a court may note that other courts have cited it approvingly."). This court finds it unnecessary to engage in the *Marks* analysis. The court therefore examines Justice White's concurring opinion to determine if it controls the outcome of this case.

In his concurring opinion, Justice White articulated the "sole and only issue:" "whether the particular tax in question was levied in such form as to cause it to be repugnant to the Constitution. This is to be resolved by answering the inquiry, Had Porto Rico, at the time of the passage of the act in question, been incorporated into and become an integral part of the United States?" *Downes*, 182 U.S. at 299 (White, J., concurring). Before reaching the answer to the

question presented, he expressed his view that it "is self-evident" that "the Constitution is operative" "[i]n the case of the territories." *See id*. at 292. For Justice White, the question was not whether the Constitution applies to Puerto Rico, but whether the *specific* provision of the Constitution "relied on is applicable." *See id*.[29]

Justice White's holding was limited to the specific Constitutional provision at issue—the Uniformity Clause. *See Downes*, 182 U.S. at 341–42 (White, J. concurring). He held that because Puerto Rico "had not been incorporated into the United States," it was within Congress' authority to pass an act taxing goods coming from Puerto Rico because Congress was not bound by the Uniformity Clause. *See id*. This is so, he held, because that specific "provision of the Constitution"—the Uniformity Clause "was not applicable to Congress in legislating Porto Rico." *Id*. at 342.[30] Thus, it is undisputed that Justice White's holding was limited to the Uniformity Clause.

Despite the limited question presented, and Justice White's limited holding, the Government relies on Justice White's statements related to citizenship.[31] More specifically, the

---

[29] *Downes*, 182 U.S. at 292 (White, J. concurring) ("In the case of the territories, as in every other instance, when a provision of the Constitution is invoked, the question which arises is, not whether the Constitution is operative, for that is self-evident, but whether the provision relied on is applicable.").

[30] *See Downes*, 182 U.S. at 341–42 ("The result of what has been said is that while in an international sense Porto Rico was not a foreign country, since it was subject to the sovereignty of and was owned by the United States, it was foreign to the United States in a domestic sense, because the island had not been incorporated into the United States, but was merely appurtenant thereto as a possession. As a necessary consequence, the impost in question assessed on coming from Porto Rico into the United States after the cession was within the power of Congress, and that body was not, moreover, as to such impost, controlled by the clause requiring that imposts should be uniform throughout the United States; in other words, **the provision of the Constitution just referred** to was not applicable to Congress in legislating for Porto Rico." (bold added).).

[31] The Government also relies extensively on the opinion of Justice Brown. (*See* ECF No. 66 at 20; 22–23; 25–26; 31; 36.) As explained above, the opinion of Justice Brown does not control this court. But even if it did, his commentary on citizenship would amount to mere dicta. His discussion on citizenship is not legal reasoning that is necessary to his ultimate conclusion. Apart from Justice Brown's agreement with the Supreme Court's ultimate conclusion, this court owes no obedience to his opinion. Justice Brown's digression related to citizenship is largely premised on notions of white supremacy that the Supreme Court has long ago rejected. Unbounded by the strict requirements of vertical stare decisis, this court rejects Justice Brown's opinion.

Government quotes Justice White's statement that "[t]he right to acquire territory 'could not be practically exercised if the result would be to endow the inhabitants with citizenship of the United States.'" (ECF No. 66 at 23 (quoting *Downes*, 182 U.S. at 306 (White, J., concurring)); *see also* ECF No. 66 at 22 n. 6). As explained below, Justice White's statement relating to citizenship is dicta—and as such, this court is not bound to follow its reasoning.

Justice White's statement relating to citizenship must be read in context. Justice White was addressing an argument that all territory acquired by the United States is automatically fully incorporated into the United States—meaning "every provision" of the Constitution would apply in full. *See Downes*, 182 U.S. at 305–06 (White, J. concurring).[32] He rejected that argument, insisting that "acquired territory," in the absence of" an agreement to the contrary, bears "such relation to the acquiring government" as determined by the acquiring government. *Id*. at 306. He then stated that the United States, as a member of "the family of nations" possesses full authority to acquire territory. *See id*. He then continued:

> **Let me _illustrate_ the accuracy of this statement**. Take a case of discovery. Citizens of the United States discover an unknown island, peopled with an *uncivilized race*, yet rich in soil, and valuable to the United States for commercial and strategic reasons. Clearly, by the law of nations, the right to ratify such acquisition and thus to acquire the territory would pertain to the government of the United States.
>
> *Can it be denied that such right could not be practically exercised if the result would be to endow the inhabitants with citizenship of the United States* and to subject them, not only to local, but also to an equal proportion of national, taxes, even although the consequence would be to entail ruin on the discovered territory, and to inflict grave detriment on the United States, to arise both from the dislocation of its fiscal system and *the immediate bestowal of citizenship on those absolutely unfit to receive it*?

