**FILED**
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**July 15, 2021**

_____

**Christopher M. Wolpert**
**Clerk of Court**

JOHN FITISEMANU; PALE TULI;
ROSAVITA TULI; SOUTHERN UTAH
PACIFIC ISLANDER COALITION,

      Plaintiffs - Appellees,

v.

UNITED STATES OF AMERICA; U.S.
DEPARTMENT OF STATE; ANTONY
BLINKEN, in his official capacity as
Secretary of the U.S. Department of State;
IAN G. BROWNLEE, in his official
capacity as Assistant Secretary of State for
Consular Affairs,

      Defendants - Appellants,

and

THE HONORABLE AUMUA AMATA;
AMERICAN SAMOA GOVERNMENT,

      Intervenor Defendants - Appellants.

------------------------------

VIRGIN ISLANDS BAR ASSOCIATION;
AMERICAN CIVIL LIBERTIES UNION;
ACLU OF UTAH; LINDA S. BOSNIAK;
KRISTIN COLLINS; STELLA BURCH
ELIAS; SAM ERMAN; TORRIE
HESTER; POLLY J. PRICE; MICHAEL
RAMSEY; NATHAN PERL-
ROSENTHAL; LUCY E. SALYER;
KATHERINE R. UNTERMAN;
CHARLES R. VENATOR-SANTIAGO;
SAMOAN FEDERATION OF AMERICA,

Nos. 20-4017 & 20-4019
(D.C. No. 1:18-CV-00036-CW)
(D. Utah)

INC.; RAFAEL COX ALOMAR; J.
ANDREW KENT; GARY S. LAWSON;
SANFORD V. LEVINSON; CHRISTINA
DUFFY PONSA-KRAUS; STEPHEN I.
VLADECK; CONGRESSWOMAN
STACEY PLASKETT; CONGRESSMAN
MICHAEL F.Q. SAN NICOLAS; CARL
GUTIERREZ; FELIX P. CAMACHO;
JUAN BABAUTA; DR. PEDRO
ROSSELLO; ANIBAL ACEVEDO VILA;
LUIS FORTUNO; JOHN DE JONGH;
KENNETH MAPP; DONNA M.
CHRISTIAN-CHRISTENSEN,

     Amici Curiae.

_____

## ORDER

_____

Before **TYMKOVICH**, Chief Judge, **LUCERO**, and **BACHARACH**, Circuit Judges.

_____

These matters are before the court *sua sponte* to correct a clerical error in the

caption for the Opinion issued June 15, 2021. The Honorable Aumua Amata and the

American Samoa Government inadvertently were not designated as appellants in the

consolidated caption for the Opinion. To correct that clerical error, the Clerk shall reissue

the attached corrected version of the Opinion, effective nunc pro tunc to the date the

original Opinion was filed.

                               Entered for the Court
                               CHRISTOPHER M. WOLPERT, Clerk

                               by: Jane K. Castro
                                   Chief Deputy Clerk

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**June 15, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

| | |
|---|---|
| JOHN FITISEMANU; PALE TULI; ROSAVITA TULI; SOUTHERN UTAH PACIFIC ISLANDER COALITION, | |
| Plaintiffs - Appellees, | |
| v. | Nos. 20-4017 & 20-4019 |
| UNITED STATES OF AMERICA; U.S. DEPARTMENT OF STATE; ANTONY BLINKEN, in his official capacity as Secretary of the U.S. Department of State; IAN G. BROWNLEE, in his official capacity as Assistant Secretary of State for Consular Affairs,[*] | |
| Defendants - Appellants, | |
| and | |
| THE HONORABLE AUMUA AMATA; AMERICAN SAMOA GOVERNMENT, | |
| Intervenor Defendants - Appellants. | |
| ----------------------------- | |
| VIRGIN ISLANDS BAR ASSOCIATION; AMERICAN CIVIL LIBERTIES UNION; ACLU OF UTAH; LINDA S. BOSNIAK; KRISTIN COLLINS; STELLA BURCH ELIAS; SAM ERMAN; TORRIE | |

_____

[*] Pursuant to Fed. R. App. P. 43(c)(2) Rex W. Tillerson is replaced by Antony Blinken, and Carl C. Risch is replaced by Ian G. Brownlee as appellants in this case.

HESTER; POLLY J. PRICE; MICHAEL
RAMSEY; NATHAN PERL-
ROSENTHAL; LUCY E. SALYER;
KATHERINE R. UNTERMAN;
CHARLES R. VENATOR-SANTIAGO;
SAMOAN FEDERATION OF AMERICA,
INC.; RAFAEL COX ALOMAR; J.
ANDREW KENT; GARY S. LAWSON;
SANFORD V. LEVINSON; CHRISTINA
DUFFY PONSA-KRAUS; STEPHEN I.
VLADECK; CONGRESSWOMAN
STACEY PLASKETT; CONGRESSMAN
MICHAEL F.Q. SAN NICOLAS; CARL
GUTIERREZ; FELIX P. CAMACHO;
JUAN BABAUTA; DR. PEDRO
ROSSELLO; ANIBAL ACEVEDO VILA;
LUIS FORTUNO; JOHN DE JONGH;
KENNETH MAPP; DONNA M.
CHRISTIAN-CHRISTENSEN,

       Amici Curiae.

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 1:18-CV-00036-CW)**

_____

Joseph H. Hunt, Assistant Attorney General, Washington, DC (John W. Huber, United
States Attorney, Salt Lake City, UT, Sharon Swingle, Attorney, and Brad Hinshelwood,
Attorney, United States Department of Justice, Washington, DC with him on the briefs)
for Defendants-Appellants.

Michael F. Williams, Kirkland & Ellis LLP, Washington, DC (Kathleen A. Brogan,
Britney A. Lewis, Lauren N. Beebe, and Thomas S. Vaseliou, Kirkland & Ellis LLP,
Washington, DC with him on the briefs) for Intervenor Defendants-Appellants.

Matthew D. McGill, Gibson, Dunn & Crutcher LLP, Washington, DC (Jacob T. Spencer,
Jeremy M. Christiansen, and John H. Heyburn, Gibson, Dunn & Crutcher LLP,
Washington, DC, Steven S. Rosenthal and Neil C. Weare, Loeb & Loeb LLP,
Washington, DC, and Charles V. Ala'ilima, The Law Offices of Charles V. Ala'ilima,
PLLC, Nu'uuli, AS with him on the brief) for Plaintiffs-Appellees.

David M. Zionts, Covington & Burling LLP, Washington, DC (Patricio Martínez-Llompart, Cristina Álvarez, and Nandini Singh, Covington & Burling LLP, Washington, DC with him on the brief) for *amici curiae* Representatives of Guam, the Northern Mariana Islands, Puerto Rico, and the US Virgin Islands.

Paul R.Q. Wolfson, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC (Andres C. Salinas, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC with him on the brief) for *amici curiae* Constitutional Law Scholars.

Adriel I. Cepeda Derieux, American Civil Liberties Union, New York, NY (Alejandro A. Ortiz and Celso Javier Perez, American Civil Liberties Union, New York, NY, and John Mejia, Brittney Nystrom, and Valentina De Fex, ACLU of Utah, Salt Lake City, UT with him on the brief) for *amici curiae* American Civil Liberties Union and ACLU of Utah.

David A. Perez, Perkins Coie LLP, Seattle, WA (Aaron J. Ver, Perkins Coie LLP, San Francisco, CA with him on the brief) for *amicus curiae* Samoan Federation of America, Inc.

Dwyer Arce, Kutak Rock LLP, Omaha, NE for *amicus curiae* Virgin Islands Bar Association.

———————————————

Before **TYMKOVICH**, Chief Judge, **LUCERO**, Senior Circuit Judge, and **BACHARACH**, Circuit Judge.

———————————————

**LUCERO**, Senior Circuit Judge.

———————————————

For over a century, the land of American Samoa has been an American territory, but its people have never been considered American citizens.  Plaintiffs, three citizens of American Samoa, asked the district court in Utah to upend this long-standing arrangement and declare that American Samoans have been citizens from the start.  The district court agreed and so declared.  Appellants, the United States federal government joined by the American Samoan government and an individual representative acting as intervenors, ask us to reverse the district court's decision.

-3-

We conclude that neither constitutional text nor Supreme Court precedent demands the district court's interpretation of the Citizenship Clause of the Fourteenth Amendment.

We instead recognize that Congress plays the preeminent role in the determination of citizenship in unincorporated territorial lands, and that the courts play but a subordinate role in the process. We further understand text, precedent, and historical practice as instructing that the prevailing circumstances in the territory be considered in determining the reach of the Citizenship Clause. It is evident that the wishes of the territory's democratically elected representatives, who remind us that their people have not formed a consensus in favor of American citizenship and urge us not to impose citizenship on an unwilling people from a courthouse thousands of miles away, have not been taken into adequate consideration. Such consideration properly falls under the purview of Congress, a point on which we fully agree with the concurrence. These circumstances advise against the extension of birthright citizenship to American Samoa. We reverse.

## I

American Samoa is one of several unincorporated territories[1] of the United States. It is the only one whose inhabitants are not birthright American citizens.

---

[1] An "unincorporated territory" is a territory "not intended for statehood." Commonwealth of N. Mariana Islands v. Atalig, 723 F.2d 682, 688 (9th Cir. 1984). These unincorporated territories have received separate and distinct legal treatment as compared to incorporated territories from the outset. It is precisely at this initial phase of territorial evaluation where my respected colleague in the dissent goes astray in

Congress has conferred American citizenship on the peoples of all other inhabited unincorporated territories—Puerto Rico, Guam, the U.S. Virgin Islands, and others—but not the people of American Samoa. American Samoans are instead designated by statute "nationals, but not citizens, of the United States." 8 U.S.C. § 1408.

As a result, American Samoans are denied the right to vote, the right to run for elective federal or state office outside American Samoa, and the right to serve on federal and state juries. They are, however, entitled to work and travel freely in the United States and receive certain advantages in the naturalization process. Plaintiffs, three American Samoans who are now residents of Utah but remain "non-citizen nationals" of the United States, contend that this arrangement violates the Citizenship Clause of the Fourteenth Amendment.[2] They seek American citizenship on the basis of their birth in American Samoa. Opposing them is the United States government, which argues the Citizenship Clause does not extend so broadly as to encompass unincorporated territories. Also in opposition are the intervenor-defendants ("Intervenors"), elected officials representing the government of American Samoa, who argue that not only is the current arrangement constitutional, but that imposition

_____

conflating incorporated territories destined for statehood with unincorporated territories. The distinction between incorporated and unincorporated territories was announced in Downes v. Bidwell, 182 U.S. 244 (1901) and carried forward in subsequent Supreme Court cases. See id. at 311-13 (White, J., concurring); see also, e.g., Dorr v. United States, 195 U.S. 138, 143 (1904); United States v. Verdugo-Urquidez, 494 U.S. 259, 268-69 (1990).

[2] The Citizenship Clause states, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1, cl. 1.

of birthright citizenship would be against their people's will and would risk upending certain core traditional practices.

We preliminarily review two topics in more depth:  A) the relevant history and characteristics of American Samoa; and B) the history of American citizenship as it has been applied to American territories.

## A

American Samoa encompasses the eastern islands of an archipelago located in the South Pacific, approximately 2,500 miles due south of Hawaii.  Its current population is 49,437; another 204,640 individuals of Samoan descent live in the United States.  In 1900, its tribal leaders ceded sovereignty to the American government.  See 48 U.S.C. § 1661.  The documents effectuating this cession did not specify how the territory would be governed, and were silent on whether American Samoans were, or would ever be, American citizens.[3]  Since then, American Samoans have owed "permanent allegiance" to the United States but have never been American citizens.  8 U.S.C. § 1101(21), (22).

Not unlike other colonial relationships, the nature of the relationship between American Samoa and the United States is contested.  The traditional view is that the relationship has been largely amicable.  According to this narrative, American Samoa voluntarily ceded sovereignty to the United States, and the United States has since provided protection from external interference while largely staying out of the

---

[3] See Cession of Tutuila and Aunu'u, Apr. 17, 1900, in Papers Relating to the Foreign Relations of the United States, 1929, vol. I, doc. 853 (1943).

internal affairs of the territory.  <u>See, e.g.</u>, U.S. Dep't of State, U.S. Relations with American Samoa (2020).  More recent scholarship has questioned this account, arguing that the relationship has been built more on domination than friendship.  <u>See, e.g.</u>, Kirisitina Gail Sailiata, <u>The Samoan Cause:  Colonialism, Culture, and the Rule of Law</u> (2014) (Ph.D. dissertation, University of Michigan).  Whatever the origin, there is no doubt that the relationship has profoundly influenced the culture of American Samoa.  American Samoans have particularly high enlistment rates in the American military, for example, and its constitution recognizes freedom of speech, freedom of religion, due process of law, and other basic civil rights.  Revised Const. of Am. Samoa art. I, §§ 1–16.

Notwithstanding these cultural imprints, the people of American Samoa have maintained a traditional and distinctive way of life:  the <u>fa'a</u> <u>Samoa</u>.  It is this amalgam of customs and practices that Intervenors argue would be threatened if birthright citizenship were imposed.  For example, the social structure of American Samoa is organized around large, extended families called <u>'aiga</u>.  These families are led by <u>matai</u>, holders of hereditary chieftain titles.  The <u>matai</u> regulate the village life of their <u>'aiga</u> and are the only individuals permitted to serve in the upper house of the American Samoan legislature.  Land ownership is predominantly communal, with more than 90% of American Samoan land belonging to the <u>'aiga</u> rather than to any one individual.  According to one local official, "Cultural identity is the core basis of the Sāmoan people, and communally owned lands are the central foundation that will allow our cultural identity to survive in today's world."  Line-Noue Memea Kruse,

The Pacific Insular Case of American Sāmoa 2 (2018).  There are also racial restrictions on land ownership requiring landowners to be at least 50% American Samoan.  Am. Samoa Code Ann. § 37.0204(a)–(b).  Intervenors worry that these and other traditional elements of the American Samoan culture could run afoul of constitutional protections should the plaintiffs in this case prevail.

Citizenship has been a contested issue in American Samoa since its cession to the United States.  When the American Samoan people first learned they were not considered American citizens, many advocated for citizenship.  This effort culminated in the creation of the American Samoan Commission in 1930, which subsequently recommended that Congress grant citizenship to the people of the territory.  The United States Senate passed legislation to this effect, but the effort failed in the House.

Public opinion among American Samoans appears to have shifted, with the elected government of American Samoa intervening in this case to argue against "citizenship by judicial fiat."  Limited evidence exists regarding American Samoan public opinion on the question of birthright citizenship, but what little evidence there is suggests Intervenors are not out of step with the people they represent.  According to a 2007 report commissioned by the American Samoan government, "Public views expressed to the Commission indicate the anti-citizenship attitude remain[s] strong . . . ."  The Future Political Status Study Comm. of Am. Sam., Final Report 64 (Jan. 2007) (on file with Tenth Circuit Library).  The position taken by the American

Samoan elected representatives appears to be a reliable expression of their people's attitude toward citizenship.

B

Early American attitudes toward what we now call citizenship developed in the context of English law regarding the relationship between monarch and subject. "England's law envisioned various types of subjectship, . . . all [of which] mirrored permanent hierarchical principles of the natural order."  James H. Kettner, The Development of American Citizenship, 1608-1870 8 (1978).  "The conceptual analogue of the subject-king relationship was the natural bond between parent and child."  Id.  Due to concerns that were "preeminently practical," "colonial attitudes slowly diverged from those of Coke[4] and his English successors," with "little attention [ ] paid to doctrinal consistency."  Id. at 8–9.  Animating this divergence were not only practical considerations but also the emerging American maxim that "the tie between the individual and the community was contractual and volitional, not natural and perpetual."  Id. at 10.  The colonists "ultimately concluded that all allegiance ought to be considered the result of a contract resting on consent."  Id. at 9.  "This idea shaped their response to the claims of Parliament and the king, legitimized their withdrawal from the British empire, . . . and underwrote their creation of independent governments."  Id. at 10.  A model of citizenship based on consent is imbued in our founding documents.