---

[32] *Downes*, 182 U.S. at 305–06 (White, J. concurring) ("It is insisted, however, conceding the right of the government of the United States to acquire territory, as all such territory when acquired becomes absolutely incorporated into the United States, every provision of the Constitution which would apply under that situation is controlling in such acquired territory. This, however, is but to admit the power to acquire, and immediately to deny its beneficial existence.").

The practice of the government has been otherwise.

*Downes*, 182 U.S. at 305–06 (White, J. concurring) (emphases added).

Justice White's "illustration" relating to citizenship was a digression concerning a "legal proposition not necessarily involved nor essential to determination of the case in hand." *United States v. Barela*, 797 F.3d 1186, 1190 (10th Cir. 2015). Justice White's "illustration" was dicta. It was "merely [a] remark[] made in the course of a decision, but not essential to the reasoning behind that decision." Garner at 44. As dicta, it is not binding on this court.

To be sure, the Tenth Circuit has "previously held" that it is "'bound by Supreme Court dicta *almost* as firmly as by the Courts' outright holdings, particularly when the dicta is recent and not enfeebled by later statements.'" *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015) (emphasis added) (citation omitted). But this court is not bound by *Downes'* dicta because the principles of vertical stare decisis require this court to give priority to the Supreme Court's holdings over its dicta—and, explained above, *Wong Kim Ark's* holding is binding. Second, *Downes'* dicta do not squarely relate to the holding itself and are therefore "assuredly . . . gratuitous." *See id*. Third, the Supreme Court has, since *Downes*, thoroughly rejected the bigoted premise upon which Justice White's dicta is founded—that some groups are inferior to others based simply on their race. *See e.g,*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 272 (1995) ("the Constitution and [the Supreme] Court . . . abide no measure 'designed to maintain White Supremacy.'") (citation omitted).

To summarize, because *Downes* did not construe the Citizenship Clause, and because the controlling opinion's statements in *Downes* related to citizenship are not binding on this court, *Downes* does not control the outcome of this case.

C.  This Court Must Read *Wong Kim Ark* and *Downes* Harmoniously

At oral argument Plaintiffs did not dispute that, under the *Insular Cases*, American Samoa is considered an unincorporated territory. Justice White's controlling opinion in *Downes* that Puerto Rico, having "not been incorporated into the United States," could not be considered to be "an integral part of the United States" for purposes of the Uniformity Clause is a persuasive argument that American Samoa, as an unincorporated territory, is not "in the United States" for purposes of the Citizenship Clause.

But as explained above, under *Wong Kim Ark* this court *must* apply the English common law rule for citizenship to determine whether American Samoa is "in the United States" for purposes of the Citizenship Clause. And, as explained above, the application of that rule requires this court to hold that American Samoa is in the United States. This outcome results in an incongruity that the Government has identified in its briefing. (*See* ECF No. 79 at 11 ("Plaintiffs have provided no principled justification for holding that unincorporated territories are 'in the United States' for purposes of the Citizenship Clause, even though the Supreme Court has held that unincorporated territories are *not* a part of 'the United States,' for purposes of the Tax Uniformity Clause.") (emphasis in original).) It is not for this court to explain this incongruity. That is a task for the Supreme Court. This court's role is simply to faithfully apply binding precedent.

"A court considering discordant decisions must first determine whether the perceived conflict between them is real." Garner at 300. "If at all possible, the opinions should be harmonized." *Id*. "Lower courts almost uniformly adhere to the rule that the most recent opinion of the high court within the jurisdiction is to be followed." *Id*. at 301. "The lower court will examine whether the later case overruled all or part of an earlier case." *Id*. "If the overruling was

express, then its task is easy." *Id*. "If the overruling was thought to be tacit, things get more difficult." *Id*. "Before a lower court makes the assumption of a tacit overruling, it will want to exhaust all possibilities of reconciling the two decisions—perhaps even assuming that the highest court may not adopt just one of the decisions if confronted with the question but may instead reconcile the decisions by thoughtfully distinguishing them." *Id*. at 301–02.

None of the *Insular Cases* ever expressly overruled *Wong Kim Ark*. This court declines to assume that *Wong Kim Ark* was tacitly overruled. Instead, this court, in pursuit of its duty-bound obedience to Supreme Court precedent, harmonizes *Wong Kim Ark* and the *Insular Cases*. This court concludes that whether an unincorporated territory is "in the United States" for purposes of the Citizenship Clause is a different question than whether an unincorporated territory is "part of the United States" for purposes of the Uniformity Clause.