---

[4] "Coke" refers to Sir Edward Coke, whose opinion in Calvin's Case, 77 Eng. Rep. 377 (1608) would shape the English law of subjectship for centuries to come.

The precise scope of citizenship was left unclear. Though the term "citizen" was used repeatedly, the Constitution did not define its meaning. <u>See</u> William Rawle, <u>A View of the Constitution of the United States of America</u> 85 (2d ed. 1829). This left two competing views. According to one, national citizenship was predicated on state citizenship—a person had to be a citizen of a state in order to be a citizen of the United States. <u>See</u> <u>Slaughter-House Cases</u>, 83 U.S. 36, 72–73 (1872). Under the contrary view, national citizenship attached to people born in the United States directly, meaning people born in the territories as the country pushed westward were American citizens. <u>See id</u>. The way courts approached citizenship vacillated, with neither view becoming dominant until the Citizenship Clause ended the debate in favor of national citizenship as a standalone guarantee not requiring state citizenship. <u>See id</u>.

But while the legal question remained murky, one aspect of the nation's approach to American citizenship in the territories was always clear: it was not extended by operation of the Constitution. While "there was no consistent policy to define the nationality status of the inhabitants of U.S. territories and possessions," citizenship generally came from some kind of <u>ad hoc</u> legal procedure—"treaties, acts of Congress, administrative rulings, and judicial decisions"—rather than as an automatic individual right guaranteed by the Constitution. Charles Gordon et al., 7

Immigration Law and Procedure § 92.04[1][a] (2020).[5] This flexibility in the

territories with regards to citizenship was but one example of the broader approach

the political and judicial branches applied to the territories. "[E]arly decisions on

territorial acquisition seemed to assert that whether a particular geographic location

was within or without the United States was a question that had, in essence, two

answers. . . . [T]erritory could be sovereign American soil for some purposes, yet still

be foreign for others." Kal Raustiala, Does the Constitution Follow the Flag? 46

(2009). The 1848 Treaty of Guadalupe Hidalgo and the 1867 Cession of Alaska, the

country's most recent territorial acquisitions at the time of the ratification of the

Fourteenth Amendment, show that citizenship was not assumed to automatically

extend with sovereignty. See Treaty of Peace, Friendship, Limits and Settlement

---

[5] See, e.g., American Ins. Co. v. 356 Bales of Cotton, 26 U.S. 511 (1828). In this case, the Supreme Court addressed the status of Florida's inhabitants upon Spain's cession of Florida to the United States via treaty. Following the cession, Florida's inhabitants were "admitted to the enjoyment of the privileges, rights, and immunities of the citizens of the United States," but only because the treaty effectuating that cession so provided. Id. at 542 (quotation omitted). The inhabitants "[would] not, however participate in political power" or "share in the government, till Florida shall become a state." Id. In the United States' most significant territorial expansions of the nineteenth century, citizenship was typically decided by treaty provisions. See, e.g., Cession of Louisiana, Fr.-U.S., art. III, Apr. 30, 1803, 8 Stat. 200; Treaty of Peace, Friendship, Limits and Settlement (Treaty of Guadalupe Hidalgo), Mex.-U.S., art. VIII, Feb. 2, 1848, 9 Stat. 922 (providing that Mexican citizens remaining in lands ceded to the United States must elect either American or Mexican citizenship within one year of the treaty's ratification); Cession of Alaska, U.S.-Russ., art. III, Mar. 30, 1867, 15 Stat. 539 ("The inhabitants of the ceded territory, according to their choice, reserving their natural allegiance, may return to Russia within three years; but if they should prefer to remain in the ceded territory, they, with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights, advantages and immunities of citizens of the United States . . . .").

(Treaty of Guadalupe Hidalgo), Mex.-U.S., art. VIII, Feb. 2, 1848, 9 Stat. 922;

Cession of Alaska, U.S.-Russ., art. III, Mar. 30, 1867, 15 Stat. 539.

In 1898, the United States acquired significant overseas territories in the wake of the Spanish-American War.  There was quickly a practical necessity to determine the citizenship status of the inhabitants of these territories.  See Boumediene v. Bush, 553 U.S. 723, 756 (2008).  Congress filled the void.  Ever since, every extension of citizenship to inhabitants of an overseas territory has come by an act of Congress. See Tuaua v. United States, 788 F.3d 300, 308 n.7 (D.C. Cir. 2015).  Without such an act, no inhabitant of an overseas territory has ever been deemed an American citizen by dint of birth in that territory.[6]  Plaintiffs in this case argue these acts of Congress were unnecessary because, properly interpreted, the Citizenship Clause of the Fourteenth Amendment already guaranteed birthright citizenship to these territorial inhabitants.  But it cannot be disputed that this interpretation would contradict the consistent practice of the American government since our nation's founding: citizenship in the territories comes from a specific act of law, not from the Constitution.

## II

At the outset, we must decide which of two lines of precedent will guide our analysis.  The choices before us are the Insular Cases, a string of Supreme Court

---

[6] See Rogers M. Smith, The Insular Cases, Differentiated Citizenship, and Territorial Statuses in the Twenty-First Century, in Reconsidering the Insular Cases 103, 110–13 (Gerald L. Neuman & Tomiko Brown-Nagin eds., 2015) (reviewing the history of citizenship in American territories).

decisions issued at the turn of the twentieth century that addressed how the Constitution applies to unincorporated territories, and United States v. Wong Kim Ark, 169 U.S. 649 (1898), a case in which the Supreme Court considered the Citizenship Clause's guarantee of birthright citizenship to those born in the United States.

We proceed in three parts.  Part A discusses the Insular Cases from their origin to their modern interpretation and application.  Part B reviews Wong Kim Ark, the precedent principally relied on by the district court in its analysis.  Part C explains why the Insular Cases supply the correct framework for application of constitutional provisions to the unincorporated territories, and therefore why the district court erred by relying on Wong Kim Ark.

## A

Issued between 1900 and 1922, the Insular Cases[7] were a string of Supreme Court opinions that addressed a basic question:  when the American flag is raised over an overseas territory, does the Constitution follow?[8]  In his concurrence in what became Insular's seminal case, Downes v. Bidwell, 182 U.S. 244 (1901), Justice

---

[7] A name derived from the Department of War's Bureau of Insular Affairs, which administered the relevant islands at the time.  For a list of the opinions that comprise the Insular Cases, see Ballentine v. United States, 2001 WL 1242571, at *5 n.11 (D.V.I. Oct. 15, 2001).

[8] Raustiala, supra, at 80.  With the United States' entry into the imperial arena following its 1898 acquisition of the Philippines after the Spanish-American War, this question was suddenly pressing and of significant popular interest.  See id. at 81 ("Reports of the time describe that unprecedented crowds gathered before the Supreme Court when the [first Insular] decision was announced.").

-13-

Edward White wrote, "[T]he determination of what particular provision of the Constitution is applicable [in an unincorporated territory] . . . involves an inquiry into the situation of the territory and its relations to the United States." Id. at 293. Though not the issue in Downes, Justice White specifically mentioned citizenship as the type of constitutional right that should not be extended automatically to unincorporated territories. See id. at 306. This flexible and pragmatic approach to the extension of the Constitution to America's overseas territories "bec[a]me the settled law of the court." Balzac v. Porto Rico, 258 U.S. 298, 305 (1922). The proposition the Insular Cases came to stand for is that constitutional provisions apply only if the circumstances of the territory warrant their application.

The Insular Cases have become controversial. They are criticized as amounting to a license for further imperial expansion and having been based at least in part on racist ideology. These cases "facilitated the imperial ambitions of turn of the century America while retaining a veneer of commitment to constitutional self-government." Raustiala, supra, at 86. See also Igartúa de la Rosa v. United States, 417 F.3d 145, 163 (1st Cir. 2005) (Torruella, J., dissenting) (describing the Insular Cases as "anchored on theories of dubious legal or historical validity, contrived by academics interested in promoting an expansionist agenda"). This facilitation was an explicit concern of the Court in the Insular Cases. See, e.g., Downes, 182 U.S. at 286 ("A false step at this time might be fatal to the development of . . . the American Empire.").

-14-

Not only is the purpose of the Insular Cases disreputable to modern eyes, so too is their reasoning.  The Court repeatedly voiced concern that native inhabitants of the unincorporated territories were simply unfit for the American constitutional regime.  For example, in Downes, Justice White found it self-evident that citizenship could not be automatically extended to "those absolutely unfit to receive it."  Id. at 306.  Justice Brown, meanwhile, suggested that "differences of race" raised "grave questions" about the rights that ought to be afforded to native inhabitants.  Id. at 282, 287.  Plaintiffs and their supporting amici view this ignominious history as militating against application of the Insular Cases to the case before us.

Yet the Supreme Court has continued to invoke the Insular framework when it has grappled with questions of constitutional applicability to unincorporated territories.  In Reid v. Covert, 354 U.S. 1 (1957), Justice Harlan "read the Insular Cases to teach that whether a constitutional provision has extraterritorial effect depends upon the 'particular circumstances, the practical necessities, and the possible alternatives which Congress had before it' and, in particular, whether judicial enforcement of the provision would be 'impracticable and anomalous.'" Boumediene, 553 U.S. at 759 (quoting id. at 74-75).  "Impracticable and anomalous" has since been employed as the standard for determining whether a particular constitutional guarantee is applicable abroad.  See United States v. Verdugo-Urquidez, 494 U.S. 259, 277-78 (1990) (Kennedy, J., concurring).  More recently, in Boumediene, Justice Kennedy summarized the lessons of the Insular Cases as follows:  "[T]he Court devised in the Insular Cases a doctrine that allowed it to use

-15-

its power sparingly and where it would be most needed." 553 U.S. at 759. Insular's framework was not to be left in the past; instead, "[t]his century-old doctrine informs our analysis in the present matter." Id. Tying together the Insular precedents, wrote Justice Kennedy, is "a common thread": "questions of extraterritoriality turn on objective factors and practical concerns, not formalism." Id. at 764.

Notwithstanding its beginnings, the approach developed in the Insular Cases and carried forward in recent Supreme Court decisions can be repurposed to preserve the dignity and autonomy of the peoples of America's overseas territories. "[S]cholars, and increasingly federal judges, have lately recognized the opportunity to repurpose the [Insular] framework in order to protect indigenous culture from the imposition of federal scrutiny and oversight." Developments in the Law – The U.S. Territories, 130 Harv. L. Rev. 1616, 1680 (2017). See also Ian Falefuafua Tapu, Comment, Who Really is a Noble?  The Constitutionality of American Samoa's Matai System, 24 U.C.L.A. As. Pac. Am. L.J. 61, 79 (2020); Russell Rennie, Note, A Qualified Defense of the Insular Cases, 92 N.Y.U. L. Rev. 1683, 1706-13 (2017). The flexibility of the Insular Cases' framework gives federal courts significant latitude to preserve traditional cultural practices that might otherwise run afoul of individual rights enshrined in the Constitution.  This same flexibility permits courts to defer to the preferences of indigenous peoples, so that they may chart their own course.

**B**

Published just three years before the first of the Insular Cases, United States v. Wong Kim Ark, 169 U.S. 649 (1898) is the alternative candidate for a governing precedent in this case.  Wong Kim Ark concerned a man who was born in the state of California to two non-citizen parents who had immigrated from China.  After Wong tried to return to San Francisco following a visit to China, he was denied reentry because he was deemed not a citizen on account of his parents' Chinese citizenship.  The Supreme Court declared the denial unconstitutional.  It explained that the Citizenship Clause of the Fourteenth Amendment "must be interpreted in the light of the common law," under which the doctrine of jus soli ("right of soil"), rather than jus sanguinis ("right of blood"), applies.  Id. at 654.  "The fundamental principle of the common law with regard to English nationality was birth within the allegiance. . . . The principle embraced all persons born within the king's allegiance, and subject to his protection."  Id. at 655.  Determining Wong was a citizen, the Supreme Court held, "The fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country . . . ."  Id. at 693.

Though Wong Kim Ark was about a man born in California, the district court below considered its holding binding on the applicability of the Citizenship Clause to unincorporated territories such as American Samoa.  It reached this conclusion by way of two predicates.  First, Wong Kim Ark instructed that the Constitution "must be interpreted in the light of the common law."  Id. at 654.  Second, under the

-17-

English common law and as expounded in the leading case on the issue, <u>Calvin's</u>

<u>Case</u>, 77 Eng. Rep. 377 (1608),[9] all persons born "within the king's allegiance, [ ]

subject to his protection, . . . [and] within the kingdom" were "natural-born subjects."

<u>Wong Kim Ark</u>, 169 U.S. at 655.  From these predicates, the district court reasoned,

"American Samoa is within the dominion of the United States because it is a territory

under the full sovereignty of the United States," and so American Samoa is "'in the

United States' for purposes of the Fourteenth Amendment."

      Our interpretation of <u>Wong Kim Ark</u> differs in several respects from that of

the district court's.  Most notably, we do not understand <u>Wong Kim Ark</u> as

commanding that we "<u>must</u> apply the English common law rule for citizenship to

determine" the outcome of this case, as the district court phrased it.  <u>Wong Kim Ark</u>

never went so far.  Instead, <u>Wong Kim Ark</u> instructs us that the Citizenship Clause,

as with the rest of the Constitution, "must be interpreted <u>in the light of</u> the common

law."  169 U.S. at 654 (emphasis added).  We take the general meaning of "in the

light of" to mean "in context, through the lens of, or taking into consideration."  It is

a phrase that introduces persuasive, not binding, authority.  <u>Wong Kim Ark</u> therefore

tells us to consider the common law in hopes that it sheds light on the constitutional

question before us.  It does not incorporate wholesale the entirety of English common

law as governing precedent.

---

    [9] <u>Calvin's Case</u> held that, following the unification of the kingdoms of
England and Scotland, the Scottish had become full subjects of the English kingdom:
"[W]hosoever is born within the fee of England, though it be another kingdom, was a
natural-born subject."  77 Eng. Rep. at 403.

English common law, especially <u>Calvin's Case</u>, was apparently persuasive to the Supreme Court in <u>Wong Kim Ark</u>, but there is reason to question its applicability to this case. Both <u>Calvin's Case</u> and <u>Wong Kim Ark</u> centered around the requirement of "allegiance" for citizenship; the crux of this case concerns what falls within the category of "within the dominion," a separate requirement for citizenship. The essence of Lord Coke's reasoning in <u>Calvin's Case</u> concerned whether it mattered for subjectship purposes that Scotsmen owed allegiance to King James as the King of Scotland rather than in his capacity as the King of England. Lord Coke concluded that this distinction did not matter, that a Scotsman was an English subject once he owed allegiance to King James in any of his royal capacities. <u>See</u> Kettner, <u>supra</u>, at 20-22. <u>Wong Kim Ark</u> likewise only concerned allegiance—there could have been no argument that Wong was born outside American territory, having been born in the state of California. The only argument made against Wong's American citizenship was that Wong did not owe allegiance to the United States because of his parents' Chinese citizenship. In rejecting this argument, the Supreme Court looked to Lord Coke's analysis of the concept of allegiance. It had no occasion to consider, much less endorse, any aspect of the English common law's approach to defining the scope of the monarch's dominion.[10]

---

[10] Furthermore, English law came to make some of the same distinctions between the citizenship status of its imperial subjects that Plaintiffs now contend violate bedrock principles of English common law. As the British empire expanded to more distant territories, the simple maxim that birth within the allegiance and dominion of the empire conferred full subjectship gave way to a more variegated

That scope is precisely the crux of this case.  The gravamen of what we must consider is whether birth in American Samoa constitutes birth within the United States for purposes of the Fourteenth Amendment.  On this point, we conclude English common law has much less to say.  English conceptions regarding territorial acquisition from that era differ markedly from any we would accept today.  Scotland was within the dominion of King James because he inherited it; Ireland was within his dominion, and indeed subject to his "power of life and death," due to military conquest.  Id. at 24.  While shrouded in history, our dominion over American Samoa stems from voluntary cession.  It is difficult to see what lessons are to be drawn for the relationship between the United States and its unincorporated territories from the development of the British Empire.