This outcome is not foreclosed by the *Insular Cases*. "The Constitution of the United States is in force in [unincorporated territories] as it is wherever and whenever the sovereign power of that government is exerted." *See Balzac v. Porto Rico*, 258 U.S. 298, 312 (1922). "The Constitution, however, contains grants of power, and limitations which in the nature of things are not always and everywhere applicable and the real issue in the Insular Cases was not whether the Constitution extended to [unincorporated territories] when we went there, but *which ones of its provisions were applicable* by way of limitation upon the exercise of . . . legislative power in dealing with new conditions and requirements." *See id*. (emphases added). As discussed above, Justice White's controlling opinion in *Downes* was limited to the specific provision at issue in that case. This court, harmonizing the *Insular Cases* with *Wong Kim Ark*, holds that the Citizenship Clause of the Fourteenth Amendment is a Constitutional provision that is applicable to American Samoa.

66

American Samoans owe permanent allegiance to the United States. They are therefore "subject to the jurisdiction" of the United States. American Samoa is a territory that is within the dominion of the United States. It is therefore "in the United States." Plaintiffs, having been born in the United States, and owing allegiance to the United States, are citizens by virtue of the Citizenship Clause of the Fourteenth Amendment.

Because the Citizenship Clause applies to Plaintiffs, Congress has no authority to deny them citizenship. *C.f. Wong Kim Ark*, 169 U.S. at 703 ("The fourteenth amendment, while it leaves the power, where it was before, in congress, to regulate naturalization, has conferred no authority upon congress to restrict the effect of birth, declared by the constitution to constitute a sufficient and complete right to citizenship.").

D. *Wong Kim Ark's* Holding Requires this Court to Reject the Intervenors' Arguments

As discussed above, in addition to the arguments the Government makes, Intervenors argue that this court "should dismiss the complaint for at least two additional reasons . . . ." (ECF No. 89 at 7.) First, Intervenors argue that "imposition of citizenship by judicial fiat would fail to recognize American Samoa's sovereignty and the importance of the *fa'a Samoa*. (ECF No. 89 at 15.) *Fa'a Samoa* is "the Samoan way of life." (ECF No. 89 at 7.) Second, they argue that "imposition of citizenship over American Samoan's objections violates fundamental principles of self-determination." (ECF No. 89 at 15.) They argue that the "imposition of a compact of citizenship, directly conflicting with the will of the American Samoan people," would intrude upon the autonomy of American Samoa. (*See* ECF No. 89 at 21.)

In response, this court is not imposing "citizenship by judicial fiat." The action is required by the mandate of the Fourteenth Amendment as construed and applied by Supreme Court precedent. Further, Plaintiffs are American Samoans. They brought this action seeking to

realize their rights to citizenship under the Fourteenth Amendment. Intervenors cannot be said to represent the will of all American Samoans. Additionally, in its amicus brief, the Samoan Federation of America, Inc. argues that the American Samoan government's "elected officials' concerns that birthright citizenship presents a threat to American Samoan self-determination or cultural preservation are misplaced." (ECF No. 55 at 29.)

It is not this court's role to weigh in on what effect, if any, a ruling in Plaintiffs' favor may have on *Fa'a Samoa*. This court must apply binding precedent. As explained in length above, *Wong Kim Ark*'s holding is binding on this court. This court has no choice but to deny Intervenors' Motion.

## Conclusion

I.      The Government's Motion to Dismiss, (ECF No. 66) is DENIED.

II.     The Intervenors' Motion to Dismiss, (ECF No. 89) is DENIED.

III.    Plaintiffs' Motion for Summary Judgment, (ECF No. 30) is GRANTED.

    a.  Persons born in American Samoa are citizens of the United States by virtue of the Citizenship Clause of the Fourteenth Amendment. 8 U.S.C. § 1408(1) is unconstitutional both on its face and as applied to Plaintiffs.

    b.  The court enjoins Defendants from enforcing 8 U.S.C. § 1408(1). Defendants shall not imprint Endorsement Code 09 in Plaintiffs' passports. Defendants shall issue new passports to Plaintiffs that do not disclaim their U.S. citizenship.

    c.  Any State Department policy that provides that the citizenship provisions of the Constitution do not apply to persons born in American Samoa violates the Fourteenth Amendment.

d.  Defendants are enjoined from enforcing any Department of State Foreign Affairs Manual provision that provides that the citizenship provisions of the Constitution do not apply to persons born in American Samoa.

e.  Defendants' practice and policy of enforcing 8 U.S.C. § 1408(1) through imprinting Endorsement Code 09 in the passports of persons born in American Samoa is contrary to constitutional right and is not in accordance with law. Pursuant to 5 U.S.C. § 706(2), Defendants are enjoined from further enforcement of that practice and policy.

SO ORDERED this 12th day of December, 2019.

BY THE COURT:

Clark Waddoups
United States District Judge