Subsequent developments in the American law of citizenship cast further doubt on the dispositive role the district court believes Calvin's Case plays in the matter before us.  In the colonies, as noted above, the role of consent to subjectship came to play a prominent role in the early American understanding of what it meant

---

approach.  "British imperial citizenship was . . . inclusive in the formal sense, [but] stratified in reality."  Niraja Gopal Jayal, Citizenship and Its Discontents 30 (2013).  While "all those born within the British Empire shared the common status of being subjects of the king-emperor," that "was pretty much all that was shared or common" among British-born subjects and those born in the far reaches of the empire.  Id.; see also Clive Parry, Nationality and Citizenship Laws of the Commonwealth and of the Republic of Ireland 72 (1957) (noting "the frequent instances in which the apparently hard-and-fast rules laid down in Calvin's Case seem to have been ignored or much modified" by the British Empire).  English law, then, is only superficially an exemplar of the rule laid down in Calvin's Case, a rule not faithfully followed by the English in their own empire.  Even if English common law were a persuasive model for us to follow, it is not so clear in what direction it would ultimately lead.

to be a subject or citizen.  "The Revolution . . . produced an expression of the general principles that ought to govern membership in a free society:  republican citizenship ought to rest on consent . . . ."  Kettner, supra, at 10.  Those general principles were often carried forward in the major territorial acquisition treaties of the nineteenth century, which repeatedly gave inhabitants a choice regarding whether they would become American citizens.  See supra Part I.B.  The Supreme Court, having never addressed the extension of citizenship to a people lacking the desire to receive it, has not clarified the role of consent in this area of American law.  But in our view, the role ascribed to consent to citizenship by the Founders and by our young country as it expanded westward undermines the persuasive force of a common law that paid it no mind.

In sum, we interpret Wong Kim Ark's discussion of English common law as an invocation of persuasive authority rather than an incorporation of binding caselaw.  We take up Wong Kim Ark's instruction to consider English common law in analyzing the extraterritorial application of the Citizenship Clause, but find little light shed by this endeavor.

## C

Between these competing frameworks, the Insular Cases provide the more relevant, workable, and, as applied here, just standard.  This is so for several reasons: 1) the Insular Cases were written with the type of issue presented by this case in mind, whereas Wong Kim Ark was not; 2) the district court overread the weight accorded English common law by Wong Kim Ark; and 3) the Insular Cases permit

-21-

this court to respect the wishes of the American Samoan people, whereas <u>Wong Kim Ark</u> would support the imposition of citizenship on unwilling recipients.

  1) *The Insular Cases contemplate the issue of constitutional extension to unincorporated territories; <u>Wong Kim Ark</u> does not.*

The Insular Cases grapple with the thorny question at the heart of this case: how does the Constitution apply to unincorporated territories?  From the Uniformity Clause[11] to the Sixth Amendment,[12] the Supreme Court wrestled with which constitutional provisions would extend to the new territories and which would be left behind.  These are issues that federal courts have continued to address, and in doing so have continued to apply the Insular framework.[13]  This case falls squarely in that line of caselaw.  It calls for the extension of another constitutional provision to another unincorporated territory.  The Insular Cases are plainly relevant.

<u>Wong Kim Ark</u>, in contrast, was not about the unincorporated territories at all. It was about a racist denial of citizenship to an American man born in an American state.  Not only was it not about unincorporated territories, it was published months before the United States had even acquired its first unincorporated territory. Moreover, its holding <u>interprets</u> a Constitutional provision—which ignores the logically prior issue of whether the provision even <u>applies</u> to an unincorporated territory in the first place, the issue addressed by the Insular Cases.

---

[11] <u>Downes</u>, 182 U.S. 244.

[12] <u>Balzac</u>, 258 U.S. 298.

[13] <u>See</u> <u>Boumediene</u>, 553 U.S. at 764.

Nor does it appear that the Supreme Court that wrote Wong Kim Ark understood its holding to govern the citizenship status of the peoples of the unincorporated territories. Recall that Downes, published a mere three years after Wong Kim Ark, contains dicta, unchallenged by any Justice, casting doubt on the constitutional extension of citizenship to the peoples of the new American territories. See, e.g., 182 U.S. at 279-80 ("We are also of opinion that the power to acquire territory by treaty implies, not only the power to govern such territory, but to prescribe upon what terms the United States will receive its inhabitants, and what their status shall be . . . ."). It is quite difficult to reconcile these dicta with the interpretation of Wong Kim Ark urged by the district court. The Justices who issued Wong Kim Ark clearly did not understand it as deciding the issue they opined on just three years later in Downes. Of course, it is possible for a court that issues a holding to remain ignorant of the full panoply of its implications. But Downes' discussion of territorial citizenship without any mention of Wong Kim Ark suggests Wong Kim Ark stood for a more limited proposition than the one assigned it by the district court.

For Wong Kim Ark to govern its analysis, the district court had to rely on the very general rule that the Fourteenth Amendment must be interpreted in light of English common law. Yet Wong Kim Ark itself advised: "It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when

-23-

the very point is presented for decision." 169 U.S. at 679 (quotation omitted).[14] That

maxim is one this court will heed.

   2) *The district court overread the weight accorded English common law by* <u>Wong</u>
       <u>Kim Ark</u>.

     As explained in Part II.B, we reject the district court's interpretation of <u>Wong</u>

<u>Kim Ark</u> insofar as it treats the English common law regarding subjectship as

authoritative precedent for all questions concerning American citizenship.  The text

of <u>Wong Kim Ark</u> does not suggest this breathtakingly broad holding, and the

Supreme Court's omission of <u>Wong Kim Ark</u> in its discussion of citizenship in

<u>Downes</u> further undercuts such an interpretation.  All that <u>Wong Kim Ark</u>'s

invocation of English common law suggests is its ordinary use as persuasive

precedent.  In this case, that historical context does little to edify our analysis.

   3) *The Insular framework better upholds the goals of cultural autonomy and self-*
      *direction.*

     We have grave misgivings about forcing the American Samoan people to

become American citizens against their wishes.  They are fully capable of making

their own decision on this issue, and current law authorizes each individual Samoan

to seek American citizenship should it be desired.  The Insular Cases, despite their

origins, allow us to respect the wishes of the American Samoan people within the

framework of century-old precedent.  It follows that they are not only the most

---

   [14] <u>See also</u> <u>United States v. Rubin</u>, 609 F.2d 51, 69 n.2 (2d Cir. 1979)
(Friendly, J., concurring) ("A judge's power to bind is limited to the issue that is
before him . . . .").

relevant precedents, but also the ones that lead to the most respectful and just outcome.

## III

Under the Insular Cases' framework, courts first consider whether a constitutional provision applies to unincorporated territories "by its own terms." Examining Bd. of Engineers, Architects & Surveyors v. Flores de Otero, 426 U.S. 572, 589 n.21 (1976). We interpret this as erecting something of a plain-language standard: if the text of the constitutional provision states that it applies to unincorporated territories, courts have no discretion to hold otherwise. See Tuaua, 788 F.3d at 306 (explaining the Citizenship Clause does not apply to American Samoa by its own terms because its "scope . . . may not be readily discerned from the plain text or other indicia of the framers' intent"). The Citizenship Clause's applicability hinges on a geographic scope clause—"in the United States"—and a jurisdictional clause—"subject to the jurisdiction thereof." Both the district court and the Tuaua court concluded that the Citizenship Clause leaves its geographic scope ambiguous.[15] We agree.

---

[15] The Tuaua court also concluded that American Samoa does not meet the jurisdictional criterion because, as a "significantly self-governing political territor[y]," it was not "'completely subject to [the United States'] political jurisdiction." Id. at 305, 306 (quoting Elk, 112 U.S. at 102) (emphasis added in Tuaua quotation). On this point our analysis departs from that of our sibling circuit. By statute, American Samoans "owe[ ] permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22)(B). Furthermore, as the only populated territory for which Congress has not passed an organic act, American Samoa is "unorganized" and therefore especially subject to American political control. Amendments to the

Two textual considerations push in opposite directions.  The first compares the Fourteenth Amendment's Citizenship Clause—"in the United States, <u>and</u> subject to the jurisdiction thereof"—to the Thirteenth Amendment's prohibition of slavery— "within the United States, <u>or</u> any place subject to their jurisdiction."  U.S. Const. amends. XIII, XIV (emphases added).  The "or" in the Thirteenth Amendment seems to contemplate places subject to American jurisdiction that are not within the United States, whereas the Citizenship Clause requires persons to be born in places that are both in the United States "<u>and</u>" subject to American jurisdiction.  Because the Thirteenth Amendment seems to apply more broadly than the Citizenship Clause, it is plausible to conclude territories are covered by the Thirteenth Amendment but not the Citizenship Clause.  This argument therefore supports a reading of the Citizenship Clause that does not encompass the territories.[16]

By comparison, the competing argument juxtaposes the Fourteenth Amendment's Citizenship Clause in Section One with its apportionment provisions in Section Two.  The former uses the broad term "in the United States," whereas the latter apportions representatives "among the several States."  Because the Citizenship

---

American Samoan Constitution, for example, require ratification by an act of Congress.  48 U.S.C. § 1662a.  In our view, the statutory and practical control exercised by the United States over American Samoa render American Samoa subject to the jurisdiction of the United States.

[16] Another textual consideration suggesting the Citizenship Clause's exclusive application to state-born residents is its effect of rendering persons born in the United States "citizens of the United States and of the <u>State wherein they reside</u>."  U.S. Const. amend. XIV, § 1, cl. 1 (emphasis added).

Clause's geographic term is broader than that of the apportionment provisions, it seems the Citizenship Clause's geographic scope is broader than "the several States."

Neither of these arguments is entirely persuasive, with each depending on uncertain inferences.[17]  Nor is the legislative history cited by Plaintiffs purporting to show that the framers of the Fourteenth Amendment understood the Citizenship Clause to apply to the territories dispositive.  See, e.g., Cong. Globe, 39th Cong., 1st Sess. 2894 (Senator Trumbull's statement that the Citizenship Clause "refers to persons everywhere, whether in the States or in the Territories or in the District of Columbia").  "[T]he legislative history of the Fourteenth Amendment . . . like most other legislative history, contains many statements from which conflicting inferences can be drawn . . . ."  Afroyim v. Rusk, 387 U.S. 253, 267 (1967).  Moreover, "[i]solated statements . . . are not impressive legislative history."  Garcia v. United States, 469 U.S. 70, 78 (1984) (quotation omitted).  This is especially true given that the Fourteenth Amendment's authors could only have been speaking of incorporated territories destined for statehood, not the unincorporated territories around which this case revolves.

The analysis offered by the dissent rests entirely on eliding the distinction between incorporated and unincorporated territories.  In the view presented by the

---

[17] The dissent concludes the same.  See Dissent at 29 ("From the Territories Clause and the Eighteenth Amendment, we can safely conclude that the term 'United States' doesn't always include territories.").

dissent, because territories on their way to becoming states were often[18] considered part of the United States in the nineteenth century, so too must unincorporated territories like American Samoa be considered "in the United States" for purposes of the Citizenship Clause.  This argument requires rejecting the distinction between incorporated and unincorporated territories.  Such a rejection is not ours to make. The Supreme Court established the distinction and relied on it repeatedly in the Insular Cases and thereafter.  See, e.g., Dorr v. United States, 195 U.S. 138, 143 (1904); Balzac, 258 U.S. at 304-06; Verdugo-Urquidez, 494 U.S. at 268-69.  The dissent does not adequately explain on what grounds it casts aside this long-settled distinction.  It simply assumes that all territories are alike, making evidence about incorporated territories in the nineteenth century sufficiently conclusive to resolve any ambiguity about the text of the Citizenship Clause.  Because the dissent does not justify conflating incorporated and unincorporated territories, its historical evidence cannot resolve the meaning of the constitutional text.

Not only is the distinction between incorporated and unincorporated territories firmly established in caselaw, it also undercuts the relevance of the evidence offered

---

[18] The dissent characterizes available historical evidence as "uniformly" supporting its conclusion.  Dissent at 2, 14.  This seems an overstatement.  A map published in the 1830s, for example, is titled "A map of the United States and part of Louisiana," despite Louisiana having been a territory under one name or another since 1805.  Mary Van Schaack, A Map of the United States and Part of Louisiana (c. 1830), www.loc.gov/resource/g3700.ct000876/ (on file with the Library of Congress).  And a dictionary cited by the dissent omits the territory of Alaska from its definition of the United States, an omission that the dissent speculates was "inadvertent."  Dissent at 9 n.6.

by the dissent.  The dissent's historical evidence merely suggests that the United States often, though not always, conceived of itself as including both states and the territories on their way to becoming states.  This observation only carries us so far.  It is no surprise that Americans from the era preceding the ratification of the Fourteenth Amendment, animated by an ideology of manifest destiny and in the throes of continuous territorial expansion, harbored an expansive understanding of the geographical scope of their country.  But the territories those Americans had in mind are different than those around which this case turns.  Those territories were generally geographically contiguous, in the process of being settled by American citizens, and destined for statehood.  There is thus a meaningful distinction between such territories and overseas territories like American Samoa, one grounded in a sensible recognition of the dissimilar situations that prevailed in each category of territory.  Only by entirely ignoring the differences between these two types of territories can the dissent find certainty.  We are not prepared to cast aside this distinction, backed by both binding precedent and over a century of unbroken historical practice, to deem the text in question unambiguous.

Were we to resolve the remaining ambiguity about the geographic scope of the Citizenship Clause, consistent historical practice would recommend a narrow interpretation.  When faced with textual ambiguity, evidence of an unbroken understanding of the meaning of the text, confirmed by longstanding practice, is persuasive.  "[A]n unbroken practice . . . openly [conducted] . . . by affirmative state action . . . is not something to be lightly cast aside."  Walz v. Tax Comm'n of City of

-29-

New York, 397 U.S. 664, 678 (1970).  Congress has always wielded plenary

authority over the citizenship status of unincorporated territories, a practice that itself

harked back to territorial administration in the nineteenth century.  See supra Part

I.B.  Residents of Puerto Rico, Guam, the Northern Mariana Islands, and the U.S.

Virgin Islands each enjoy birthright citizenship by an act of Congress.[19]  Moreover,

Congress' discretionary authority in this area has been upheld by every circuit court

to have addressed the issue.[20]  We resolve this case by application of the Insular

Cases' "impracticable and anomalous" framework rather than by relying on

ambiguous constitutional text.  Yet if the text were the decisive issue, then its

consistent historical interpretation would counsel a narrow reading.

A constitutional provision may "apply by its own terms" to an unincorporated

territory, but the text of the Citizenship Clause does not require such application.

The constitutional text alone is therefore not a sound basis on which to decide this

case.  Consistent historical practice suggests this textual ambiguity be resolved so as

to leave the citizenship status of American Samoans in the hands of Congress, as the

concurrence concludes.  See Concurrence at 4.

---

[19] Article IV vests authority over the territories squarely in the hands of Congress.  "The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory . . . ."  U.S. Const. art. IV, § 3, cl. 2; see also Simms v. Simms, 175 U.S. 162, 168 (1899) ("In the territories of the United States, Congress has the entire dominion and sovereignty . . . .").

[20] See Tuaua, 788 F.3d at 302; Nolos v. Holder, 611 F.3d 279, 282-284 (5th Cir. 2010) (per curiam); Lacap v. INS, 138 F.3d 518,519 (3d Cir. 1998); Valmonte v. INS, 136 F.3d 914, 917-20 (2d Cir. 1998); Rabang v. INS, 35 F.3d 1449, 1451-53 (9th Cir. 1994).

-30-

## IV

In light of the textual ambiguity, I proceed to the next stage of the Insular analysis:  whether citizenship is a "fundamental personal right" as that term is defined by the Insular Cases.[21]

Under the Insular Cases, constitutional provisions that implicate fundamental personal rights apply without regard to local context.  "[G]uaranties of certain fundamental personal rights declared in the Constitution" apply "even in unincorporated Territories." <u>Boumediene</u>, 553 U.S. at 758 (quotation omitted).  But "'[f]undamental' has a distinct and narrow meaning in the context of territorial rights." <u>Tuaua</u>, 788 F.3d at 308.  Even rights that we would normally think of as fundamental, such as the constitutional right to a jury trial,[22] are not "fundamental" under the framework of the Insular Cases.  Instead, only those "principles which are the basis of all free government" establish the rights that are "fundamental" for Insular purposes.  <u>Dorr</u>, 195 U.S. at 147 (quotation omitted).

Several difficulties attend this step of the analysis.  As an initial matter, parsing rights to determine whether they are truly necessary to free government is a somewhat uncomfortable inquiry.  Assessing whether a personal right meets some instrumental threshold to qualify for fundamental status under the Insular framework

---

[21] Because the concurrence does not join Parts IV and V of the analysis, the opinion shifts from "we" to "I" to make clear that these Parts do not command a majority.

[22] <u>Balzac</u>, 258 U.S. 298.

-31-

is not only an unusual mode of inquiry, but one that is in some tension with the

nature of individual rights, which we generally do not justify by their instrumental

value but rather as ends unto themselves.  I prefer the Hohfeldian use of the terms

"rights" and "fundamental rights" and their correlatives, which would disallow such

parsing.  See generally Wesley Newcomb Hohfeld, Fundamental Legal Conceptions

as Applied in Judicial Reasoning, 26 Yale L.J. 710 (1917).  Exacerbating the

challenge is the dearth of Supreme Court precedent from the Insular lineage to guide

the analysis.  I also question whether citizenship is properly conceived of as a

personal right at all.  As I see it, citizenship usually denotes jurisdictional facts, and

connotes the Constitutional rights that follow.  The district court inverted the proper

order of the inquiry.  The historic authority of Congress to regulate citizenship in

territories—authority we are reluctant to usurp—indicates that the right is more

jurisdictional than personal, a means of conveying membership in the American

political system rather than a freestanding individual right.

Even setting these conceptual difficulties aside, birthright citizenship does not

qualify as a fundamental right under the Insular framework.  Birthright citizenship,

like the right to a trial by jury, is an important element of the American legal system,

but it is not a prerequisite to a free government.  Numerous free countries do not

practice birthright citizenship, or practice it with significant restrictions, including

Australia, France, and Germany.[23]  The United States, for its part, does not apply birthright citizenship to children of American citizens born abroad.[24]  Nor has birthright citizenship proven necessary to safeguard basic human rights in American Samoa, where the rights to freedom of speech, freedom of religion, and due process of law are constitutionally guaranteed.[25]  Under the particular definition supplied by the Insular Cases, birthright citizenship is not a fundamental right that would preclude application of the "impracticable and anomalous" standard.

## V

Though its articulation postdates the Insular Cases, the lodestar of the Insular framework has come to be the "impracticable and anomalous" standard.  Under this standard, "the question is which guarantees of the Constitution should apply in view of the particular circumstances, the practical necessities, and the possible alternatives which Congress had before it."  Reid, 354 U.S. at 75 (Harlan, J., concurring).  As with all extraterritoriality questions, the answer turns on "objective factors and practical concerns."  Boumediene, 533 U.S. at 764.  "In sum, we must ask whether the circumstances are such that recognition of the right to birthright citizenship

---

[23] See Graziella Bertocchi & Chiara Strozzi, The Evolution of Citizenship: Economic and Institutional Determinants, 53 J. L. & Econ. 95, 99–100 (2010).

[24] In such circumstances, the child becomes an American citizen due to the citizenship status of the parents.  See, e.g., 8 U.S.C. § 1401(c).

[25] See Revised Const. of Am. Samoa art. I, §§ 1-2.

-33-

would prove impracticable and anomalous, as applied to contemporary American Samoa." Tuaua, 788 F.3d at 309 (quotation omitted).

Two characteristics of contemporary American Samoa guide my analysis: the expressed preferences of the American Samoan people, and the potential disruption of their way of life by judicial imposition of citizenship.

### A

No circumstance is more persuasive to me than the preference against citizenship expressed by the American Samoan people through their elected representatives.

In the context of citizenship, there can hardly be a more compelling practical concern than that it is not wanted by the people who are to receive it. To impose citizenship in such a situation would violate a basic principle of republican association: that "governments . . . deriv[e] their [] powers from the consent of the governed." Kennett v. Chambers, 55 U.S. (14 How.) 38, 41 (1852). This is a principle that animated the Founders' rejection of their status as colonial subjects of the British empire. See supra Part I.B. "[T]he notion . . . that the tie between the individual and the community was contractual and volitional . . . shaped their response to the claims of Parliament and the king, legitimized their withdrawal from the British empire, . . . and underwrote their creation of independent governments." Kettner, supra, at 10. This history undergirds what is a fundamental and timeless truth: a people's incorporation into the citizenry of another nation ought to be done with their consent or not done at all.

-34-

Respect for this principle should be at its zenith in the case of territories born from American imperial expansion, a project that was always in significant tension with our aspirations toward representative democracy. "The fabric of American empire ought to rest on the solid basis of the consent of the People." The Federalist No. 22 (Alexander Hamilton). We have sometimes failed to live up to Hamilton's admonition. It is for this reason "that sovereignty and membership need to be reconceptualized in less rigid terms if we are to establish a political regime that overcomes historical subordination and justly rules over the territory and inhabitants of the United States." T. Alexander Aleinikoff, Semblances of Sovereignty 183 (2002). Recognizing consent as a cornerstone of a flexible approach to the extension of citizenship to the unincorporated territories is a step toward rectifying those mistakes.

Though consent to citizenship is important among the "objective factors and practical concerns" that must be considered, Boumediene, 553 U.S. at 764, it need not be dispositive. Contrary to the dissent, my analysis certainly does not "require" a change in outcome for "every change in the popular will" of American Samoa. Dissent at 48. The Insular framework demands a holistic review of the prevailing circumstances in a territory; any future case would consider the totality of the relevant factors and concerns in the territory. "Ping-ponging" judicial outcomes are neither a necessary nor even a likely consequence of my reasoning. Id. I likewise would not expect such oscillation in congressional consideration of the will of American Samoans. The nature of citizenship makes consent an important

-35-

consideration for application of the "impracticable and anomalous" standard, but nothing in this opinion suggests consent must eclipse other factors.

I agree with the representatives of the American Samoan government that "an extension of birthright citizenship without the will of the governed is in essence a form of 'autocratic subjugation' of the American Samoan people."[26]  While I am sympathetic to Plaintiffs' desire for citizenship, to accept their position would be to impose citizenship over the expressed preferences of the American Samoan people. Such a result would be anomalous to our history and our understanding of the Constitution.

**B**

A further concern of extending birthright citizenship to American Samoa is the tension between individual constitutional rights and the American Samoan way of life (the fa'a Samoa).  Fundamental elements of the fa'a Samoa rest uneasily

---

[26] Plaintiffs counter that concerns about the wishes of the American Samoan people are wrongheaded for two reasons.  First, such concerns "fundamentally misunderstand[] the nature of a written constitution," which removed the scope of the Citizenship Clause beyond democratic influence.  I disagree for the reasons explained above.  Second, Plaintiffs argue the current preferences of American Samoans is "ephemeral," and "history on this subject shows that they very well could change their minds."  This may be so.  Circumstances may indeed change in the future.  In that event, American Samoans retain the political remedy of requesting that Congress grant them American citizenship akin to that of Puerto Rico and the U.S. Virgin Islands.  Congress has repeatedly done so with respect to other territories.  The concurrence suggests the political branches rather than the courts are best positioned to consider the wishes of the American Samoan people.  See Concurrence at 4.  On this point I do not disagree.  Those wishes are relevant for purposes of the Insular framework, but they are best acted upon by Congress, as has been the consistent historical practice.

alongside the American legal system.  Constitutional provisions such as the Equal

Protection Clause, the Takings Clause, and the Establishment Clause are difficult to

reconcile with several traditional American Samoan practices, such as the <u>matai</u>

chieftain social structure, communal land ownership, and communal regulation of

religious practice.  "In American Sāmoa's case, 'partial membership' works to

protect the customary institutions and traditions, and so a push for full equality [as

American citizens] is not readily embraced by the American Sāmoan citizenry."

Kruse, <u>supra</u>, at 79.

Plaintiffs, the dissent, and the amicus brief filed by the governments of other

unincorporated territories question whether any of these harms are likely to befall

American Samoa upon the extension of citizenship.  They point out that, for example,

the First Amendment and the Equal Protection Clause already apply to the

unincorporated territories, regardless of anyone's citizenship status.  <u>See</u> <u>Posadas de</u>

<u>P.R. Assocs. v. Tourism Co. of P.R.</u>, 478 U.S. 328, 331 n.1 (1986); <u>Flores de Otero</u>,

426 U.S. at 600.  The amicus brief filed by other unincorporated territories asserts

that, in their experience, American citizenship need not result in the undermining of

local culture and autonomy.[27]  Because the American Samoan aversion to citizenship

is not founded on plausible concerns, they argue, it should receive less weight.  The

dissent echoes this argument.  <u>See</u> Dissent at 43-44.

---

[27] The American Samoan government replies that the comparison is inapposite
because of differences between American Samoa's cultural practices and those of
other unincorporated territories.

Citizenship's legal consequences for American Samoa are less certain than Plaintiffs and the dissent suggest, and the American Samoans' cautious approach should be respected regardless. There is simply insufficient caselaw to conclude with certainty that citizenship will have no effect on the legal status of the fa'a Samoa. The constitutional issues that would arise in the context of America Samoa's unique culture and social structure would be unusual, if not entirely novel, and therefore unpredictable. Citizenship status has often been an important factor in determining how the Constitution applies to the unincorporated territories. For example, the "most common interpretation of Reid," the 1957 case that introduced the "impracticable and anomalous" standard, was that "citizenship [was] the fundamental variable" in determining the constitutional rights afforded to inhabitants of unincorporated territories. Raustiala, supra, at 150. Citizenship simply cannot be confidently declared irrelevant to how the Constitution will affect American Samoa. And even if the contrary conclusion were tenable, it is not the role of this court to second-guess the political judgment of the American Samoan people. As stated throughout, the considerations discussed in this section belong most properly to Congress at the initial stage, not to us.

Required by the Insular framework to weigh the practical considerations concerning the extension of the constitutional right to birthright citizenship to American Samoa, I would hold that the extension of United States birthright citizenship is impracticable and anomalous.

-38-

## VI

The judgment of the district court is **REVERSED**.

20-4017, 20-4019, *Fitisemanu v. United States*
**TYMKOVICH**, Chief Judge, concurring.

This case calls upon us to determine whether an individual born in a United States territory is "born . . . in the United States" within the meaning of the Citizenship Clause of the Fourteenth Amendment.  U.S. Const. amend. XIV, § 1 ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside.").  Curiously, the question of whether individuals born in U.S. territories are citizens by virtue of the Citizenship Clause has been neglected in the century and a half since the Fourteenth Amendment was ratified.[1]

Because the Supreme Court has never defined the territorial scope of the Citizenship Clause, we must start by using traditional tools of constitutional interpretation: text, structure, and history.  *See Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012) ("[C]onstitutional interpretation . . . demands careful examination of the textual, structural, and historical evidence.").  Only if those tools fail us, and the meaning of "in the United States" is indeterminate, do we turn to Supreme Court authorities such as *Wong Kim Ark* or the *Insular Cases* for guidance.

---

[1] Recent scholarship is stepping into the void.  *See e.g.* Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405 (2020) (arguing the original public meaning of the Citizenship Clause extends birthright citizenship to territorial residents); *Developments in the Law   The U.S. Territories*, 130 Harv. L. Rev. 1616, 1680 (2017) (arguing courts should not extend the reach of the Citizenship Clause to unwilling territories).

Though I might weigh the inter-textual evidence differently, I ultimately agree with the majority (and the district court) that the precise geographic scope of the Citizenship Clause cannot be divined from the text and constitutional structure. *Accord Tuaua v. United States*, 788 F.2d 300, 303 (D.C. Cir. 2015) ("The text and structure alone are insufficient to divine the Citizenship Clause's geographic scope.").[2]

Nor am I persuaded that historical evidence of the Clause's original public meaning resolves this case. To be sure, some evidence supports the view that "in the United States" encompassed "the territories." But the evidence supporting Fitisemanu's position largely consists of floor statements by individual legislators, which may not have aligned with common public understanding. *Cf. N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history.").

At the time of ratification, moreover, the United States lacked material overseas possessions or territories.[3] Any mention of "the territories" referred to

---

[2] Other constitutional provisions used more precision. *See, e.g.*, U.S. Const. amend. XVIII (prohibiting the sale and manufacture of alcohol in "the United States and *all territory subject to the jurisdiction thereof*") (emphasis added).

[3] The sole exception is Alaska. But the Alaska Purchase Treaty, by its express terms, extended U.S. citizenship to all non-Native inhabitants of the newly-annexed territory, unless they returned to Russia within three years of the

(continued...)

-2-

contiguous United States territories destined for statehood, and statehood resolved citizenship concerns.  No new territories were acquired during the thirty years between ratification in 1868 and the Spanish-American War in 1898.  While we are interested in divining the original *meaning* of the Citizenship Clause rather than its original expected *application,* these historical facts diminish the probative weight of legislators' off-the-cuff statements about the geographic scope of the phrase "in the United States."  *See* Lawrence B. Solum, *Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record*, 2017 B.Y.U. L. Rev. 1621, 1637 (2017) ("The meaning of a text is one thing; expectations about how the text will or should be applied to particular cases or issues is another."  But "original expected applications . . . can provide *evidence* of original public meaning.").  And interestingly enough, more than a century after ratification, no case has yet reached the Supreme Court that applies the Citizenship Clause to the extended territories or, for that matter, the United States proper.

The cases, unfortunately, are not much help either.  As the majority explains, *Wong Kim Ark did* concern a dispute over citizenship and was decided at the dawn of the twentieth century, when the nation had just acquired significant insular possessions.  But while its reasoning suggests birthright citizenship would

---

[3](...continued)
treaty's ratification.

extend to those territories, the case does not squarely address the question because the plaintiff was born in the State of California. *See United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898). And, although a plurality in *Downes* pronounced that American citizenship does not extend to "non-incorporated" territories, that case was not brought squarely under the Citizenship Clause. *Downes v. Bidwell*, 182 U.S. 244, 279  80 (1901).

Faced with an ambiguous constitutional text, equivocal evidence of its original public meaning, and uncertain Supreme Court precedent, we are left with historical practice. The settled understanding and practice over the past century is that Congress has the authority to decide the citizenship status of unincorporated territorial inhabitants. On this basis, I would reverse.

In my view, either party's reading of the Citizenship Clause is plausible, so I resolve the tie in favor of the historical practice, undisturbed for over a century, that Congress has the authority to determine the citizenship status of unincorporated territorial inhabitants. Finally, although I agree with much of Judge Lucero's reasoning endorsing consideration of the wishes of the American Samoan people, I would leave that consideration to the political branches and not to our court.

Accordingly, I join the majority except for Parts IV and V.

*Fitisemanu, et al. v. United States of America, et al.*, Nos. 20-4017, 20-4019
**BACHARACH**, J., dissenting.

As Justice Brandeis once observed, "the only title in our democracy superior to that of President is the title of citizen." U.S. Dep't of Homeland Sec. & U.S. Citizenship & Immigr. Servs., *The Citizen's Almanac* 2 (2007) (cleaned up). The district court concluded that this title extends to the people of American Samoa, and I agree.[1]

The Fourteenth Amendment's Citizenship Clause extends birthright citizenship to every person "born . . . in the United States." U.S. Const. amend. XIV, § 1, cl. 1.[2] For three reasons, this clause provides citizenship to the three individual plaintiffs.

---

[1]    The district court enjoined the defendants from denying citizenship to anyone born in American Samoa. The parties agree that if we were to affirm, we should order the district court to narrow its injunction. I too agree. *See* Part V(B), below.

[2]    The clause is also limited to individuals "subject to the [United States'] jurisdiction." U.S. Const. Amend. XIV, § 1, cl. 1. The majority acknowledges that natives of American Samoa are subject to the United States' jurisdiction. But in my view, the American Samoan government forfeited this issue.

For the first time on appeal, the American Samoan government argues that American Samoa isn't "subject to the jurisdiction" of the United States. Because the issue wasn't raised in district court, the argument is forfeited. *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127–28 (10th Cir. 2011).

The American Samoan government asserts that this Court can decide the issue because the district court decided the issue. This assertion is

First, all were born in American Samoa, which is a territory "in the United States." When the Fourteenth Amendment was ratified, courts, dictionaries, maps, and censuses uniformly regarded territories as land "in the United States."

Second, even if the territory of American Samoa lay outside the United States, the Citizenship Clause would apply because citizenship is a fundamental right.

Third, even if the right were not fundamental, applying the Citizenship Clause to the three American Samoan plaintiffs would not be impracticable or anomalous.

Because the plaintiffs are U.S. citizens, I would affirm.

---

incorrect. The district court stated only in passing that American Samoans are subject to the jurisdiction of the United States. Appellants' App'x vol. 3, at 627. The court didn't discuss the issue in greater detail because

- the American Samoan government hadn't raised the issue and

- the U.S. Government had conceded the issue.

*Id.* at 595. We thus consider the argument forfeited. Given the forfeiture, we'd ordinarily apply the plain-error standard. *Richison*, 634 F.3d at 1130–31. But the American Samoan government hasn't discussed the plain-error standard, which we treat as a waiver. *See id.*

I.     **The issue arises from a challenge brought by three American Samoan natives residing in Utah.**

This appeal stems from a suit by three individuals: John Fitisemanu, Pale Tuli, and Rosavita Tuli.[3] All were born in American Samoa and currently live in Utah.

Though the three individuals were born in the United States, the U.S. government considers them non-citizen "nationals." 8 U.S.C. § 1408(1). Because they are not classified as citizens, they cannot vote (Utah Const. art. IV, § 5; Utah Code Ann. § 20A-2-101(1)(a)), run for federal or state office (U.S. Const. art. I, § 2, cl. 2; *id.* art. II, § 1, cl. 5; Utah Code Ann. § 20A-9-201(1)(a)), serve as military officers (10 U.S.C. § 532(a)(1)),[4] or serve on a jury (28 U.S.C. § 1865(b)(1); Utah Code Ann. § 78B-1-105(1)(a)).

The three individuals claim U.S. citizenship. The district court agreed and granted them summary judgment. The federal government has appealed, with the support of the American Samoan government.

---

[3]     A nonprofit corporation, the Southern Utah Pacific Island Coalition, also appears as a plaintiff. This corporation is based in Utah.

[4]     But they can fight our wars, and American Samoans have enlisted in our military at a greater rate, per capita, than citizens of any other state or territory. U.S. Army Reserve, *American Samoa At A Glance* (2014), available at https://www.usar.army.mil/Portals/98/Documents/At%20A%20Glance%20Prints/Samoa_ataglance.pdf (last visited May 17, 2021).

## II.   We conduct de novo review, applying the summary-judgment standard.

Our review is de novo. *Navajo Nation v. San Juan Cty.*, 929 F.3d 1270, 1280 (10th Cir. 2019). In applying de novo review, we view the evidence in the light most favorable to the federal and American Samoan governments. *Stender v. Archstone-Smith Operating Trust*, 910 F.3d 1107, 1111 (10th Cir. 2018). With this view of the evidence, we consider whether the plaintiffs have shown (1) the lack of a genuine dispute of material fact and (2) entitlement to judgment as a matter of law. *Zahourek Sys., Inc. v. Balanced Body Univ., LLC*, 965 F.3d 1141, 1143 (10th Cir. 2020).

## III.   The Citizenship Clause unambiguously applies to natives of American Samoa.

The Citizenship Clause of the Fourteenth Amendment provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States . . . ." U.S. Const. amend. XIV, § 1, cl. 1. The threshold issue is the meaning of "in the United States."

### A.   We interpret the Citizenship Clause based on its text, its purpose, and our national experience.

"[W]e interpret the Constitution in light of its text, purposes, and 'our whole experience' as a Nation." *NLRB v. Noel Canning*, 573 U.S. 513, 557 (2014) (quoting *Missouri v. Holland*, 252 U.S. 416, 433 (1920)). To learn the meaning of the text, we consider the lens of the

4

- 1866 Congress, which drafted the Citizenship Clause, and

- the state legislatures, which ratified the clause from 1866 to 1868.

*See District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008).

## B. The phrase "in the United States" unambiguously includes United States territories like American Samoa.

To determine the meaning of the Citizenship Clause, we first consider the public understanding of the phrase "in the United States" from 1866 to 1868. *NLRB*, 573 U.S. at 526–27. At that time, Congress and ordinary Americans understood that U.S. citizenship extended to everyone born within the nation's territorial limits who did not owe allegiance to another sovereign entity. This understanding is reflected in (1) the judicial opinions decided by 1868, (2) the dictionaries, maps, and censuses from the era, (3) the debates surrounding the Citizenship Clause, and (4) the common law's conception of a citizen.

### 1. American Samoa is a United States territory.

Over a century ago, the chiefs of American Samoa's seven islands ceded their territory to the United States. *See* Instrument of Cession, Chiefs of Tutuila-U.S., April 17, 1900 (Tutuila and Aunu'u Islands), available at https://history.state.gov/historicaldocuments/frus1929v01/d853 (last visited May 17, 2021); Instrument of Cession, Chiefs of Manu'a-U.S., July 14, 1904 (Ta'u, Olosega, Ofu, and Rose Islands), available at https://history.state.gov/historicaldocuments/frus1929v01/d855 (last

visited May 21, 2021). In return, the United States promised to respect
American Samoans' property rights. Instrument of Cession: Chiefs of
Tutuila to United States Government; Instrument of Cession: Chiefs of
Manu'a to United States Government. Congress ratified these cessions. 48
U.S.C. § 1661(a); *see also* 48 U.S.C. § 1662 (providing U.S. sovereignty
over Swains Island). Upon ratification, American Samoa became a territory
of the United States. *See, e.g.*, 48 U.S.C. §§ 1731–33 (identifying
American Samoa as the "Territory of American Samoa").

### 2. Contemporary judicial opinions included the territories as part of the United States.

To discern what ordinary Americans meant in 1866 to 1868 by the
phrase "in the United States," we can consider contemporary judicial
opinions. In the nineteenth century, "[c]ourts . . . commonly referred to
U.S. territories as 'in' the United States." Michael D. Ramsey, *Originalism
and Birthright Citizenship*, 109 Geo. L.J. 405, 426 (2020).

For example, in the early part of the century, the Supreme Court
observed that

- "the United States" "is the name given to our great republic,
  which is composed of States and territories" and

- "the territory west of the Missouri [was] not less within the
  United States . . . than Maryland or Pennsylvania."

*Loughborough v. Blake*, 18 U.S. (5 Wheat.) 317, 319 (1820) (Marshall,
C.J.).

6

Justice Story, riding Circuit, also explained that "[a] citizen of one of our territories is a citizen of the United States." *Picquet v. Swan*, 19 F. Cas. 609, 616 (C.C.D. Mass. 1828).

About 25 years later, the Court considered whether U.S. tariffs had been properly applied to products coming from outside the United States into the Territory of California after its cession by treaty. *Cross v. Harrison*, 57 U.S. (16 How.) 164, 181, 197 (1853). The Court answered "yes," considering the Territory of California as "part of the United States." *Id.* at 197–98.

And in 1867, the Supreme Court observed that U.S. citizens included inhabitants of "the most remote States or territories." *Crandall v. State of Nevada*, 73 U.S. (6 Wall.) 35, 48–49 (1867) (quoting *Smith v. Turner* (*The Passenger Cases*), 48 U.S. (7 How.) 283, 492 (1849) (Taney, C.J., dissenting)).[5]

The American Samoan government points out that in *Fleming v. Page*, the Supreme Court held that Tampico (a port in Tamaulipas, Mexico)

---

[5]     A leading attorney of the era, William Rawle, also observed that "every person born within the United States, its territories or districts, whether the parents are citizens or aliens, is a natural born citizen in the sense of the [c]onstitution . . . ." William Rawle, *A View of the Constitution of the United States of America* 86 (Philip H. Nicklin, 2d ed. 1829); *see* Stewart Jay, *The Status of the Law of Nations in Early American Law*, 42 Vand. L. Rev. 819, 826–27 (1989) (stating that Mr. Rawle was a U.S. Attorney and a leading attorney of the period).

was not "in the United States" even though the port was occupied by the U.S. military during the Mexican-American war. 50 U.S. 603, 614–16 (1850). But the Court clarified that even though other nations had to regard Tampico as U.S. territory, the port was not "territory included in our established boundaries" without a formal cession or annexation. *Id.* So the opinion doesn't address whether territories of the United States are "in the United States."

### 3. Contemporary dictionaries, maps, and censuses included the territories as part of the United States.

We may also consider contemporary dictionaries, maps, and censuses. *See NLRB v. Noel Canning*, 573 U.S. 513, 527 (2014) (looking to contemporary dictionaries to interpret the Recess Appointments Clause); *New Jersey v. New York*, 523 U.S. 767, 797–803, 810 (1998) (looking to historical censuses and maps to allocate Ellis Island between New York and New Jersey); *Michigan v. Wisconsin*, 270 U.S. 295, 301–07, 316–17 (1926) (using the same method to establish state boundaries).

Like judicial opinions, dictionaries of the era regarded territories as land "in the United States."

For example, the 1867 edition of *Webster's Dictionary* defined "Territory" as "2. A distant tract of land belonging to a prince or state. 3. In the United States, a portion of the country not yet admitted as a State into the Union, but organized with a separate legislature, a governor."

William G. Webster & William A. Wheeler, *Academic Edition. A Dictionary of the English Language, explanatory, pronouncing, etymological, and synonymous. Mainly abridged from the latest edition of the quarto dictionary of Noah Webster* at 434 (1867).

The next year, Judge John Bouvier's legal dictionary defined "Territory" even more broadly as "[a] portion of the country subject to and belonging to the United States which is not within the boundary of any of the States." II John Bouvier, *A Law Dictionary, Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union* 587 (George W. Childs 12th ed. rev. 1868).

Fifteen years later, this dictionary defined "United States of America" to include Alaska—an unincorporated territory—in the definition of "United States of America." II John Bouvier, *A Law Dictionary, Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union* 765 (J. P. Lippincott and Co., 15th ed. rev. 1883);[6] *see* note 8, below (discussing Alaska's unincorporated

---

[6]     The American Samoan government points out that Alaska is omitted from the definition of the "United States of America" in the 1868 edition of this dictionary. *See* II John Bouvier, *A Law Dictionary, Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union* 622 (George W. Childs 12th ed. rev. 1868). But later editions of the same dictionary added Alaska (even while it remained unincorporated), suggesting that the omission had been inadvertent. *See* text accompanying note. In any event, omission of Alaska in the 1868 edition sheds little insight into the meaning of the "United

status prior to 1891). So contemporary dictionaries regarded territories as "in the United States."

This understanding is also apparent in contemporary maps and census records. For example, the 1857 map of the United States included the territories of Washington, Oregon, Nebraska, Nevada, Utah, New Mexico, Arizona, Dakota, and Indian Territory (later Oklahoma):



---

States" during the drafting and ratification of the Citizenship Clause. Kevin P. Tobia, *Testing Ordinary Meaning*, 134 Harv. L. Rev. 726, 295 (2020).

Henry D. Rogers, W. & A.K. Johnston Ltd. & Edward Stanford Ltd., *General map of the United States, showing the area and extent of the free & slave-holding states & the territories of the Union: also the boundary of the seceding states* (1857), available at https://www.loc.gov/resource/g3701e.cw1020000/ (last visited on May 13, 2021) (on file at the Library of Congress). Similarly, the 1868 map of the United States contained the territories, including the new unincorporated territory of Alaska:



H. H. Lloyd & Co., *The Washington map of the United States* (1868), available at https://www.loc.gov/resources/g3700.ct002969/ (last visited May 13, 2021) (on file at the Library of Congress).

Like contemporary maps, the censuses of the era showed territories as part of the United States. For example, the 1854 census stated that "[t]he United States consist at the present time (1st July 1854,) of thirty-one independent States and nine Territories . . . ." J.D.B. De Bow, Superintendent of the U.S. Census, *Statistical View of the United States* 35–36 (A.O.P. Nicholson, 1854).

In 1870, the government conducted another census, again

- listing both states and territories as the region constituting the United States and

- including the unincorporated territory of Alaska:



Francis A. Walker, *Statistical atlas of the United States based on the results of the ninth census 1870 with contributions from many eminent men of science and several departments of the government* (image 32) (1874), available at https://www.loc.gov/loc.gmd/g3701gm.gct00008 (last visited May 13, 2021) (on file at the Library of Congress). The census thus derived the area of "the United States" by including the territories as well as the states.



Area and population of "The States"

Area and population of "The United States," the sum of the States and the Territories

Area and population of "The Territories"

As shown by contemporary judicial opinions, dictionaries, maps, and censuses, U.S. territories were uniformly considered "in the United States." There was nothing uncertain or ambiguous about the application of the Citizenship Clause to the territories. So when the United States acquired American Samoa as a territory, everyone born in the territory became a U.S. citizen. We need not look beyond the text of the Citizenship Clause to determine the plaintiffs' citizenship.

### 4.   The drafters and ratifiers interpreted the Citizenship Clause to encompass territories.

Even if we were to look beyond the constitutional text, however, we would find confirmation of the unambiguous meaning of the Citizenship Clause. One meaningful source is the congressional debates leading to the enactment of the Citizenship Clause; the statements in these debates provide "valuable" input on what "contemporaneous opinions of jurists and statesmen" regarded as the "legal meaning" of the Citizenship Clause. *United States v. Wong Kim Ark*, 169 U.S. 649, 699 (1898).[7] These

---

[7]   Chief Judge Tymkovich discounts the historical value of these floor statements, suggesting that they "may not have aligned with common public understanding." Tymkovich, C.J. Concurrence at 2. But the Supreme Court thought differently, relying on the legislators' floor statements on the meaning of the Citizenship Clause as "valuable" "contemporaneous opinions of jurists and statesmen upon the legal meaning of the words themselves." *Wong Kim Ark*, 169 U.S. at 699.

Disregarding the Supreme Court's own reliance on these floor statements, the concurrence points to a law review article by Professor

14

statements can also provide evidence of the people's understanding, especially if "there is evidence that these statements were disseminated to the public." *McDonald v. City of Chicago*, 561 U.S. 742, 828 (2010) (Thomas, J., concurring in part & concurring in the judgment).

Senator Jacob Howard proposed amending the Constitution to include the Citizenship Clause. Cong. Globe, 39th Cong., 1st Sess. 2869 (1866). The Senate adopted his proposed amendment after considering whether its language extended citizenship to the children of American Indians and Chinese immigrants. *Id.* at 2890–97.

In wording the amendment, Senator Howard drew from Senator Lyman Trumbull's draft of the 1866 Civil Rights Act. *Id.* at 2894. Given the reliance on the Civil Rights Act, Senator Trumbull commented on his understanding of the phrase "in the United States," stating that it "refers to persons everywhere, whether in the States or in the Territories or in the District of Columbia." *Id.* at 2894.

Eleven other Senators spoke, all agreeing with Senator Trumbull. *Id.* at 2890–97. For example, in discussing the extension of citizenship to children of American Indians, the Senators considered the Ojibwe

---

Michael Ramsey. Tymkovich, C.J. Concurrence at 1 n.1. But Professor Ramsey thinks it clear that the drafters and public had viewed the Citizenship Clause as applicable to everyone born in territories subject to permanent U.S. sovereignty. Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, 427–28, 432 (2020).

(Chippewa) people in the state of Wisconsin, the Navajo Nation in the then-territory of New Mexico, and the Tribes in the unorganized "region of the country within the territorial limits of the United States." *Id.* at 2892, 2894. No Senator questioned whether residents of the American Indian tribes were "in the United States." *Id.* at 2890–97; Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, 427–29 (2020). Each "knew and properly respected the old and revered decision in the *Loughborough-Blake* case," where Chief Justice Marshall had referred to "the United States" as "the name given to our great Republic which is composed of States and territories." Letter from J.B. Henderson to Hon. C.E. Littlefield (June 28, 1901), reproduced in Charles E. Littlefield, *The Insular Cases (II: Dred Scott v. Sandford)*, 15 Harv. L. Rev. 281, 299 (1901) (quoting *Loughborough v. Blake*, 18 U.S. 317, 319 (1820)).

News of this debate was carried the next day in the New York Herald, the country's best-selling newspaper, and other papers. *See* N.Y. Herald, May 31, 1866, at 1; Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 187 (Yale Univ. Press, 2008); *see also* N. Y. Times, May 31, 1866, at 1 (carrying the debate); Chi. Trib., May 31, 1866, at 1 (carrying the debate). So the Citizenship Clause was understood to apply to the territories.

**5.     The ratifiers had fresh experience in acquiring Alaska
through a treaty silent on incorporation or statehood.**

The majority says that the drafters of the Fourteenth Amendment
"could only have been speaking of incorporated territories destined for
statehood, not the unincorporated territories around which this case
revolves." Maj. Op. at 27. But this distinction would have meant nothing
from 1866 to 1868, because the term "unincorporated territory" had no
meaning. The term would not be coined for another 35 years. *Downes v.
Bidwell*, 182 U.S. 244, 311–14 (1901) (White, J., concurring).

And the ratifiers had fresh experience with acquiring territory not yet
destined for statehood. Only a year before ratification, the United States
acquired the Territory of Alaska. This acquisition was memorialized in a
treaty, which didn't mention statehood or incorporation. Cession of Alaska,
Russ.-U.S., T.S. No. 301, Mar. 30, 1867. By contrast, the United States'
other treaties had "specifically provided that the inhabitants of the ceded
territories should be incorporated into the Union." Max Farrand, *Territory
and District*, 5 Am. Hist. Rev. 676, 678 (1900). So it is not clear that
Congress and the public anticipated Alaska's inclusion as a state. *See id.* at
679–80 (stating over 30 years later that "there is no intention [among
representative institutions] of incorporating [Alaska] as a state" and "no
immediate probability that it [would] be so incorporated").

17

Despite the lack of any mention of statehood or incorporation of

Alaska, the treaty said:

> The inhabitants of the ceded territory . . . shall be admitted to
> the enjoyment of all of the rights, advantages, and immunities of
> citizens of the United States; and shall be maintained and
> protected in the free enjoyment of their liberty, property, and
> religion.

Cession of Alaska, Russ.-U.S., T.S. No. 301, art. III, Mar. 30, 1867

(Alaska).

At the time, no one considered Alaska either incorporated or

unincorporated because the terms hadn't yet been coined. But the United

States accepted the Territory of Alaska through a treaty requiring equal

treatment with U.S. citizens.[8]

---

[8]     The Supreme Court later suggested in *Rassmussen v. United States*,
197 U.S. 516 (1905), that Alaska had become incorporated in 1891. There
the Supreme Court held that Alaska had been incorporated based on "the
text of the treaty by which Alaska was acquired, . . . the action of Congress
thereunder, and the reiterated decisions of this Court." *Id.* at 525. Along
with the treaty's "purpose to incorporate," the *Rassmussen* Court relied on

- 1868 Congressional acts,

- 1891 Congressional and Court actions,

- an 1896 Supreme Court opinion recognizing the import of those
  1891 actions (*Coquitlam v. United States*, 163 U.S. 346
  (1896)), and

- a 1904 Supreme Court opinion recognizing the import of the
  1896 opinion (*Binns v. United States*, 194 U.S. 486 (1904)).

18

Roughly four decades later, Manu'a—a substantial part of American Samoa—ceded itself to the United States, obtaining the same assurance of equal treatment with U.S. citizens:

> [T]here [would] be no discrimination in the suffrages and political privileges between the present residents of said Islands and citizens of the United States dwelling therein, and also that the rights of the Chiefs in each village and of all people concerning their property according to their customs shall be recognized.

Instrument of Cession, Chiefs of Manu'a-U.S., July 14, 1904 (Ta'u, Olosega, Ofu, and Rose Islands), available at

https://history.state.gov/historicaldocuments/frus1929v01/d855.

Though the drafters and ratifiers of the Fourteenth Amendment couldn't have had American Samoa in mind, the country had just acquired the territory of Alaska, promising no discrimination in the political privileges enjoyed by U.S. citizens—the same promise extended in 1904 in the second cession of American Samoan land. And Alaska was considered "in the United States." *See* Part III(B)(3), above.

Even if we were to look beyond the unambiguous constitutional text, we'd find that the Citizenship Clause's plain language wasn't accidental:

---

*See Rassmussen*, 197 U.S. at 523–25. So *Rassmussen* suggests that Alaska was unincorporated prior to 1891. *Id.*; *cf.* Max Farrand, *Territory and District*, 5 Am. Hist. Rev. 676, 679–80 (1900) (noting even by 1900, incorporation of Alaska seemed unlikely in the near future).

The drafters intended the clause to extend birthright citizenship to everyone born in the U.S. territories as well as the states.

### 6.    The Fourteenth Amendment re-inscribed the common-law application of *jus soli* to the states and the territories.

From the Founding, Congress had viewed the new nation to include the territories. Before adopting the Constitution, Congress had called the Northwest Territory "part" of the "Confederacy of the United States of America." Northwest Ordinance of 1787, § 14, art. 4, 1 Stat. 51 (July 13, 1787); Northwest Ordinance of 1789, ch. 8, 1 Stat. 50, 50–53 (1789).

But the U.S. Constitution did not initially define the "United States" or say who would be considered its citizens. U.S. Const. (1791). Given this omission in the Constitution, courts defined the citizenry based on the common law. *See, e.g.*, *Dawson's Lessee v. Godfrey*, 8 U.S. (4 Cranch) 321, 322–24 (1808); *Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 167–68 (1874).

The common law viewed everyone born in the sovereign's dominion as subjects of the sovereign. *Inglis v. Trs. of Sailor's Snug Harbor*, 28 U.S. (3 Pet.) 99, 155 (1830) (Story, J., concurring). "Dominion" was a broad concept that included "colonies and dependencies." *Calvin's Case* (1608), 77 Eng. Rep. 377, 409; *see also Inglis*, 28 U.S. at 120 (stating that "all persons born within the colonies of North America, whilst subject to the crown of Great Britain, were natural born British subjects"). The sovereign

20

changed with the American Revolution, but the common-law concept of citizenship remained, continuing "the fundamental rule of citizenship by birth" within the dominion of the United States. *United States v. Wong Kim Ark*, 169 U.S. 649, 658–64, 674 (1898). The territories, the Supreme Court explained, are "political subdivisions of the outlying dominion of the United States." *First Nat'l Bank v. Yankton Cty.*, 101 U.S. 129, 133 (1879).

Despite the common law's broad conception of birthright citizenship, which extended to individuals born in the territories, the Supreme Court concluded in *Dred Scott v. Sandford* that African Americans couldn't become citizens even if they had been born in the United States. 60 U.S. (19 How.) 393, 404–05 (1857). This conclusion struck many as a repudiation of the common law's recognition of birthright citizenship, known as the doctrine of *jus soli*.

Invoking this doctrine, Senator Howard proposed the Citizenship Clause, stating that it was "simply declaratory of what [he] regard[ed] as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, [was] by virtue of the natural and national law a citizen of the United States." Cong. Globe, 39th Cong., 1st Sess. 2890 (1866). Through the Citizenship Clause, Congress tried to squelch the notion that persons born "in the District of Columbia *or in the Territories*, though within the United States, were not citizens." *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 72–73 (1872) (emphasis

21

added). A person "may . . . be a citizen of the United States without being a citizen of a State . . . ." *Id.* at 74.

Roughly 20 years after ratification, the Supreme Court considered the meaning of the Citizenship Clause in *Elk v. Wilkins*, 112 U.S. 94 (1884). There the Court considered whether the plaintiff, who was born as a member of an American Indian tribe, was a U.S. citizen by virtue of his birth "within the territorial limits of the United States." *Id.* at 98–99, 102. Though the plaintiff was born in the territories, the Supreme Court observed that he was "in a geographical sense born in the United States." *Id.* at 102.[9]

The Supreme Court soon returned to the meaning of the Citizenship Clause in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). That case involved the citizenship of Mr. Wong Kim Ark, who was born in a state (California) to Chinese nationals. To decide whether Mr. Wong was a U.S. citizen, the Court relied on the common-law recognition that everyone born within the sovereign's dominion was a subject of the sovereign: "The fourteenth amendment affirms the ancient and fundamental rule of

---

[9]      The Court held that although the plaintiff had been born in the United States, he was not a U.S. citizen under the Fourteenth Amendment because he owed allegiance to his tribe rather than to the United States. *Elk*, 112 U.S. at 98–99, 109.

citizenship by birth within the territory, in the allegiance and under the protection of the country . . . ." *Id.* at 655, 693.

The majority and the federal government dismiss this language as irrelevant dicta because Mr. Wong was born in a state (California). Maj. Op. at Part II(B)–(C). Though he was born in a state, rather than a territory, the Court had to decide how to define citizenship because Mr. Wong's parents were Chinese nationals. *Wong Kim Ark*, 169 U.S. at 652, 693–94. The Supreme Court decided that the nationality of Mr. Wong's parents didn't matter because citizenship under the new constitutional amendment stemmed from the common-law principle of birth within the sovereign's dominion. Given the Court's focus on the common-law principle of birth within the sovereign's dominion, the Court observed that the Citizenship Clause "in clear words and in manifest intent, includes the children born *within the territory of the United States*[,] . . . of whatever race or color, domiciled within the United States." *Id.* at 693 (emphasis added); *see also Gonzales v. Williams*, 192 U.S. 1, 13 (1904) (stating only a few years later that the territory of Puerto Rico lies within "the dominion of the United States").

Even if this discussion were dicta, it would carry great weight, as the Supreme Court recently observed: "Some have referred to this part of [*Wong Kim Ark*] as a holding, while others have referred to it as obiter dictum. Whichever it was, the statement was evidently the result of serious

23

consideration and is *entitled to great weight*." *Afroyim v. Rusk*, 387 U.S. 253, 266 n.22 (1967) (citations omitted) (emphasis added). So we should apply the methodology of *Wong Kim Ark*. *See District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) (stating that when the Constitution "codified a *pre-existing* right," courts must derive the scope of this right by considering its "historical background" (emphasis in original)).

Applying the common-law rule of birthright citizenship, I would consider the individual plaintiffs—born in the U.S. territory of American Samoa—as U.S. citizens.

### 7.   Other constitutional references to "the United States" do not affect the meaning of the term in the Citizenship Clause.

The Supreme Court has recognized that the term "the United States" may refer either to the sovereign, the territory subject to the sovereign's control, or the collective name for the states and the District of Columbia. *Hooven & Allison Co. v. Evatt*, 324 U.S. 652, 671–72 (1945), *overruled on other grounds by Limbach v. Hooven & Allison Co.*, 466 U.S. 353 (1984). Although we consider other constitutional references to "the United States," they provide little guidance.

In focusing on the constitutional structure, the parties point to two other constitutional provisions adopted at or about the same time as the Citizenship Clause: Section 2 of the Fourteenth Amendment and the Thirteenth Amendment.

24

The plaintiffs point to Section 2 of the Fourteenth Amendment, which uses the phrase "among the several States." U.S. Const. amend. XIV, § 2. This clause appears narrower than the clause "in the United States," suggesting that "the United States" might extend beyond the combination of states.

But the different terminology doesn't reveal how much further the phrase "in the United States" extends beyond the combination of states. The plaintiffs theorize that the phrase "in the United States" must encompass all the territories, including American Samoa. The federal government posits that the phrase "in the United States" includes the District of Columbia but not the territories. Both interpretations are possible; neither is decisive.

For its part, the federal government points to the Thirteenth Amendment, adopted roughly 1-½ years before the Citizenship Clause. The Thirteenth Amendment banned slavery "within the United States, *or* any place subject to *their* jurisdiction." U.S. Const. amend. XIII (emphases added). The federal government argues that this language shows that "the United States" must not include the territories because

- the disjunctive ("or") shows that some places lie outside the United States but are subject to U.S. jurisdiction and

- the use of "their" in reference to the "United States" suggests that the term "United States" refers only to the combination of states, excluding the territories.

These arguments are not persuasive for two reasons.

First, the Thirteenth Amendment's reference to "any place subject to their jurisdiction" need not encompass territories; this reference may instead pertain to locations like U.S. military bases located overseas. *See In re Chung Fat*, 96 F. 202, 203–04 (D. Wash. 1899) (concluding that slavery aboard a U.S. vessel would violate the Thirteenth Amendment).

Second, the Fourteenth Amendment's Citizenship Clause was designed to make explicit what the Thirteenth Amendment had implied. So the Citizenship Clause must extend at least as far as the Thirteenth Amendment.

The drafters of the Citizenship Clause believed that the Thirteenth Amendment had already overturned *Dred Scott* and re-established the natural law of citizenship. For example, between the passage of the Thirteenth Amendment and the Fourteenth Amendment, Senator Trumbull urged inclusion of a similarly worded citizenship clause in the 1866 Civil Rights Act. He stated that with the new constitutional protection of freedom for African Americans came renewed status as "citizens" and "the great fundamental rights belonging to free citizens." Cong. Globe, 39th Cong., 1st Sess. 475 (1866); *see* N. Y. Times, Jan. 30, 1866, at 1 (carrying debate); Chi. Trib., Jan. 30, 1866, at 1 (same).

Other congressmen agreed that they could now confirm citizenship for African Americans and passed the Civil Rights Act of 1866 over

26

President Johnson's veto. Ch. 31, 14 Stat. 29–30; *see also* Michael Curtis,
*No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights*
48 (Duke Univ. Press 1986) ("Republicans believed the Thirteenth
Amendment effectively overruled *Dred Scott* so that black[] [Americans]
were entitled to all rights of citizens."); Andrew Johnson, *The Veto*, N.Y.
Times, March 28, 1866, at 1 ("If, *as is claimed by many*, all persons who
are native born, already are, by virtue of the Constitution, citizens of the
United States, the passage of the pending bill cannot be necessary to make
them such." (emphasis added)).

The Citizenship Clause made explicit what the Thirteenth
Amendment had already memorialized. So Senator Howard introduced his
proposed language for the Citizenship Clause, regarding it as "simply
declaratory of what [he] regard[ed] as the law of the land *already*." Cong.
Globe, 39th Cong., 1st Sess. 2890 (1866) (emphasis added). And
contemporary newspapers quoted Senator Doolittle's statement that the
Civil Rights Act and the Citizenship Clause had undertaken "to do th[e]
same thing." N.Y. Herald, May 31, 1866 p. 1; N.Y. Times, May 31. 1866 p.
1 (same); Chi. Trib., May 31, 1866, p. 1 (same). Indeed, in *United States v.
Wong Kim Ark*, the Supreme Court recognized that the Citizenship Clause
was "declaratory of existing rights, and affirmative of existing law." 169
U.S. 649, 676, 687–88 (1898). Because the Fourteenth Amendment did not

"impose any new restrictions upon citizenship," the Citizenship Clause must apply at least as broadly as the Thirteenth Amendment. *Id.* at 688.

The federal government also points to other constitutional provisions adopted long before and after the Citizenship Clause, such as the Territories Clause and the Eighteenth Amendment.

The Territories Clause provides for "the Territory and other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. This language treats a territory as a possession of the United States rather than a part of it. But the Constitution elsewhere refers to the territories as places distinct from U.S. "possessions." *See, e.g.*, U.S. Const. amend. XXI, § 2 (referring to "any State, Territory, *or* possession of the United States" (emphasis added)).

Nor is the Eighteenth Amendment decisive. This amendment (now repealed) banned the import and export of liquor, referring to "the United States and all territory subject to the jurisdiction thereof for beverage purposes." U.S. Const. amend. XVIII, § 1. From this language, we know that some territories are subject to U.S. jurisdiction even though they lie outside the United States. The Thirteenth Amendment had also shown the existence of territories subject to the U.S. jurisdiction even though they lay outside the United States. But no party suggests that the Thirteenth Amendment excludes all territories from "in the United States."

28

From the Territories Clause and the Eighteenth Amendment, we can safely conclude that the term "the United States" doesn't always include territories. But the Territories Clause preceded the Citizenship Clause by roughly eighty years, and the Citizenship Clause preceded the Eighteenth Amendment by roughly fifty years. And we know that the phrase "the United States" means different things in different constitutional contexts. *See Hooven & Allison Co. v. Evatt*, 324 U.S. 652, 671–72 (1945), *overruled on other grounds by Limbach v. Hooven & Allison Co.*, 466 U.S. 353 (1984); *see also* p. 24, above. So when we interpret the Citizenship Clause's reference to "in the United States," we can learn little from

- the Territories Clause's 80-year-old reference to "the Territory . . . belonging to" the United States or

- the Eighteenth Amendment's repealed reference to "territory subject to" U.S. jurisdiction.

**C.   The constitutional structure does not affect the meaning of "in the United States" in the Citizenship Clause.**

Despite the clear import of the Citizenship Clause, the defendants point to the constitutional structure, arguing that Congress's plenary power over the territories should override the Citizenship Clause. *See* U.S. Const. art. IV, § 3, cl. 2; *see also Downes v. Bidwell*, 182 U.S. 244, 306 (1901) (White, J., concurring) (questioning whether the right to acquire territory could "be practically exercised if the result would be to endow the inhabitants with citizenship of the United States and to subject them" to

29

the Constitution's tax requirements). The defendants thus urge judicial restraint to prevent encroaching on congressional oversight of the territories.

But the defendants don't address the historical import of the Citizenship Clause. That clause wasn't part of the Constitution's original structure or the Founders' initial conception of the separation of powers. The clause emerged in the Fourteenth Amendment, which was designed to adjust the constitutional structure by putting "this question of citizenship . . . beyond the legislative power." *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967) (quoting Cong. Globe, 39th Cong., 1st Sess. 2896 (1866) (statement of Sen. Howard)). The Citizenship Clause was thus designed to remove birthright citizenship from Congress's domain, confirming the abrogation of *Dred Scott* and ensuring preservation of the citizenship that freed slaves had enjoyed under the common law.

The Fourteenth Amendment realigned the Constitution's structure. Given this realignment, a general structural argument about Congressional power to govern territories can't override the Citizenship Clause.

**D.    The majority erroneously relies on congressional actions 50 years after adoption of the Citizenship Clause to conclude that it does not apply to American Samoa.**

Though I regard the Citizenship Clause as unambiguous, the majority doesn't. In characterizing the clause as ambiguous, the majority never considers what "in the United States" means in the Citizenship Clause,

30

choosing instead to find ambiguity based on other uses of "United States" in other constitutional provisions enacted at other times. In my view, this approach mixes apples and oranges, for the term "United States" is used in the Constitution sometimes as shorthand for

- the aggregation of states (U.S. Const. Preamble; amend. XI),

- the entity created by the states (art. I, § 8, cls. 16, 18; art. III, § 1; art. VI, cl. 2), and

- a place (amend. XIV, § 1; art. II, § 1, cl. 5; art. I, § 8, cl. 1).

*See* Part III(B)(7), above. The Citizenship Clause unambiguously uses the term "in the United States" to refer to a place. So we can parse the Citizenship Clause's meaning only by considering the use of the term "United States" when the clause was adopted and ratified.

But my esteemed colleagues do something different: They decline to consider the public understanding of "in the United States" or the intent of the drafters when extending birthright citizenship to everyone born "in the United States." Indeed, no one in the case—not the parties, the intervenors, or my colleagues—has pointed to a single contemporary judicial opinion, dictionary, map, census, or congressional statement that treated U.S. territories as outside the United States from 1866 to 1868.

Disregarding the public understanding of "in the United States" in 1866 to 1868, the majority instead relies on Congress's practice beginning roughly 50 years after adoption of the Citizenship Clause, when Congress

31

granted statutory citizenship to individuals born in the Territory of Puerto Rico.[10] But Congress's later views shed little light on the intent of the drafters and ratifiers from 1866 to 1868, for "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures . . . think that scope too broad." *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008); *see also United States v. Price*, 361 U.S. 304, 313 (1960) (stating that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one").

Still, finding that ambiguity remains, Judge Lucero considers whether

- U.S. citizenship is a fundamental right or
- application of the Citizenship Clause would be impractical or anomalous in American Samoa.

But these inquiries would be appropriate only if the Citizenship Clause had not expressly defined its geographic scope, which the clause did through the phrase "in the United States." *See Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 589 n.21 (1976).[11]

---

[10]    Years later, Congress also granted statutory citizenship to natives of four other territories (Guam, the Virgin Islands, and the Commonwealth of the Northern Mariana Islands).

[11]    There the Supreme Court interpreted one of the Insular Cases—*Dorr v. United States*, 195 U.S. 138, 143 (1904)—as holding "that the

Congress's later actions shed little light on the thinking 50 years earlier.

### E.   We can draw little insight from *Downes v. Bidwell* and its distinction between incorporated and unincorporated territories.

The federal government relies on *Downes v. Bidwell*, arguing that it suggests disregard for the common law's principle of birthright citizenship. 182 U.S. 244 (1901). In *Downes*, the Court considered the meaning of the Tax Uniformity Clause, which provides that "all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art I, § 8, cl. 1; *Downes*, 182 U.S. at 288 (White, J., concurring).

The context is all-important: Because citizenship wasn't involved, the Court had no reason to consider the common law's treatment of the country's geographic scope. For purposes of the Tax Uniformity Clause, the *Downes* Court held that the phrase "United States" does not include unincorporated territories. U.S. Const. art. I, § 8, cl. 1; *see Downes*, 182 U.S. at 263, 277–78, 287 (opinion of Brown, J.); *id.* at 341–42 (White, J., concurring); *id.* at 346 (Gray, J. concurring). The federal government extends this conclusion to the Citizenship Clause. I disagree for three reasons:

_____

Constitution, *except insofar as required by its terms*, did not extend to the Philippines as an unincorporated territory." *Examining Bd. of Eng'rs*, 426 U.S. at 589 n.21 (emphasis added).

33

1.   The Citizenship Clause's use of "United States" includes territories.

2.   Justice White's discussion of citizenship entailed only dicta in a plurality opinion.

3.   The Supreme Court has repeatedly warned against extending *Downes*.

First, the term "in the United States" in the Citizenship Clause refers to the states and territories. *See* Part III, above; *Examining Bd. of Eng'rs, Architects & Surveyors*, 426 U.S. at 589 n.21, 599 n.30. The term "United States" can refer to different geographic bounds depending on the context. *See* Part III(B)(7), above. *Downes* held that "United States," as used in the Tax Uniformity Clause, doesn't include unincorporated territories. *See* p. 33, above. But the Citizenship Clause followed the Tax Uniformity Clause by over a half century, with different drafters and a different purpose. Between 1866 and 1868, the word "territory" referred to an area in the United States.

The Tax Uniformity Clause was designed to prevent the federal government from using its power over commerce to the disadvantage of individual states. *United States v. Ptasynski*, 462 U.S. 74, 80–81 (1983). In contrast, the Citizenship Clause addresses "a reciprocal relationship between an individual and a nation, irrespective of where within that nation the individual may be found." José Julián Álvarez González, *The Empire Strikes Out: Congressional Ruminations on the Citizenship Status*

34

*of Puerto Ricans*, 27 Harv. J. on Legis. 309, 335 (1990). In determining the extent of this reciprocal relationship, the Citizenship Clause expressly defines its geographic reach, applying to all land "in the United States." By defining its own geographic reach, the Citizenship Clause differs from the Tax Uniformity Clause.

The majority points out that the Supreme Court has recognized a distinction between incorporated and unincorporated territories, citing *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), *Balzac v. Porto Rico*, 258 U.S. 298 (1922), and *Dorr v. United States*, 195 U.S. 138 (1904). Maj. Op. at 4–5 n.1 and 28. But those opinions addressed the right against unreasonable searches and the right to a jury trial—rights that do not identify their geographic scope. *See Verdugo-Urquidez*, 494 U.S. at 264 (Fourth Amendment protections against unreasonable searches and seizures), *Balzac*, 258 U.S. at 304 (Article III and the right to a jury trial under the Sixth and Seventh Amendments); *Dorr*, 195 U.S. at 144 (Sixth Amendment right to a jury trial). So those opinions don't establish a distinction between incorporated and unincorporated territories for a right, like the Citizenship Clause, that defines its own geographic scope.

Second, to the extent that the *Downes* opinions discussed citizenship, the opinions were splintered and provided only unhelpful dicta on the geographic scope of the "United States" for purposes of the Tax Uniformity Clause. There was no majority beyond *Downes*'s core holding.

35

Justice White's opinion was later recognized as "the settled law of the court." *Balzac v. Porto Rico*, 258 U.S. 298, 305 (1922). But Justice White's opinion garnered only two other votes. *Downes*, 182 U.S. at 287 (White, J., concurring). The holding is thus limited to the "position taken by [the concurring Justices] on the narrowest grounds." *Nichols v. United States*, 511 U.S. 738, 745 (1994) (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)).

And Justice White's discussion of citizenship constituted dicta outside the Court's narrow holding. In this dicta, Justice White used citizenship only as an illustration. *See Downes*, 182 U.S. at 306 (White, J., concurring) ("Let me illustrate . . . . Can it be denied that such right [to acquire territory] could not be practically exercised if the result would be to endow the inhabitants with citizenship of the United States . . . ?").

In another context, even dicta would carry great weight. *See Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015) (explaining that this Court is "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements" (quoting *United States v. Serawop*, 505 F.3d 1112, 1122 (10th Cir. 2007))). But given the fractured opinions, Justice White's reasoning on citizenship carries only the authority of a concurrence. *See Nichols*, 511 U.S. at 745.

36

Finally, *Downes* is one of the nine "Insular Cases" whose impact has diminished over the last century. In the middle of the twentieth century, for example, a plurality of the Supreme Court stated that "neither the [Insular] cases nor their reasoning should be given any further expansion." *Reid v. Covert*, 354 U.S. 1, 14 (1957) (plurality op.); *see also Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, ___ U.S. ___, 140 S. Ct. 1649, 1665 (2020) ("Those [Insular Cases] did not reach this issue, and whatever their continued validity we will not extend them in these cases." (citing *Reid*, 354 U.S. at 14)); *cf. Torres v. Puerto Rico*, 442 U.S. 465, 475 (1979) (Brennan, J., concurring in the judgment) ("Whatever the validity of the [Insular] cases . . . those cases are clearly not authority for questioning the application of the Fourth Amendment—or any other provision of the Bill of Rights—to the Commonwealth of Puerto Rico in the 1970's." (internal citations omitted)). Dicta from *Downes* has thus been further "enfeebled" by the Supreme Court's "later statements." *See Bonidy*, 790 F.3d at 1125.

We should thus draw little guidance from *Downes*'s interpretation of the Tax Uniformity Clause.

**IV. Even if the Citizenship Clause did not otherwise extend to American Samoa, this clause would apply because it recognized a fundamental right.**

In *Downes*, Justice White's opinion distinguished between incorporated and unincorporated territories:

37

- an incorporated territory was "destined for statehood" and the Constitution applied in full;

- other territories were unincorporated, and constitutional provisions would govern only if they applied "by [their] own terms" or were considered "fundamental."

*Downes v. Bidwell*, 182 U.S. 244, 290–91, 299–300 (1901) (White, J., concurring); *see Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 589 n.21, 599 n.30 (1976); *Boumediene v. Bush*, 553 U.S. 723, 758 (2008). In my view, the Citizenship Clause applies by its own terms. *See* Part III, above. But even if its application were ambiguous, the right to citizenship in some country would be fundamental.

A right is considered fundamental if it is "the basis of all free government." *Downes*, 182 U.S. at 290–91 (White, J., concurring). In the United States, citizenship lies at the core of our national identity: "Citizenship in this Nation is a part of a cooperative affair. Its citizenry is the country and the country is its citizenry." *Afroyim v. Rusk*, 387 U.S. 253, 268 (1967). Though some other countries' constitutions don't elevate the status of citizens as we do in the United States, "[o]ther nations are governed by their own constitutions, if any, and we can draw no support from theirs." *Id.* at 257. The Supreme Court explained the unique importance of citizenship in the United States:

[I]t is safe to assert that nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country. It would be difficult to exaggerate its value and

38

importance. By many it is regarded as the highest hope of civilized men.

*Schneiderman v. United States*, 320 U.S. 118, 122 (1943). Citizenship in

our country is fundamental because political participation

- lies at the core of our government and

- turns on citizenship.

Our political identity comes from "voluntary consent" by individuals

subject to U.S. laws. 1 Joseph Story, *Commentaries on the Constitution of

the United States* § 325 (Charles C. Little & James Brown, 2d ed. 1851). In

turn, this consent springs from the right to vote, which the Supreme Court

has regarded "as a fundamental political right, . . . preservative of all

rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *see Reynolds v.

Sims*, 377 U.S. 533, 561–62 (1964) (stating that "the right of suffrage is a

fundamental matter in a free and democratic society" and "is preservative

of other basic civil and political rights"); *see also Burdick v. Takushi*, 504

U.S. 428, 432 (1992) ("It is beyond cavil that 'voting is of the most

fundamental significance under our constitutional structure.'" (quoting *Ill.

Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979))).

In the United States, voting hinges on citizenship. *See* Richard Sobel,

*Citizenship as Foundation of Rights: Meaning for America* 154 (2016)

("Citizenship ultimately encompasses the rights and requisites to determine

the nature of society and government."). The U.S. concept of citizenship

39

originated in ancient Greece, where citizenship reflected membership in the political body: citizens were "defined by no other thing so much as" voting ("partaking in decision") and "office." Aristotle, *Politics*, bk. 3, ch. 1, (Carnes Lord trans., Univ. Chi. Press, 2d ed. 2013) (c. 350 B.C.E.). Through this ancient concept of citizenship, it remains tied to voting. Our constitution thus refers to voting as a right of citizenship. U.S. Const. amend. XV, § 1; amend. XIX; amend XXIV, § 1; amend. XXVI, § 1.

Because citizenship unlocks the fundamental right of voting, a plurality of the Supreme Court has regarded citizenship itself as a "fundamental right" beyond the control of ordinary governmental powers. *Trop v. Dulles*, 356 U.S. 86, 92–93 (1958) (plurality op.); *see also Klapprott v. United States*, 335 U.S. 601, 616 (1949) (Rutledge, J., concurring) ("To take away a man's citizenship deprives him of a right no less precious than life or liberty, indeed of one which today comprehends those rights and almost all others."). And a majority of the Court later recognized that "the very nature of our free government" prevents government officials from taking away someone's constitutional citizenship. *Afroyim*, 387 U.S. at 286. So, in my view, the fundamental nature of citizenship prevents delegation of American Samoans' citizenship to Congress or any other political body.

## V.   Even if citizenship were not a fundamental right, its application in American Samoa would be neither impracticable nor anomalous.

Even when rights aren't fundamental, they presumptively apply in unincorporated territories. *Reid v. Covert*, 354 U.S. 1, 74–75 (1957) (Harlan, J., concurring); *see also* Sean Morrison, *Foreign in a Domestic Sense: American Samoa and the Last U.S. Nationals*, 41 Hastings Const. L. Q. 71, 119 (2013) ("The presumption is that a constitutional provision does apply [in unincorporated territories] unless it is impractical or anomalous to that particular territory."). So the burden falls on those who would decline to apply a given constitutional right based on impracticability or anomalousness. *See Reid*, 354 U.S. at 74–75 (Harlan, J., concurring).

The Court has interchangeably used the terms "impracticable" and "impractical" to refer to "[p]ractical considerations." *See Boumediene v. Bush*, 553 U.S. 723, 770, 793 (2008). "Impractical" "connotes difficulty of implementation or such a substantial degree of inconvenience that it makes the likelihood of success in realizing such a right very low." Anna Su, *Speech Beyond Borders: Extraterritoriality and the First Amendment*, 67 Vand. L. Rev. 1373, 1417 (2014). So when the Supreme Court has considered the "impracticability" of applying a given right, the Court has focused on the difficulty of applying the right in a given territory. For example, the *Boumediene* Court analyzed the impracticability of applying

41

the Suspension Clause based in part on the "few practical barriers" to the exercise of habeas corpus. 553 U.S. at 770.

If it's not impracticable to implement a constitutional right in a territory, the court must do so unless it would be "anomalous." Implementing a right would be "anomalous" only if it deviates from ordinary conditions. *New Oxford American Dictionary* 64 (Oxford Univ. Press, 3d ed. 2010).

To determine whether extending citizenship to inhabitants of unincorporated territories is "impracticable and anomalous," a court must balance "the particular local setting, the practical necessities, and the possible alternatives" against the seriousness of the right. *Reid*, 354 U.S. at 75, 77–78 (Harlan, J., concurring).

## A. Citizenship for everyone born in American Samoa is neither impracticable nor anomalous.

Even if citizenship were not a fundamental right, birthright citizenship for everyone born in American Samoa would be neither impracticable nor anomalous. Even without recognition of citizenship, American Samoans already enjoy the constitutional protections of due process and *Miranda* warnings. *Balzac v. Porto Rico*, 258 U.S. 298, 312–13 (1922) (right to due process); *Am. Sam. Gov't v. Pino*, 1 Am. Samoa 3d 186, 190–92 (1997) (*Miranda* warnings).

The American Samoan government argues that U.S citizenship would be impractical because it would lead to recognition of other constitutional rights, like equal protection, that would threaten local cultural traditions. This worry lacks any legal foundation. Equal protection already applies to everyone within the United States' territorial jurisdiction regardless of whether they are citizens. *See Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (stating that the Fourteenth Amendment's equal protection clause applies universally to "all persons within the territorial jurisdiction" and "is not confined to the protection of citizens"); *see also Graham v. Richardson*, 403 U.S. 365, 371 (1971) (observing that the Fourteenth Amendment's equal protection clause encompasses both aliens and citizens). So courts have already applied the right to equal protection to American Samoans even while considering them non-citizens. *See Craddick v. Territorial Registrar*, 1 Am. Samoa 2d 10, 12 (App. Div. 1980) (stating that "the constitutional guarantees of due process and equal protection are fundamental rights which do apply in the Territory of American Samoa"); *see also Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 600 (1976) (concluding that the right to equal protection applies to the Puerto Rican government).

And there's no reason to think that citizenship would open the floodgates to other constitutional rights. If another right is asserted, the court would need to separately decide the applicability of that right in

American Samoa. This inquiry would turn not on citizenship, but on (1) whether the right is fundamental and (2) if not, whether application of the Citizenship Clause in American Samoa would be impracticable or anomalous. *See* pp. 37–42, above.

The American Samoan government argues that birthright citizenship would upend political processes that ensure self-determination. I would reject this argument for three reasons:

1.  The Citizenship Clause applies by its own terms.

2.  Judicial recognition of birthright citizenship respects American Samoa's right to self-determination.

3.  The practicality of applying a constitutional provision does not depend on elected legislators.

First, in my view, the Citizenship Clause currently applies by its own terms. *See* Part III, above. And the Citizenship Clause was meant to "put [the] question of citizenship . . . beyond the legislative power" for those to whom it applies. *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967) (quoting Cong. Globe, 39th Cong., 1st Sess. 2896 (1866) (statement of Sen. Howard)). As long as American Samoa remains a U.S. territory, citizenship is not for elected leaders to decide. That responsibility instead falls to the courts. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803) (Marshall, J.) ("To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?").

44

American Samoa can always choose independence. But while American Samoa remains joined with the United States, birthright citizenship respects the promises underlying the political union with the United States.

A substantial part of American Samoa memorialized in its cession that the United States had promised protection against "discrimination in the suffrages and political privileges between the present residents of said Islands and citizens of the United States dwelling therein." Instrument of Cession, Chiefs of Manu'a-U.S., July 14, 1904 (Ta'u, Olosega, Ofu, and Rose Islands), available at https://history.state.gov/historicaldocuments/frus1929v01/d855. To honor this promise, birthright citizenship ensures that people born in American Samoa and living elsewhere can retain autonomy by deciding whether to consent to the governing laws. *See* Part IV, above.

And the practicality of applying a constitutional amendment does not depend on the practices of elected legislators, whether they are in the U.S. Congress or the Fono, for constitutional rights do not flicker with the practices of political majorities. *See Boumediene v. Bush,* 553 U.S. 723, 765 (2008). Indeed, the Citizenship Clause was designed "to remove the right of citizenship by birth from transitory political pressures." Richard Sobel, *Citizenship as Foundation of Rights: Meaning for America* 6 (2016) (quoting Walter Dellinger, *Legislation Denying Citizenship at Birth to*

45

*Certain Children Born in the United States*, Statement before Subcomms. on Immigration and Claims and on the Constitution, 5 House Comm. on Judiciary (Dec. 13, 1995)).

Judge Lucero argues that it would be impractical to recognize birthright citizenship because of the "preference against citizenship expressed by the American Samoan people through their elected representatives." Maj. Op. at 34. In my view, the appellants have not made this argument and it lacks factual or legal support.

We have no poll or even argument about what American Samoans want. To the contrary, the American Samoan government denies "a monolithic view of citizenship among American Samoan people," claiming instead that "the American Samoan people have never achieved consensus regarding the imposition of birthright citizenship." Intervenors' Reply Br. at 9 n.1; Intervenors' Opening Br. at 26. So the American Samoan government has waived any argument that the American Samoan people oppose U.S. citizenship, and I would not consider the argument sua sponte. *See Frasier v. Evans*, 992 F.3d 1003, 1033 (10th Cir. 2021).

Second, the argument is factually unsupported, for the record says nothing about the preference of a majority in American Samoa. Despite the lack of such evidence, the American Samoan government cites a 2007 report by the American Samoa Future Political Status Study Commission. The American Samoa Future Political Status Study Commission, *Final*

46

*Report* (Jan. 2, 2007). This report states that among American Samoans who had publicly expressed their views to the Commission, "anti-citizenship attitude remain[s] strong[,] especially among the elders." *Id.* at 64. But the report also observed that "some" American Samoans residing in other parts of the United States had "recommended that American Samoa change to a political status which guarantees U.S. citizenship." *Id.* at 65. And one intervenor, the Honorable Aumua Amata, has proposed litigation to provide an expeditious route to U.S. citizenship for American Samoans. *See* H.R. 5026, 115th Cong. (2017); H.R. 1208, 116th Cong. (2019); H.R. 3482, 116th Cong. (2019).

Despite the dearth of evidence reflecting opposition to U.S. citizenship, Judge Lucero elevates the role of consent, insisting that we should confine U.S. citizenship to those who consent. Maj. Op. at 34–37. Certainly the three American Samoan plaintiffs consent to U.S. citizenship.

But Judge Lucero's focus on current consent is misguided. Our job is to interpret the Constitution regardless of the popularity of our interpretation in American Samoa, and the application of constitutional rights does not become impracticable or anomalous because of disagreement. *See Obergefell v. Hodges*, 576 U.S. 644, 677 (2015) ("The idea of the Constitution 'was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be

47

applied by the courts.'" (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S.
624, 638 (1943)). As long as America Samoa remains a U.S. territory and
the U.S. Constitution contains the Citizenship Clause, consent plays no
role in applying the Citizenship Clause under the "impracticable or
anomalous" test.

Judge Lucero acknowledges that American Samoan preferences may
change. Maj. Op. at 36 n.27. To Judge Lucero, Congress can accommodate
by granting statutory citizenship to natives of American Samoa. *Id.* Put
aside that

- Congress might not grant such a request and

- the Citizenship Clause either grants citizenship to natives of
  American Samoa or it doesn't.

By Judge Lucero's logic, every change in the popular will would
require a change in our application of the Citizenship Clause. If we rely on
the current political climate to resist application of the Citizenship Clause,
would we overrule that precedent next year if the political climate changes,
ping-ponging our interpretation with the change in political winds? I think
not. Natives of American Samoa are either born in the United States or
they're not. Because natives of American Samoa are born in the United
States, they are citizens at birth irrespective of consent.

Judge Lucero's approach is not only short-sighted but misguided
based on the fervor that spurred the creation and adoption of the

48

Citizenship Clause. Shortly before the Citizenship Clause was proposed, Congress had passed the 1866 Civil Rights Act, which extended citizenship to everyone born in the United States.

But fierce opposition worried the Republican Congress, for the law could be repealed. Ryan C. Williams, *Originalism and the Other Desegregation Decision*, 99 Va. L. Rev. 493, 578–79 (2013). Many Congressmen wanted to strip future congresses of the power to take away birthright citizenship. Eugene Gressman, *The Unhappy History of Civil Rights Legislation*, 50 Mich. L. Rev. 1323, 1328–29 (1952).

Among these congressmen was Senator Jacob Howard. On the floor of the Senate, he proposed the amendment that would ultimately become the Citizenship Clause. The amendment, he explained, was necessary to remove the issue of citizenship from the domain of legislators: "It settles the great question of citizenship and removes all doubt as to what persons are or not citizens of the United States . . . . We desired to put this question of citizenship and the rights of citizens . . . under the civil rights bill beyond the legislative power . . . ." Cong. Globe, 39th Cong., 1st Sess. 2890, 2896 (1866).

The Supreme Court relied in part on this intention in *Afroyim v. Rusk*, 387 U.S. 253 (1967). There the issue was whether Congress's oversight of foreign affairs could affect someone's constitutional right to citizenship. *Id.* at 254–56. The issue arose because (1) Congress had

49

forbidden U.S. citizens from voting in a foreign election and (2) a U.S. citizen had voted in an Israeli election. *Id.* at 254. The Court recognized Congress's province over foreign affairs. *Id.* at 256. But this right did not override the clear import of the Citizenship Clause. To interpret this clause, the Court considered its origins, recognizing that Senator Howard had proposed the constitutional language in order to remove citizenship from the legislative realm. *Id.* at 262–63.

The American Samoan government downplays *Afroyim* and the history of the Citizenship Clause, pointing out that here we are addressing recognition of citizenship in the first instance rather than a political choice to strip individuals of their citizenship. This is a distinction without a difference. The Supreme Court reasoned that Congress had adopted the Citizenship Clause to divest legislatures of power over someone's citizenship. *Id.*

In elevating citizenship beyond legislative influence, the drafters and ratifiers of the Fourteenth Amendment recognized that some rights should not be subject to political preferences: "The very nature of our free government makes it completely incongruous to have a rule of law under which a group of citizens temporarily in office can deprive another group of citizens of their citizenship." *Id.* at 268.

From 1866 to 1868, many would have preferred to remove the constitutional recognition of citizenship for the recently freed slaves. But

that preference didn't rule the day because citizenship wasn't subject to a popularity contest. Irrespective of who we think best suited to decide who are citizens, the Citizenship Clause and the Supreme Court have vested that decision in us, not the political leadership in American Samoa.

Regardless of whether we want that responsibility, the Citizenship Clause entitles the American Samoan people to citizenship. The opposition of the American Samoan government does not, and cannot, affect the applicability of the Citizenship Clause to the natives of American Samoa. Irrespective of that opposition, application of the Citizenship Clause to all of American Samoa would be neither impracticable nor anomalous.

**B.    Citizenship for the plaintiffs, who were born in American Samoa and now reside in Utah, is neither impracticable nor anomalous.**

To determine the impracticability or anomaly of applying a constitutional right, we must consider the application in the particular case rather than in a vacuum. In *Reid v. Covert*, for example, Justice Harlan did not "agree with the sweeping proposition that a full Article III trial, with indictment and trial by jury, is required in every case for the trial of a civilian dependent of a serviceman overseas." 354 U.S. 1, 75 (1957) (Harlan, J., concurring). He instead concluded only that the petitioners should obtain a jury trial "on [the] narrow ground" that they were standing trial for a capital offense "on pain of life itself." *Id.* at 77–78. So we must decide only whether application of the Citizenship Clause would be

51

impracticable or anomalous for the three individual plaintiffs. All were born in American Samoa, but reside now in Utah.

Would it be impracticable to treat them as citizens only because they moved to Utah (or any other State or incorporated territory)? In *Reid*, Justice Harlan limited the right to a jury trial to capital defendants because they had the most to gain. 354 U.S. at 74–78 (Harlan, J., concurring). Similarly, an injunction for the three individual plaintiffs would allow them to vote, serve on juries, and run for state office. *See* Part I & n.1, above; n.12, below.

Citizenship wouldn't impair the individual plaintiffs' ability to follow the cultural traditions of American Samoa, for these plaintiffs do not live on communal land or vote for members of the Fono. *See* Am. Samoa Const. art. II § 7 (providing that only residents of American Samoa may vote for its legislature); 48 U.S.C. § 1732(a) (providing that American Samoa's delegate to Congress "shall be elected by the people qualified to vote for [its] popularly elected officials"). So U.S. citizenship is uniquely practicable for the individual plaintiffs here, just as a jury trial was uniquely practicable for the plaintiffs in *Reid.*

And if the plaintiffs ultimately return to American Samoa, it would be no more impracticable to recognize their continued U.S. citizenship than

52

it would be to recognize U.S. citizenship for natives of a state who have moved to American Samoa.[12]

## VI. Applying the Citizenship Clause would create a circuit split, but the other circuits' contrary opinions are wrongly decided.

Circuit courts have had six occasions to consider application of the Citizenship Clause to an unincorporated territory. *Tuaua v. United States*, 788 F.3d 300, 302–06 (D.C. Cir. 2015); *Thomas v. Lynch*, 796 F.3d 535, 542 (5th Cir. 2015); *Nolos v. Holder*, 611 F.3d 279, 284 (5th Cir. 2010); *Lacap v. I.N.S.*, 138 F.3d 518, 519 (3d Cir. 1998); *Valmonte v. I.N.S.*, 136 F.3d 914, 920 (2d Cir. 1998); *Rabang v. I.N.S.*, 35 F.3d 1449, 1452 (9th Cir. 1994). One of these cases (*Tuaua*) involved American Samoa; four involved the Philippines; and one (*Thomas*) involved a U.S. military base in Germany. On each occasion, the circuit court held that the Citizenship Clause does not apply to the territory. In light of these holdings, we should exercise caution before creating a circuit split. *United States v. Thomas*, 939 F.3d 1121, 1130–31 (10th Cir. 2019). Despite this caution, we must

---

[12]     Though I would affirm because American Samoans are U.S. citizens, I would instruct the district court to narrow its injunction. The injunction currently extends to anyone born in American Samoa. I would direct the district court to modify the injunction so that it applies only to the three individual plaintiffs. *See* n.1, above.

interpret the Constitution correctly when convinced that other circuit courts haven't. In my view, that is the case here.

For American Samoa, the D.C. Circuit Court of Appeals held that the Citizenship Clause does not apply, reasoning that it would be anomalous to recognize citizenship for American Samoans in the face of disapproval from their elected leadership. *Tuaua*, 788 F.3d at 309–12. But this rationale confuses the case law.[13] Courts consider the anomaly of applying a given constitutional right in an unincorporated territory, not the anomaly of recognizing constitutional rights for residents when the elected leadership opposes recognition of these rights. *See* Part V(A), above.

## VII. Conclusion

A U.S. territory, like American Samoa, is "in the United States." So the Citizenship Clause unambiguously covers individuals born in American

---

[13]    The Citizenship Clause applies by its own terms to U.S. territories, including American Samoa, so the Citizenship Clause's application is not for legislatures to decide. *See* Part III, above.

The other circuits make the same mistake, interpreting the Citizenship Clause not on its own terms but instead through the lens of *Downes*'s interpretation of the Tax Uniformity Clause. *See Thomas*, 796 F.3d at 539–42; *Nolos*, 611 F.3d at 282–84; *Lacap*, 138 F.3d at 519; *Valmonte*, 136 F.3d at 918–19, *Rabang*, 35 F.3d at 1452–53. Four of these cases (*Nolos*, *Lacap*, *Valmonte*, and *Rabang*) are even less useful because they concern the Philippines, which had only a temporary relationship with the United States. *See Boumediene v. Bush*, 553 U.S. 723, 757–58, 768–69 (2008) (distinguishing the *Insular Cases* because they concerned regions where the United States had "not intend[ed] to govern indefinitely").

Samoa. From colonial days, Americans understood that citizenship extended to everyone within the sovereign's dominion. So those in territories like American Samoa enjoy birthright citizenship, just like anyone else born in our country. The plaintiffs are thus U.S. citizens, and I would affirm.